**Martha SANDOVAL, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**L.N. HAGAN, in his official capacity as the Director of the Alabama Department of Public Safety, and the Alabama Department of Public Safety, Defendants.**

**No. Civ.A. 96–D–1875–N.**

United States District Court, M.D. Alabama, Northern Division.

June 3, 1998.

As Corrected June 5, 1998.

---

7. Leon Hoffman, in his individual capacity was not a party to the contract at issue.

J. Richard Cohen, Rhonda Brownstein, Marcia Bull Stadeker, Ellen M. Bowden, Mary Beth Schultz, Southern Poverty Law Center, Montgomery, AL, Shannon L. Holliday, Alabama Civil Liberties Union, Montgomery, AL, Edward M. Chen, American Civil Liberties Union, Foundation of Northern California, Inc., San Francisco, CA, Christopher Ho, San Francisco, CA, for Martha Sandoval.

Robert E. Morrow, Dept. of Public Safety Legal Unit, Montgomery, AL, John J. Park, Jr., Office of Atty. Gen., Montgomery, AL, for L.N. Hagan, Alabama Department of Public Safety.

**MEMORANDUM OPINION, JUDGMENT, DECLARATION, ORDER AND PERMANENT INJUNCTION**

TABLE OF CONTENTS

I. INTRODUCTION ............................................. 1242

II. STANDARD OF REVIEW FOR BENCH TRIALS, AND THE GRANTING OF PERMANENT INJUNCTIVE RELIEF .............................. 1245

A. Bench Trials ............................................. 1245

B. Permanent Injunctive Relief ............................... 1245

III. DISCUSSION ............................................... 1246

A. Motion For Leave To Amend The Complaint ................. 1246

B. Application Of Title VI .................................... 1247

1. The Department is a recipient of federal funds within the meaning of Title VI ..................................... 1249

2. The regulations enacted pursuant to Title VI (§ 2000d–1) allow for a private right of action ............................ 1251

3. Plaintiffs have the requisite standing to bring suit .......... 1265

4. The Eleventh Amendment does not bar Plaintiffs' suit ....... 1268

C. Findings Of Fact And Conclusions Of Law .................. 1277

1. Legal Framework ...................................... 1277

2. Plaintiffs have established by a preponderance of the evidence that they are members of a class protected by the statute and that Defendants have promulgated a facially neutral practice that has a disproportionate adverse effect ..................................1278

 a. Plaintiffs are members of a class protected by the statute .........1278

 b. The Defendants have promulgated a facially neutral practice that has a disproportionate adverse effect .....................1283

 i. Implementation and review of the Department's English–Only Policy .........................................1284

 ii. The Department's accommodation of English speaking applicants .........................................1287

 iii. Impact of the Department's English–Only Policy ...........1291

3. The Defendants have not proven that there exists a "substantial legitimate justification" for the English–Only Policy in order to avoid liability. Alternatively, if the Defendants have met this burden, the Plaintiffs have offered comparably effective alternative practices which result in less disproportionality ...............1298

 a. The English–Only Policy is not required by Amendment 509....1298

 b. The Defendants have offered no proof that resident non-English speakers are a greater safety risk on Alabama highways than English speakers ............................1300

 c. The Defendants' arguments regarding the administration and application of foreign language examinations are unpersuasive .............................................1302

 i. Examination administration ............................1303

 ii. Examination integrity.................................1306

 d. Congress has never declared English to be the official language of the United States, consequently the Department's English–Only Policy is not a reflection of national policy, and, even if it were, does not justify the Policy ...............1308

 e. The Defendants' fiscal arguments fail ........................1311

IV. CONCLUSION, JUDGMENT, AND DECLARATION .......................1313

V. ORDER...........................................................1315

DE MENT, District Judge.

## I. INTRODUCTION [1]

Like forty-eight other states and the District of Columbia, the State of Alabama has historically administered the written portion of its Class D driver's license examination in a multitude of foreign languages. From at least the 1970's until 1991, Alabama's Department of Public Safety (the "Department") administered thousands of written examinations in at least fourteen languages other than English. Former Alabama State

---

**1.** Citations for quotations in the Introduction portion of this Memorandum Opinion are provid-ed in the court's Discussion section, Part III, below.

Trooper, Lieutenant Colonel Harold Hammond, Chief of the Department's Driver's License Division from 1978 to 1987 and second-in-command of the entire Department from 1987 to 1991, testified that there were no significant problems in administering the examination. There was no evidence that non-English speakers were more likely to cheat. Translations of the English examination were obtained at no cost to the Department. There was no evidence that non-English speakers posed a greater safety risk or had more accidents than other motorists. Although some examiners complained that foreign language examinations were time consuming, the Department provided, and still provides, special accommodations to handicapped applicants, to illiterate applicants by administering oral or audio-taped examinations, and to deaf applicants by administering Sign Language videotaped examinations. Colonel Hammond never considered curtailing or ending foreign language examinations and in fact expanded the program whenever demand was great enough. When asked if he knew of any reason why the State should not continue providing foreign language examinations, he answered "no."

In 1990, the Alabama legislature ratified Amendment 509 to the Alabama Constitution. The Amendment designates English as the "official language of the State of Alabama" and requires state officials to take "all steps necessary to ensure that the role of English as the common language of the state of Alabama is preserved and enhanced." Approximately one year later, because of Amendment 509, the Department adopted its "English–Only Policy," requiring all portions of the examination process, including the written examination, to be administered in English only. Interpreters, translation dictionaries and other interpretive aids were officially forbidden. In practice, however, many of the Driver's License Divisions's branch offices still allow applicants to utilize interpreters for some portions of the examination process, and routinely allow the use of translation dictionaries for the written examination. In addition, the evidence before the court shows that Alabama provides special accommodations during the driver's examination process for illiterate applicants, and

handicapped applicants, including those that are deaf. Alabama also permits non-English speaking drivers from other states and foreign countries to drive in Alabama if they have a valid license, and, upon moving to Alabama, allows these driver's to exchange their out-of-state license for an Alabama license without requiring them to take the Department's driving examination. Despite providing special accommodations for all of these categories of drivers, Alabama provides no accommodations for its non-English speaking residents.

Eight months after the implementation of the Department's English-only policy, the Department requested an opinion from Alabama's Attorney General regarding "whether Amendment No. 509 ... prohibits the Department from giving driver license tests in any language other than English." Although the request was signed by the Director of the Department, it was actually written by Mr. Jack Curtis, the Department's General Counsel and an Assistant Attorney General. When the Attorney General's office received the request for an opinion, the project was assigned to Mr. Curtis. In other words, Mr. Curtis, in his capacities as an Assistant Attorney General and General Counsel of the Department, both drafted the request for an opinion and wrote the Opinion itself.

The Attorney General concluded that Amendment 509 required all applicants for driver's licenses to take the examination in English. Although the Attorney General's Opinion acknowledged that the Department's English–Only Policy "might be a violation of Title VI of the Civil Rights Act of 1964, or the Equal Protection Clause of the Fourteenth Amendment, consideration of safety and integrity of the licensing process would, [in the words of the Opinion], support a requirement that driver licensing examinations be given in English ." "Safety and integrity" were provided as rationales for the policy without there being *any* evidence that non-English speakers were a higher safety risk or that non-English speakers compromised examination integrity more than English speakers.

High ranking officials within the Attorney General's office disagreed with the Opinion,

noting that Alabama utilizes "international highway signs and shapes. Therefore safety is not such an issue.... Some accommodation needs to be made." Another high ranking official said of the policy—"it is dumb." Nevertheless, the Attorney General signed the Opinion.

This action was initiated on December 31, 1996, when the Plaintiff, Martha Sandoval, filed a class action Complaint seeking relief from Alabama's practice of administering its driver's license examination in English only. Both the Alabama Department Of Public Safety and L.N. Hagan, in his official capacity as the Director of the Department, were named as Defendants. Ms. Sandoval contends that "[t]he defendants' refusal to administer the examination in languages other than English or to allow for the use of translators or interpretive aids discriminates against the plaintiff and others similarly situated on the basis of national origin." (Pls.' Compl. at 1.) Ms. Sandoval's Complaint was brought pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, et seq.), and its implementing regulations. She seeks a declaration that Alabama's English–Only driver's license rules are unconstitutional and unlawful, as well as a permanent injunction requiring the Defendants, and all those acting in concert with them, to cease their allegedly unconstitutional and unlawful practices.[2]

On May 6, 1997, Ms. Sandoval filed a Motion For Class Certification, which the Magistrate Judge recommended be granted on September 3, 1997. No objections were filed to the Magistrate Judge's Recommendation, and in an October 17, 1997 Order, the court adopted the Recommendation, and granted Plaintiffs' Motion For Class Certification. Ms. Sandoval was certified as the representative of "the class of all legal residents of the State of Alabama who are otherwise qualified to obtain a Class D private vehicle driver's license but cannot do so because they are not sufficiently fluent in English."

On October 24, 1997, the Defendants filed a Motion For Summary Judgment ("Defs.'

Mot.") and a Memorandum In Support thereof ("Defs.' Mem."). Plaintiffs filed their Opposition To Defendants' Motion For Summary Judgment ("Pls.' Opp'n") on November 25, 1997, to which Defendants filed a Reply ("Defs.' Reply") on December 5, 1997. On December 24, 1997, Plaintiffs filed a Supplement to their Opposition to Defendants' Motion For Summary Judgment ("Pls.' Supp."), to which Defendants filed a Response ("Defs.' Resp.") on January 6, 1998. On February 9, 1998, the Plaintiffs filed their Supplemental Authority Concerning Defendants' Motion For Summary Judgment ("Pls.' Supp.Auth."). On February 11, 1998, the Parties filed joint Pretrial Stipulations ("Joint Stip.").

On February 12, 1998, the court issued its Order On Pretrial Hearing. On the same date, the court issued an Order denying Defendants' Motion For Summary Judgment, but stressed that the denial was "not on the substantive merits of said motion; rather, the court finds that the issues raised are more amenable to disposition after a full legal and factual exploration at trial."

Trial commenced on February 17, 1998. Plaintiffs filed a Supplement To The Record ("Pls.' Supp. To Record") and their Post–Trial Brief ("Pls.' Post–Tr.Br.") on February 24, 1998. Defendants filed a Supplement To The Record ("Defs.' Supp. To Record") and their Post–Trial Brief ("Defs.' Post–Tr.Br.") on February 27, 1998. On March 5, 1998, Plaintiffs filed their Supplemental Post–Trial Brief ("Pls.' Supp. Post–Tr.Br."), to which Defendants filed a Reply ("Defs.' Reply To Pls.' Supp. Post–Tr.Br.") on March 6, 1998. On March 13, 1998, the Defendants filed Additional Authority And Brief Argument Based Thereon ("Defs.' Add. Auth."), to which Plaintiffs filed a Response ("Pls.' Resp. To Defs.' Add. Auth.") on March 23, 1998.

Finally, on March 5, 1998, the Plaintiffs filed a Motion For Leave To Amend The Complaint By Adding A Party ("Pls.' Mot. For Leave To Amend"). Defendants' March 6, 1998 Reply To Plaintiffs' Supplemental

---

**2.** The court properly exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. § 2000d–7 (Title VI). The Parties do not contest personal jurisdiction or venue.

Post–Trial Brief also addressed Plaintiffs' Motion For Leave To Amend.

Both at the conclusion of Plaintiffs' case-in-chief, and at the close of trial, the Defendants' moved for a judgment as a matter of law. The court took these motions under advisement, and now issues this Memorandum Opinion.[3] After a careful and thorough review of the arguments of counsel, relevant law, the trial of this matter, and the record as a whole, the court finds that for the reasons set forth below, Plaintiffs' Motion For Leave To Amend is due to be granted and that Plaintiffs should prevail on their Title VI disparate impact claim and are thus entitled to their requested relief.[4] The court will enter the appropriate judgment and declaration, will permanently enjoin enforcement of the Department's English–Only Policy, and will direct the Defendants, in conjunction with the Plaintiffs, to formulate revised policies and practices for foreign language examinations that comply with the requirements of Title VI of the Civil Rights Act of 1964.

## II. STANDARD OF REVIEW FOR BENCH TRIALS, AND THE GRANTING OF PERMANENT INJUNCTIVE RELIEF [5]

### A. Bench Trials

■ The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury. *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir.1994). That is, a plaintiff bears the burden of satisfying the finder of fact that he or she has proven every element of his or her claim by a preponderance of the evidence. A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and

demonstrates that what is sought to be proved "is more likely true than not true." *See Pattern Jury Instructions*, Basic Instruction No. 6.1, U.S. Eleventh Circuit District Judges Association (Civil Cases) (1990).

■ In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir.1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

■ Moreover, "a trial judge sitting without a jury is entitled to even greater latitude concerning the admission or exclusion of evidence." *Goodman v. Highlands Ins. Co.*, 607 F.2d 665, 668 (5th Cir.1979) (citing *Wright v. Southwest Bank*, 554 F.2d 661 (5th Cir. 1977));[6] *see also Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 776 n. 5 (11th Cir.1982) (stating that the court has "broad discretion over the admission of evidence in a bench trial"). Of course, these criteria are applied in the legal context of Title VI.

### B. Permanent Injunctive Relief

Rule 65(d) of the Federal Rules of Civil Procedure provides for injunctive relief. Fed.R.Civ.P. 65(d). "Every order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those per-

---

3. The court will utilize all substantive pleadings submitted throughout this action as well as the evidence adduced at trial in formulating its findings of fact and conclusions of law.

4. At trial, the court granted the Defendants' motion for judgment as a matter of law on Plaintiffs' intentional discrimination claims. This Memorandum Opinion addresses Plaintiffs' contention that Defendants' actions violate regulations enacted pursuant to Title VI of the Civil Rights Act of 1964. Because the court finds that Plaintiffs are entitled to their requested relief, the court finds that Defendants' motion for judgment as a

matter of law on Plaintiffs' Title VI claim is due to be denied.

5. The legal elements and standard of review utilized in addressing Plaintiffs' Motion For Leave To Amend and Title VI claims will be outlined in Sections III(A), III(B), and III(C)(1) of this Memorandum Opinion.

6. Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

sons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." *Id.*

 In assessing whether permanent injunctive relief is warranted, the court must determine whether the Plaintiffs have satisfied the following three criteria: (1) violation of the applicable statute or regulatory authority by the Defendants; (2) continuing irreparable injury to the Plaintiffs in the absence of an injunction; and (3) lack of an adequate remedy at law. *See Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983); *Sierra Club v. U.S. Army Corps of Engineers,* 935 F.Supp. 1556, 1571–72 (S.D.Ala.1996). If warranted, the scope of injunctive relief should be tailored to address the specific violations of law by the Defendants. *See, e.g., Madsen v. Women's Health Ctr.,* 512 U.S. 753, 762, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1995); *cf. McKusick v. City of Melbourne, Fla.,* 96 F.3d 478, 484 n. 5 (11th Cir.1996).

## III. DISCUSSION

### A. Motion For Leave To Amend The Complaint

Plaintiffs' March 5, 1998 Motion For Leave To Amend The Complaint By Adding A Third Party seeks to add Defendant Hagan, in his official capacity, as a Defendant for purposes of Plaintiffs' Title VI claim. (Pls.' Mot. For Leave To Amend at 1.) Plaintiffs' argue that:

> In light of the Defendants' assertion of an Eleventh Amendment defense—a defense that they raised for the first time at trial— Director Hagan should be added as a defendant in his official capacity for purposes of the Title VI claim as well.
>
> . . .
>
> Because Director Hagan has always been a defendant in this case for purposes of the § 1983 and § 1981 claims, neither he nor the Department of Public Safety will suffer any prejudice from adding him as a defendant for purposes of the Title VI

claim. Indeed, it would be inequitable to deny the Plaintiffs leave to add him at this stage of the litigation. In their answer, the Defendants did not claim that the Eleventh Amendment barred an action seeking prospective relief under Title VI and its disparate impact regulations.... Nor did the Defendants raise the Eleventh Amendment issue they now seek to litigate in their statement of contentions in the Order on Pretrial Hearing.... Although the Defendants' failure to raise the issue earlier does not bar them from doing so now ... it would be unjust to preclude the Plaintiffs from making what amounts to a technical change in the complaint in light of the Defendants' delay.

(Pls.' Mot. For Leave to Amend at 1–2.)

Defendants respond by asserting, essentially, that Plaintiffs' proposed amendment would be futile because the Eleventh Amendment bars Plaintiffs' Title VI claims.[7] (Defs.' Reply To Pls.' Post–Tr.Br. at 1–3.) Defendants argue that:

> the amendment is designed to cure a perceived jurisdictional defect, and, if allowed, will result in prejudice to the State. Contrary to Plaintiffs' contention, the change is not merely "technical." Rather, the Eleventh Amendment is and has been jurisdictional. It could have been invoked as a defense to the injunctive claims at any time, even on appeal.

(*Id.* at 3, ¶ 4.)

 The decision to grant leave to amend a complaint is within the sole discretion of the district court. Fed.R.Civ.P. 15. Rule 15(a) of the Federal Rules of Civil Procedure, however, limits the court's discretion by mandating that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *see also Halliburton & Associates v. Henderson, Few & Co.,* 774 F.2d 441 (11th Cir.1985). Therefore, there must be a substantial reason to deny a motion to amend. *Id.* Substantial reasons justifying a denial include "undue delay, bad faith, dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the

---

7. The Eleventh Amendment provides that:
 The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

 U.S. Const. amend XI.

amendment, [and] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

■ In this action, Plaintiffs' seek to amend their Complaint to add Director Hagan, in his official capacity, for purposes of Plaintiffs' Title VI claim. After a thorough review of the arguments of counsel and the record as a whole, the court finds that there has been no "undue delay, bad faith, [or] dilatory motive on the part of the movant." *Id.* Plaintiffs' Motion was filed in response to Defendants' recently filed Eleventh Amendment assertions. Further, the court finds that by allowing the amendment, neither Director Hagan, nor the Department will be unduly prejudiced. Director Hagan is already a named Defendant for purposes of Plaintiffs' § 1981 and § 1983 claims and has had ample notice of this action. The court also finds that although Defendants correctly assert that the Eleventh Amendment issue is jurisdictional, in this action, it does not operate to bar Plaintiffs' Title VI claims. Plaintiffs' proposed amendment only subjects Director Hagan to the possibility of injunctive relief in his official capacity as Director of the Department of Transportation.

■ Finally, the court finds that Plaintiffs' amendment will not be futile. It is clear that "[the] Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief." *Lassiter v. Alabama A & M Univ.*, 3 F.3d 1482, 1485 (11th Cir.1993); *see also Wu v.*

*Thomas*, 863 F.2d 1543, 1549–50 (11th Cir. 1989), *reh'g and reh'g en banc denied* March 8, 1989 ("The eleventh amendment does not ... bar suits for equitable relief against state officers in their official capacity...."); *see further Cross v. State of Alabama, State Department of Mental Health & Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir.1995) (noting same). As fully addressed below, the well defined exception to *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), (allowing federal courts to enjoin state officials from conduct violating federal law), applies in this action.[8]

Additionally, as Plaintiffs note, Rule 21 of the Federal Rules of Civil Procedure allows for any party to be "dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed. R.Civ.P. 21. Here, the court finds that adding Director Hagan in his official capacity meets the interests of justice by curing any perceived or actual jurisdictional defect, thus meeting the remedial goals of Plaintiffs' suit.

Based on the foregoing, the court finds that Plaintiffs' Motion For Leave To Amend Complaint seeking to add Director Hagan, in his official capacity, as a Defendant for the purposes of Plaintiffs' Title VI claim, is due to be granted.

**B. Application Of Title VI**

Title VI of the Civil Rights Act of 1964 is an exercise of Congress' Spending Clause

---

8. The court also rejects the Department's contention that *Floyd v. Waiters*, 133 F.3d 786 (11th Cir.1998) prohibits adding Hagan as a Party–Defendant to this action. (*See* Defs.' Mot. For Leave To Submit Add. Auth. at 3–4.) In *Floyd*, two students sued a school district and several school officials for alleged sexual harassment by a school security guard. *Floyd*, 133 F.3d at 788–89. The Eleventh Circuit found that *assuming* the superintendent and school board were *not* put on notice of the harassment, "the power to bring *monetary liability* onto the [recipient of federal funds under Title IX did not] extend beyond the superintendent and school board to lower employees." *Id.* at 792 (emphasis added) ("If [after being put on notice] the superintendent or school board then does nothing, the school district can be liable"). It is sufficient for the court to note that in this action, Plaintiffs are not complaining of discriminatory conduct by one "lower employee," but are seeking the cessation of an allegedly discriminatory policy institut-

ed by the Department headed by Hagan. And, Plaintiffs here are only seeking injunctive relief against the Department and Hagan, in his official capacity, not monetary damages against the Department or Hagan as an individual.

Accordingly, nor does the court find merit in Defendants' reliance on the *Floyd* court's statement that "because the contracting party is the grant-receiving local school district, a 'Title IX claim can only be brought against a grant recipient [—that is, a local school district—] and not an individual.' *Smith v. Metro. Sch. Dist. Perry Township*, 128 F.3d 1014, 1019 (7th Cir.1997); *see also Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1012–13 (5th Cir.1996)." *Id.* at 789. As Plaintiffs note, the portion of the *Smith* case quoted by the *Floyd* court pertained to individual capacity liability, not official capacity liability for claims seeking injunctive relief only. *See Smith*, 128 F.3d at 1020–21; *see also* Pls.' Resp. To Defs.' March 13 Submission at 5.

power[9] and prohibits discrimination on the basis of "race, color or national origin . . . under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.[10] As will be explored below, the statute has been amended twice. First, in the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. § 2000d–7, Congress abrogated the States' Eleventh Amendment immunity under Title VI. Then, Congress passed the Civil Rights Restoration Act of 1987, Pub.L. 100–259, 102 Stat. 28, broadening the coverage of the anti-discrimination provisions of Title VI.

▮▮▮▮ Title VI itself bars only intentional discrimination. *Alexander v. Choate*, 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Guardians Assn. v. Civil Service Comm'n of City of New York*, 463 U.S. 582, 607–08, 612, 634, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). However, federal Departments and Agencies have promulgated rules and regulations, pursuant to Title VI, prohibiting practices leading to an unjustified disparate impact. 42 U.S.C. § 2000d–1 provides for the implementation of rules and regulations in furtherance of the express provisions and purposes of Title VI:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract . . . is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.

42 U.S.C. § 2000d–1. The Supreme Court has held that the regulations promulgated pursuant to Title VI may validly proscribe actions having a disparate impact on protected groups even if those actions are not intentionally discriminatory. *Alexander*, 469 U.S. at 292–94, 105 S.Ct. 712; *see also Elston v. Talladega County Board of Education*, 997 F.2d 1394, 1406 (11th Cir.1993); *Georgia State Conference of Branches of NAACP v. State of Georgia*, 775 F.2d 1403, 1417 (11th Cir.1985). In other words, the promulgation of regulations incorporating a disparate impact standard is a valid exercise of agency authority.[11] *See Alexander*, 469 U.S. at 292–

**9.** *See Guardians Assoc. v. Civil Service Comm'n of City of New York*, 463 U.S. 582, 598–99, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Lau v. Nichols*, 414 U.S. 563, 568–69, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Davis v. Monroe County Board of Education*, 120 F.3d 1390, 1398 (11th Cir.1997) ("In [*Guardians*], at least six members of the Supreme Court agreed that Title VI was enacted under the Spending Clause"), *id.* at 1399 (finding "Title IX, like Title VI, was enacted under Congress' power to spend for the general welfare of the United States"). *See also* U.S. Const., art. I, § 8, cl. 1 ("The Congress shall have the Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States . . .").

**10.** 42 U.S.C. § 2000d provides in full:
 **Prohibition against exclusion from participation in, denial of benefits of, and discrimination under Federally assisted programs on ground of race, color, or national origin.** No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**11.** The court also notes that "when Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *ABF Freight System, Inc. v. National Labor Relations Board*, 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also Environmental Defense Fund, Inc. v. Costle*, 636 F.2d 1229, 1257 (D.C.Cir. 1980) ("Deference to the agency's interpretation is particularly appropriate where, as here, the statute specifically requires the agency to develop implementing regulations."). In fact, "the validity of a regulation promulgated under a general authorization provision such as § 602 of Tit. VI [§ 2000d–1] 'will be sustained so long as it is reasonably related to the purposes of the enabling legislation.'" *Lau v. Nichols*, 414 U.S. 563, 571, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (White, J., concurring) (citing *Thorpe v. Housing Auth. of the City of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)).

The court finds that the disparate impact regulations at issue here are reasonably related to the purposes of the enabling legislation, and are neither arbitrary, capricious, nor manifestly contrary to the statute.

94, 105 S.Ct. 712. As explained by Justice Marshall in *Alexander:*

> [*Guardians* ] held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI.... In essence, then, we held [in *Guardians* ] that Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts.

469 U.S. at 293–94, 105 S.Ct. 712. *See also New York Urban League, Inc. v. State of New York,* 71 F.3d 1031, 1036 (2d Cir.1995) ("Title VI delegated to federal agencies the authority to promulgate regulations incorporating a disparate impact standard"). Plaintiffs' claims in this lawsuit are brought solely pursuant to disparate impact regulations enacted pursuant to § 2000d–1, and not the text of Title VI itself (§ 2000d).

This suit raises many interesting questions of law and fact, including whether discrimination on the basis of language can lead to an unjustified disparate impact in violation of Title VI: Plaintiffs argue that in this case, discrimination based on language results in an unjustified disparate impact on the basis of national origin. Before addressing that question, however, the threshold issues for the court's resolution are: (1) whether the Department is subject to the provisions of Title VI as a recipient of federal funds; [12] (2) if so, whether the regulations enacted pursuant to Title VI (§ 2000d–1) allow for private rights of action; (3) if so, whether the Plaintiffs at bar have the requisite standing to bring this action; and finally (4) whether the Eleventh Amendment bars Plaintiffs' suit.

As discussed below, the court finds that: (1) the Department is a recipient of federal funds within the meaning of Title VI; (2) the regulations enacted pursuant to Title VI allow for private rights of action; (3) Plaintiffs have the requisite standing to bring suit; and (4) the Eleventh Amendment does not bar Plaintiffs' claims. Having so found, the court then turns to the consideration and analysis of the Department's English–Only policy, ultimately concluding that it violates disparate impact regulations enacted pursuant to § 2000d–1.

### 1. The Department is a recipient of federal funds within the meaning of Title VI

■ Defendants concede that the Department receives millions of dollars in federal funds every year.[13] Accordingly, the court finds—based on Defendants stipulation at

---

**12.** In other words, are any federal funds being transferred via grant, loan or contract to a state program or activity? *See* 42 U.S.C. § 2000d.

**13.** Defendants so stipulated at trial. *See also,* Pls.' Trial Ex. 24 (Department of Public Safety's 1997–1998 Operations Plan indicating receipt of several million dollars in federal funds); *Id.,* Ex. 25 (Department's Federal Grant's Summary for October 1, 1995 through September 30, 1996); *Id.,* Ex. 26 (July 1995 grant agreement between the Federal Department of Transportation's Federal Highway Administration and the Department); *Id.,* Ex. 27 (1996 Department application for federal grant); Defs.' Mem. at 11; Defs.' Mem., Ex. I; Defs.' Reply at 14 (admitting that the Department receives federal grants).

In the 1995–1996 fiscal year, the Department received approximately $3.5 million in federal funds through several federal grants. *See* Ex. 26 (Public Safety Federal Grant Summary). In the 1997–1998 fiscal year, the Department expects to receive an even greater amount. *See* Ex. 24 (DPS Budget). Most of this federal grant money comes from the Department of Transportation and the Department of Justice. (*See* Defs.' Tr. Stip.; Pls.' Opp'n, Footnote 30.)

A recipient of federal financial assistance, such as the Department, may not "[p]rovide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program" on the basis of race, color, or national origin. *See* 49 C.F.R. § 21.5(b)(1)(ii) (1997). The complementary disparate impact provision states that:

> A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of person to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of persons to be afforded an opportunity to participate in any such program; may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin.

trial and the evidence in the record—that the Alabama Department of Public Safety, which administers Alabama's driver's license examinations, is the recipient of federal funds within the meaning of Title VI. *See* 42 U.S.C. § 2000d–4a(1)(A).

While Defendants concede that the Department receives federal funds, they argue that "it is not appropriate to hold the Department and Hagan liable where none of the grant funds received are applied to Class D driver's licenses." (Defs.' Post–Tr.Br. at 17; *see also* Defs.' Mem. at 11–13; Defs.' Reply at 14.) In other words, Defendants contend that because none of the federal funds go specifically to the Department's Driver's Licensing Division, the "program or activity" language of Title VI is not implicated.

42 U.S.C. § 2000d–4a, defines "program or activity" and "program" as follows:

> For the purposes of this subchapter, the term "program or activity" and the term "program" mean *all* of the operations of—
>
> **(1)(A)** a department, agency ... or other instrumentality of a State ...; *or*
>
> **(B)** the entity of such State ... government that distributes such assistance and each such department or agency (and each other State ... government entity) to which the assistance is extended, in the case of assistance to a State ... government;
>
> ... [*or*]
>
> **(4)** any other entity which is established by two or more of the entities described in paragraph (1) ...; *any* part of which is extended Federal financial assistance.

42 U.S.C. § 2000d–4a (italics added, bold in original).

It seems clear, based on the language of § 2000d–4a alone, that Defendants' argument that Plaintiffs cannot assert a viable Title VI claim because no federal money directly benefits applicants for Class D driver's licenses is erroneous, as is Defendants' contention that "if Congress or a federal agency wanted

Alabama to establish a foreign-language examination program, Congress should ... make a specific grant." (Defs.' Reply at 15.) "Program or activity" means "all" of the operations of a state department or agency, not just the specific program or activity receiving federal funds. 42 U.S.C. § 2000d–4a. An examination of the legislative history behind § 2000d–4a bolsters this conclusion.

Prior to the Civil Rights Restoration Act of 1987, the term "program or activity" was not defined by Congress. In 1984, the Supreme Court held in *Grove City v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), that Title VI liability was only established when the plaintiff could show discrimination in a particular program or activity that specifically received federal funds. *Id.* at 575–76, 104 S.Ct. 1211. Only those programs or activities receiving federal funds were subject to Title VI's prohibitions. So, for example, if a state Department of Public Safety restricted the use of federal funds to its Driver's License Division's "Problem Driver Pointer System," only that program would be subject to Title VI's regulations. The other non-federally funded programs run by the Driver's License Division would not be subject to Title VI. This, essentially, is Defendants' argument. (Defs.' Reply at 14; Defs.' Mem. at 11.)

Congress disagreed with the Supreme Court's narrow construction of "program or activity" and amended Title VI, over President Reagan's veto, by passage of the Civil Rights Restoration Act of 1987. (P.L. 100–259, codified in part as 42 U.S.C. § 2000d–4a (1988)). The purpose of the Act was to legislatively overturn *Grove City* and bring Title VI back into line with pre-*Grove City* "judicial and executive branch interpretations and enforcement practices which provide for broad coverage of the anti-discrimination provisions of [Title VI]." S.Rep. No. 100–64, at 2 (1988), *reprinted in* 1988 U.S.C.C.A.N. Vol. 3 at 3. Accordingly, § 2000d–4a defines "program or activity" as "all" of the opera-

---

*Id.* at § 21.5(b)(2). "Services, financial aid, or other benefits provided under a program receiving Federal financial assistance" is defined as "any service, financial aid, or other benefit provided in or through a facility provided with the aid of Federal financial assistance." *Id.* at § 21.5(b)(4). *See also* 28 C.F.R. § 42.104 (1997)

(DOJ regulations); *see further* 49 C.F.R. § 21.21(a) (stating that regulations did not supersede any other regulations prohibiting discrimination on grounds of race, color or national origin "in any program or situation to which this part is inapplicable, or [that] prohibit discrimination on any other ground").

tions of a particular entity, not just the specific program receiving federal funds. 42 U.S.C. § 2000d–4a. The legislative history explains how the Act affects the coverage of state and local governments:

The bill provides that when any part of a state or local government department or agency is extended federal financial assistance, the entire agency or department is covered. If a unit of a state or local government is extended federal aid and distributes such aid to another governmental entity, all of the operations of the entity which distributes the funds and all of the operations of the department or agency to which the funds are distributed are covered.

Examples: If federal health assistance is extended to a part of a state health department, the entire health department would be covered in all of its operations.

If the office of a mayor receives federal financial assistance and distributes it to local departments or agencies, all of the operations of the mayor's office are covered along with the departments or agencies which actually get the aid.

S.Rep. No. 100–64, at 16 (1987), *reprinted in* 1988 U.S.C.C.A.N. Vol. 3 at 18; *see also Id.* at 6 ("the department or agency which receives the aid is covered"). *See further Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 73, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (noting Amendment); *Schroeder v. City of Chicago,* 927 F.2d 957, 962 (7th Cir. 1991) (noting that statute applied to department or agency but not entire state or local government); *see further Horner v. Kentucky High School Athletic Ass'n,* 43 F.3d 265, 271 (6th Cir.1994); *Pfeiffer v. Marion Center Area School District, et al.,* 917 F.2d 779, 783 (3rd Cir.1990); *DeVargas v. Mason & Hanger–Silas Mason Co., Inc.,* 911 F.2d 1377, 1384 (10th Cir.1990); *Lussier v. Dugger,* 904 F.2d 661, 664–65 (11th Cir.1990); *Knight v. State of Alabama,* 787 F.Supp. 1030, 1364 (N.D.Ala.1991), *affirmed in part,*

*vacated in part on other grounds, and reversed in part on other grounds,* 14 F.3d 1534 (11th Cir.1994). Apparently, Defendants failed to determine the continuing validity of *Grove City,* or overlooked the plain language of § 2000d–4a.

Based on the foregoing, the court finds that the relevant consideration is whether the Driver's License Division is "part" of "the operations" of one of the entities listed in § 2000d–4a which "is extended ... federal financial assistance." Because the Department is the recipient of federal funds, all of its agencies, divisions, and programs, including its Driver's License Division, are subject to the requirements of Title VI, regardless of whether those funds are specifically directed toward its Driver's License Division or programs therein. *See* 42 U.S.C. § 2000d–4a (" "program or activity" applies to all of the operations of ... a department, agency ... or other instrumentality of a State"); *see also Schroeder,* 927 F.2d at 962 (noting that statute applied to department or agency but not entire state or local government); *Bentley v. Cleveland County Board of County Commissioners,* 41 F.3d 600, 603 (10th Cir. 1994) (distinguishing *Schroeder* by noting that plaintiff—as here—sued "the very parties he claims discriminated against him"); *Elston,* 997 F.2d at 1406 (11th Cir.1993) (noting that defendant received funds from the United States Department of Education and was therefore subject "not only to the duty of nondiscrimination mandated by Title VI, but also to the duties of nondiscrimination mandated by Department of Education regulations promulgated pursuant to Title VI").

### 2. The regulations enacted pursuant to Title VI (§ 2000d–1) allow for a private right of action

Defendants next argue that even if the Department is subject to the requirements of Title VI as a recipient of federal funds, "plaintiffs lack ... a private right of action." [14] (Defs.' Reply at 14.) In support of their contention that "plaintiffs have no pri-

---

**14.** Defendants' pleadings meld their Title VI funding, standing and private right of action arguments. Their reasoning is as follows: (1) the only grant the Department received relating to Class D driver's licenses was from the National Highway Traffic Safety Administration ("NHTSA"); (2) the grant allows Alabama to participate in the Problem Driver Pointer Sys-

tem; (3) the Problem Driver Pointer System does not convey particularized benefits to the Plaintiffs; (4) if the Department were to violate the terms of the grant, which require compliance with Title VI, NHTSA, not the general public should enforce compliance; consequently, (5) Plaintiffs have no private right of action against

vate right of action against the Department for alleged violations of any federal grant," (Defs.' Mem. at 12), Defendants rely on *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) and *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). (Defs.' Mem. at 12.) *Suter* and *Blessing*, however, have no direct bearing on the issue of whether the regulations enacted pursuant to § 2000d–1 allow for private causes of action.

 To assert a non-constitutional federal claim, litigants must have a statutorily enforceable right. *Suter* and *Blessing*

examined certain provisions of the Social Security Act to determine whether private litigants could enforce those provisions via 42 U.S.C. § 1983. In contrast, here, Plaintiffs assert a private right of action in accordance with regulations enacted pursuant to a particular statute, namely, Title VI. Not only must "each statute ... be interpreted by its own terms," *Suter*, 503 U.S. at 358 n. 8, 112 S.Ct. 1360, but the analysis of whether regulations enacted pursuant to a statute allow for private causes of action differs from an analysis of whether statutory provisions are enforceable via § 1983. Accordingly, Defendants' reliance on those cases is misplaced.[15]

the Department for violations of a federal grant. (Defs.' Mem. at 11–12.)

As discussed above, Defendants' "specific grants" argument goes to the question of whether the Department is a recipient of federal fund within the meaning of Title VI. The argument that only the NHTSA has the power to enforce compliance goes to the argument of whether Plaintiffs have the requisite standing to bring this action and whether the regulations at issue allow for private rights of action.

15. Whether a statute allows for a private cause of action is a separate issue from whether that statute may be enforced via § 1983. Although the analysis employed in answering either question may overlap because under either theory a plaintiff must demonstrate Congressional intent to create a right that may be privately enforced, *see Suter*, 112 S.Ct. at 1370; *Polchowski v. Gorris*, 714 F.2d 749, 751 (7th Cir.1983), each question is analytically distinct. *See Suter*, 112 S.Ct. at 1360 (analyzing each question separately); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (same); *see also Former Special Project Employees Ass'n v. Norfolk*, 909 F.2d 89 (4th Cir.1990); *Playboy Enters. v. Public Serv. Comm'n*, 906 F.2d 25*(1st Cir.1990); *Harper v. Federal Land Bank*, 878 F.2d 1172, 1178 (9th Cir.1989), *cert. denied*, 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990); *Victorian v. Miller*, 813 F.2d 718 (5th Cir.1987). Indeed, courts have found a viable § 1983 claim while at the same time concluding that the statute at issue did not afford a private cause of action. *See Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21 (2d Cir.1986).

Section 1983 imposes liability on persons who, under color of state law, deprive a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Although § 1983 protects rights conferred by federal statutes, *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), to seek redress through § 1983, a plaintiff must assert the violation of a federal right, not merely a federal law. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107

L.Ed.2d 420 (1989); *see also Harris v. James*, 127 F.3d 993, 997 (11th Cir.1997).

Congress, of course, may explicitly confer a federal right in a particular statute. Otherwise, the Supreme Court has "traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right." *Blessing*, 117 S.Ct. at 1359:

First, Congress must have intended that the provision in question benefit the plaintiff. *Wright*, 479 U.S. at 430, 107 S.Ct. 766. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. *Id.* at 431–432, 107 S.Ct. 766. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms. *Wilder*, 496 U.S. at 510–11, 110 S.Ct. 2510.; *see also Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531 (discussing whether Congress created obligations giving rise to an implied cause of action).

*Blessing*, 117 S.Ct. at 1359; *see also Harris*, 127 F.3d at 999, 1004 ("the three-prong 'enforceable rights' test ... remains good law").

If a plaintiff demonstrates that a federal statute creates an individual right, a rebuttable presumption is created that the right is enforceable through § 1983. *Blessing*, 117 S.Ct. at 1360. Dismissal of a claim is proper, therefore, if Congress "specifically foreclosed a remedy under § 1983 ... [either] expressly by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (citing *Smith v. Robinson*, 468 U.S. 992, 1009, n. 9, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Livadas*, 512 U.S. at 133, 114 S.Ct. 2068).

In both *Suter* and *Blessing*, the Supreme Court examined whether the Congressional legislation at issue—Title IV–E of the Social Security Act in *Suter* and Title IV–D of the Social Security Act in

Neither Title VI nor the regulations implemented pursuant to § 2000d–1, at issue here, expressly authorize a private right of action. It is clear, however, that Title VI itself (§ 2000d) authorizes "an implied private cause of action for victims of the prohibited discrimination." *Cannon v. University of Chicago*, 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("we have no doubt that Congress ... understood Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination"); *Cone Corp., C.H. v. Florida Dept. of Transportation*, 921 F.2d 1190, 1201 n. 37 (11th Cir.1991) (finding that Title VI (§ 2000d) authorized private cause of action against the Florida Department of Transportation and its Secretary).

As for Title VI regulations, in the Eleventh Circuit, two cases implicitly support the proposition that private causes of action may be brought pursuant to § 2000d–1 regulations prohibiting policies or practices resulting in an unjustified disparate impact.[16] In *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403 (11th Cir. 1985), a group of black schoolchildren challenged the policies and practices of the Georgia State Board of Education and a number of local school districts. *Id.* at 1407. The Eleventh Circuit noted that "[t]here is no doubt that the plaintiffs predicated this cause of action on the regulations. As a result, the district court correctly applied disparate impact analyses to their Title VI claims." *Id.* at 1417 (footnote omitted). In *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394 (11th Cir.1993), Plaintiffs represented a class of black children and their parents who brought suit against various Talladega Coun-

ty, Alabama, educational entities challenging several actions undertaken in the restructuring of the Talladega County school system. *Id.* at 1400. Plaintiffs claimed that the actions violated Title VI and regulations enacted by the United States Department of Education pursuant to Title VI. *Id.* As quoted above, the *Elston* court noted: "While Title VI itself, like the Fourteenth Amendment, bars only intentional discrimination, the regulations promulgated pursuant to Title VI may validly proscribe actions having a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory." *Id.* at 1406 (citations omitted).

Like the instant action, *Georgia State Conference* and *Elston* involved private litigants bringing suit pursuant to § 2000d–1 regulations alleging disparate impact. In neither case did the Eleventh Circuit address the propriety of private causes of action brought pursuant to § 2000d–1 regulations and instead proceeded to address the merits of the respective plaintiffs' allegations. Accordingly, both cases implicitly support the proposition that private causes of action may be brought under regulations enacted pursuant to § 2000d–1.

Additionally, two recent Eleventh Circuit cases support the proposition that federal rights may be created by valid regulations that merely "further define" or "flesh out" the content of a statutory right. In *Harris*, although addressing an action brought pursuant to § 1983, the Eleventh Circuit noted that:

"*Wright*[17] would seem to indicate that so long as the statute itself confers a specific right upon the plaintiff, and a valid regula-

---

*Blessing*—authorized private rights of action through § 1983. *Suter* and *Blessing* are among more recent Supreme Court decisions requiring courts to analyze the relevant statutory provisions at issue "in light of the entire legislative enactment, to determine whether the language in question created 'enforceable rights, privileges, or immunities within the meaning of § 1983.'" *Suter*, 503 U.S. at 357, 112 S.Ct. 1360 (*quoting Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)); *see also Blessing*, 117 S.Ct. at 1360; *Livadas v. Bradshaw*, 512 U.S. 107, 133 n. 27, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *Wilder*, 496 U.S. at 511–12, 110 S.Ct. 2510; *Golden State Transit*, 493 U.S. at 106, 110 S.Ct. 444; *Wright*, 479 U.S. at 430, 107 S.Ct. 766; *see further Farley v. Philadelphia Housing Authority*, 102 F.3d 697, 702 (3d Cir.1996).

In contrast to *Suter* and *Blessing*, the Plaintiffs in the case at bar are not asserting Title VI rights via § 1983. (Pls.' Opp'n at 32.) Rather, Plaintiffs contend that they have a direct cause of action under Title VI and its implementing regulations. (*Id.*) The court agrees and so finds. Rather than determining whether the regulations promulgated pursuant to § 2000d–1 establish "federal rights" enforceable via § 1983, the specific question to be resolved in this action is whether the regulations enacted pursuant to Title VI, that are at issue here, afford litigants a private cause of action.

**16.** Relevant United States Supreme Court jurisprudence is discussed below.

**17.** *Wright v. Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987).

tion merely further defines or fleshes out the content of that right, then the statute—"in conjunction with the regulation"—may create a federal right *as further defined by the regulation."*

*Harris,* 127 F.3d at 1008–09 (emphasis added). Although the *Harris* court explicitly did not "define the precise role which a valid regulation may play in the 'federal rights' analysis," *Id.* at 1008, in *Doe v. Chiles,* 136 F.3d 709, 717 (11th Cir.1998), the Eleventh Circuit cited *Harris'* observation regarding *Wright* and utilized the "in conjunction" reasoning to find that the Medicaid regulations at issue there "further define[d] the contours of the statutory right." *Doe,* 136 F.3d at 717. The court concluded that the statute "as further fleshed out by [the] regulations—creates a federal right." *Id.*

■■■ *Doe* and *Harris* indicate that a federal regulatory right may be established if it can be shown that: (1) the enabling statute conferred a specific right and (2) a valid regulation merely further defines or fleshes out the content of that right. *Doe,* 136 F.3d at 717; *Harris,* 127 F.3d at 1008–09. If so, "then the statute—'in conjunction with the regulation'—may create a federal right as further defined by the regulation." *Harris,* 127 F.3d at 1009; *Doe,* 136 F.3d at 717 (quoting *Harris* ).

Here, it is clear that Title VI prohibits discrimination in programs that receive federal funds, and confers "an implied private cause of action for victims of the prohibited discrimination." *Cannon,* 441 U.S. at 703, 99 S.Ct. 1946; *Cone,* 921 F.2d at 1201 n. 37. Therefore, the question becomes whether the disparate impact regulations "merely define or flesh out" the content of Title VI's statutory right to be free from discrimination in federally funded programs such that the court may conclude that "the statute—in conjunction with the regulation—may create a federal right as further defined by the regulation." The court concludes that they do, and, accordingly, that it can.

Title VI itself prohibits discrimination based on race, color or national origin in programs or activities receiving federal funds. 42 U.S.C. § 2000d. Although the statute is silent as to the scienter required for statutory violations, the Supreme Court has held that the statute itself only prohibits

intentional discrimination. *Alexander,* 469 U.S. at 293, 105 S.Ct. 712. Nevertheless, section 2000d–1 provides that agencies may enact regulations "to effectuate the provisions of section 2000d ... by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." 42 U.S.C. § 2000d–1. Regulations that prohibit an unjustified disparate impact in federally funded programs are valid exercises of agency authority. *Alexander,* 469 U.S. at 292–294, 105 S.Ct. 712; *Elston,* 997 F.2d at 1406. It cannot be disputed that prohibiting actions having an unjustified disparate impact "effectuate[s] the provisions of section 2000d [and is] consistent with achievement of the objectives of the statute." 42 U.S.C. § 2000d–1. The regulations merely define the contour of and flesh out the statutory right to be free from discrimination in federally funded programs. *See also Lau v. Nichols,* 414 U.S. 563, 566, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (where the Supreme Court based its reasoning on disparate impact regulations enacted pursuant to § 2000d–1, but based its holding solely on the statute (§ 2000d)).

Finally, Title VI itself authorizes "an implied private cause of action for victims of the prohibited discrimination." *Cannon,* 441 U.S. at 703, 99 S.Ct. 1946; *Cone Corp.,* 921 F.2d at 1201 n. 37. Because disparate impact regulations are valid exercises of agency authority, *Alexander,* 469 U.S. at 292–294, 105 S.Ct. 712; *Elston,* 997 F.2d at 1406, there is no principled reason to deny an implied private right of action under regulations effectuating the provisions of a statute containing an implied private right of action.

Consequently, the court can conclude that "the statute—'in conjunction with the regulation'—[ ] creates a federal right as further defined by the regulation." *Doe,* 136 F.3d at 717 (citing *Harris,* 127 F.3d at 1008–09). Valid regulations enacted pursuant to § 2000d–1 that effectuate the purposes of Title VI, allow for private causes of action against entities operating federally funded programs or activities, (as expansively defined in § 2000d–4), that work an unjustified disparate impact against those protected by Title VI.

Even if *Elston* and *Georgia State Conference* do not lead to the conclusion that

§ 2000d–1 regulations afford a private right of action, and even if *Doe* and *Harris* do not lead to the conclusion that the statute—in conjunction with the regulations—create a privately enforceable federal right as further fleshed out by the regulations, the court still finds that under an analysis of the text, legislative history and purpose of Title VI, private causes of action may be brought pursuant to § 2000d–1 regulations prohibiting an unjustified disparate impact. The court's finding is supported by the findings of other federal courts. *See Chester Residents Concerned For Quality Living v. Seif,* 132 F.3d 925 (3d Cir.1997), *petition for cert. filed* March 30, 1998 (No. 97–1620); *Cureton v. NCAA,* 1997 WL 634376, *2 (E.D.Pa. Oct.9, 1997) (finding private right of action in Title VI regulations); *Association of Mexican–American Educators v. State of California,* 836 F.Supp. 1534, 1548 (N.D.Cal.1993) (same); *see also New York Urban League, Inc. v. State of New York,* 71 F.3d 1031, 1036 (2d Cir.1995) (evaluating merits of disparate impact claim under regulations).

The only Circuit Court of Appeals to explicitly address the question of whether a private right of action exists under disparate impact regulations promulgated by a federal administrative agency pursuant to § 2000d–1 is the Third Circuit. After an exhaustive review of applicable case law, the Third Circuit held that "private plaintiffs may maintain an action under discriminatory effect regulations promulgated by federal administrative agencies pursuant to section 602(§ 2000d–1) of Title VI of the Civil Rights Act of 1964." *Chester Residents Concerned For Quality Living v. Seif,* 132 F.3d 925 (3d Cir.1997), *petition for cert. filed* March 30, 1998 (No. 97–1620). In so finding, the Third Circuit noted that the decisions of eight other Courts of Appeals supported its finding. *Id.* at 936. Among those cases cited were the Eleventh Circuit's decisions in *Elston* and *Georgia State Conference. Seif,* 132 F.3d at 936.

In its meticulous opinion, the Third Circuit first examined applicable Supreme Court precedent: *Alexander,* 469 U.S. at 287, 105 S.Ct. 712, and *Guardians,* 463 U.S. at 582, 103 S.Ct. 3221. *See Seif,* 132 F.3d at 931–932. The Third Circuit found in *Guardians* "an implicit approval by five Justices of the existence of a private right of action under discriminatory effect regulations implementing section 602 of Title VI." *Seif,* 132 F.3d at 930. The court "hesitate[d], however, to hold that *Guardians* is dispositive of [whether regulations enacted pursuant to § 2000d–1 afford a private cause of action] because the Court did not directly address the issue now before us." *Seif,* 132 F.3d at 930.

The court then examined *Alexander,* and noted that although there was some merit to the argument that:

> *Alexander* ... implicitly confirms that *Guardians* recognized the existence of a private right of action.... The Court in *Alexander* spoke in the passive voice—"could make actionable"—and did not indicate whether *Guardians* stood for the proposition that a private plaintiff, or the relevant agency, could proceed under a disparate impact standard.... [This argument] requires the inference that because *Alexander* was a suit brought by private plaintiffs, and because *Guardians* was also brought by private plaintiffs, the *Alexander* Court must have been speaking of private plaintiffs when it used the passive voice. This inference from *Guardians* may be justified, but we find no direct authority in *Alexander* that either confirms or denies the existence of a private right of action.

*Seif,* 132 F.3d at 931. Consequently, the court declined to hold that "a private right of action exists based on *Guardians* and *Alexander* alone." [18] *Id.*

The court then turned to relevant Third Circuit precedent to determine whether reg-

---

**18.** In addition to *Guardians* and *Alexander,* the Supreme Court's decision in *Lau,* 414 U.S. at 563, 94 S.Ct. 786 is instructive. There, the Supreme Court found language discrimination to be violative of Title VI. In so doing, the Court implicitly approved of an implied private right of action pursuant to disparate impact regulations. The plaintiffs in *Lau* were a group of non-En-

glish-speaking Chinese students who sued a San Francisco school district alleging violations of disparate impact regulations enacted by the federal Department of Health, Education and Welfare. After noting that: (1) § 2000d–1 authorized agencies to promulgate regulations; (2) that "the Federal Government has the power to fix the terms on which its money allotments to

ulations enacted pursuant to § 2000d–1 allowed for a private cause of action, and determined that "our own precedent does not resolve the matter." [19] *Id.* at 933. Finally, the Third Circuit utilized a three-prong test to determine whether the court could imply a private right of action from the § 2000d–1 regulations. *Id.* The test required the court to inquire:

> (1) whether the agency rule is properly within the scope of the enabling statute; (2) whether the statute under which the rule was promulgated properly permits the implication of a private right of action; and (3) whether implying a private right of action will further the purpose of the enabling statute.

*Seif,* 132 F.3d at 933 (quotations and citations omitted).

The Eleventh Circuit has not specifically articulated the proper analysis for determining whether a private right of action may be inferred from regulations enacted by a federal department or agency pursuant to an express grant of authority to do so by Congress. The Eleventh Circuit has, however, articulated the test for whether a private right of action may be inferred from a statute. *Bok v. Mutual Assur., Inc.,* 119 F.3d 927, 928 (11th Cir.1997); *Baggett v. First Nat. Bank of Gainesville,* 117 F.3d 1342, 1351 (11th Cir.1997); *Dime Coal Co., Inc. v. Combs,* 796 F.2d 394, 397 (11th Cir.1986). That test is derived from the Supreme Court's formulation in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In *Cort,* the following factors were relevant in determining whether to imply a right of action in a statute:

> (1) whether the plaintiff is a member of the class for whose "especial benefit" the

statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff; and (4) whether the cause of action is one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based on federal law.

*Cort,* 422 U.S. at 78, 95 S.Ct. 2080. The Supreme Court has since held that these factors are not entitled to equal weight, and that the central inquiry must focus on the question of legislative intent. *Thompson v. Thompson,* 484 U.S. 174, 179–80, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). In this action, the fourth factor is irrelevant because Title VI is federal law. *See Lowrey v. Texas A & M University System,* 117 F.3d 242, 250, n. 11 (5th Cir.1997).

 The court finds that for the purpose of evaluating whether regulations enacted pursuant to a statute afford a private right of action, the Third Circuit's three-prong test for evaluating regulations, articulated above, comports with the sum and substance of the Eleventh Circuit's statutory test. *See Lowrey,* 117 F.3d at 250 n. 10 (noting different analysis for whether private rights of action may be implied from a statute as opposed to regulations enacted pursuant to a statute). Accordingly, the court will utilize the Third Circuit's three-prong test in analyzing whether the § 2000d–1 regulations allow for a private cause of action, and, in fact, expressly adopts, and hereby incorporates by reference, the reasoning and findings of the Third Circuit in *Seif:* [20]

the States shall be disbursed," *Id.* at 570, 94 S.Ct. 786; and that (3) the school district "contractually agreed" to comply with Title VI, the court found for plaintiffs, resting "solely on § 601 [§ 2000d], to reverse the Court of Appeals." *Id.* at 566, 94 S.Ct. 786.

**19.** The court has discussed relevant Eleventh Circuit precedent above.

**20.** A grant of federal rulemaking power is not authority to create a cause of action or federal jurisdiction. That authority lies solely with Congress. *See Stewart v. Bernstein,* 769 F.2d 1088 (5th Cir.1985); *Marshall v. Gibson's Products,*

*Inc. of Plano,* 584 F.2d 668 (5th Cir.1978). Thus, no implied private right of action can be found from regulations standing alone. Rather, the statute authorizing federal departments or agencies to promulgate rules and regulations must itself be examined to determine if a private right of action can be implied. *See Lowrey,* 117 F.3d at 253 n. 20 ("Provided the regulations further the substantive purposes of the enabling act, a private right of action may be implied from the regulations") (citing *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 947 (3d Cir.1985); *Robertson v. Dean Witter Reynolds,* 749 F.2d 530, 536–37 (9th Cir.1984)).

In *Seif,* a non-profit residents organization sued, among others, the Pennsylvania Department of Environmental Protection and its Secretary, alleging that the Department's issuance of a permit authorizing the operation of a waste facility in a predominantly black community violated disparate impact regulations enacted by the United States Environmental Protection Agency pursuant to

Title VI. *Seif,* 132 F.3d at 927. The Third Circuit noted that:

> There is no question that the EPA's discriminatory effect regulation satisfies the first prong. The Supreme Court's unanimous opinion in *Alexander* makes clear that "actions having an unjustifiable disparate impact on minorities [can] be redressed through agency regulations designed to implement the purposes of Title VI." 469 U.S. at 293, 105 S.Ct. at 716 (footnote omitted).[21]

As noted, the predominant guide to determining whether a statute implied a private remedy was the four-step test established in *Cort,* 422 U.S. at 78, 95 S.Ct. 2080. The central inquiry must focus on the question of legislative intent. *Thompson v. Thompson,* 484 U.S. 174, 179–80, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Where an examination of one of the *Cort* criteria unequivocally reveals congressional intent "there is no need for (the court) to 'trudge through all four of the factors.'" *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 388, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (citation omitted). Thus, in determining whether to imply a private right of action, courts must look first to evidence of congressional intent and then address the other factors of the *Cort* test. *See, e.g., Johnson v. Madigan,* 1992 WL 80952 *2 (N.D.Ga.1992).

The Eleventh Circuit has explained that when determining whether Congress intended to create or preserve an implied private right of action in a statute, courts should question whether: (1) Congress has specifically indicated the intent to create or preserve such a private right of action; and (2) whether the purposes of the statute would be furthered or thwarted by the creation of such a private right of action. *See generally Liberty National Insurance Holding, Co. v. Charter Co.,* 734 F.2d 545, 558 (11th Cir.1984); *see also Florida Commercial Banks v. Culverhouse,* 772 F.2d 1513, 1517 (11th Cir.1985); *Rivers v. Rosenthal & Co.,* 634 F.2d 774 (5th Cir.1980), *vacated on other grounds,* 456 U.S. 968, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982). A regulation promulgated by an administrative agency pursuant to a delegation of Congressional authority is not legislation and, consequently, no indication of Congressional intent can be inferred from such a regulation.

The Third Circuit's three-prong test addresses all of the concerns and factors articulated in the Eleventh and Former Fifth Circuits' analysis, based on *Cort,* of whether to imply private rights of action in a statute, with the added addition of determining whether the agency regulations are properly within the scope of the enabling statute. *Seif,* 132 F.3d at 933. In fact, the Third Circuit's test incorporates the *Cort* factors in the second prong of its analysis. *Id.* at 933. Hence, the court finds that its use of the Third Circuit's test is in accordance with the sum and substance of the Eleventh and former Fifth Circuits' statutory

implied right of action case law, and, therefore, proper. *See also, Lowrey,* 117 F.3d at 253 (utilizing *Cort* factors); *Robertson,* 749 F.2d at 534 (applying two-part test to determine whether agency regulations give rise to a private right of action).

Even if the court were to utilize the traditional *Cort* factors in its analysis, however, the court would still find an implied right of action in the regulations. *See infra* note 33.

**21.** The EPA disparate impact regulation referenced in *Seif* read:

> A recipient shall not use criteria or methods of administering its program which *have the effect* of subjecting individuals to discrimination because of their race, color, national origin, or sex, or *have the effect* of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.

*Seif,* 132 F.3d at 929 (citing 40 C.F.R. § 7.35(b)) (emphasis added). The Third Circuit noted that "[t]his regulation clearly incorporates a discriminatory effect standard." *Id.*

Similarly, federal regulations at issue here provide that:

> A recipient ... may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which *have the effect* of subjecting persons to discrimination because of their race, color, or national origin, or *have the effect* of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin.

49 C.F.R. § 21.5(b)(2) (emphasis added).

The language of the EPA regulations at issue in *Seif,* and the DOT regulations at issue here, are virtually identical. *See also* 28 C.F.R. § 42.104. As did the *Seif* court with regard to the EPA regulations addressed there, this court finds that the DOT regulations at issue here clearly incorporate a disparate impact standard (prohibiting activities that "have the effect"). *See Seif,* 132 F.3d at 929.

Consequently, because disparate impact regulations further the purposes of the statute and are valid exercises of agency authority, *Alexander,* 469 U.S. at 292–294, 105 S.Ct. 712; *Elston,* 997 F.2d at 1406, the court finds that in this action, the first prong of the Third Circuit's test has been

ii.

The second and third prongs are the crux of this case. In addressing the second, a court will consider the factors set out by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and its progeny. *See Angelastro,* 764 F.2d at 947.[22] The factors relevant here are: (1) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; and (2) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." *Cort,* 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted).[23]

The United States, as amicus, contends that the implication of a private right of action is consistent with legislative intent because Congress acknowledged the existence of the right when it amended Title VI. The purpose of the amendment was to broaden the scope of coverage of Title VI in response to the Supreme Court's decision in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984),

where the Court narrowly construed the terms "program or activity." [24] The United States cites various items of legislative history which it claims indicates an "understanding ... [of] the existence of the discriminatory effects regulations and the fact that they could be enforced in federal court by private parties." Amicus Br. at 21.

First, the United States relies on a House Report on an early version of the relevant bill, which states that the "private right of action which allows a private individual or entity to sue to enforce Title IX would continue to provide the vehicle to test [certain] regulations in Title IX and their expanded meaning to their outermost limits." H.R.REP. NO. 963, Pt. 1, 99th Cong., 2d Sess. 24 (1986).[25] Second, the United States relies on several legislators' comments in the Congressional Record, where the legislators appear to recognize the existence of a private right of action.[26] Third, the United States also relies on the following compilations of testimony at congressional hearings: Civil Rights Act of

---

met: The agency rule is properly within the scope of the enabling statute. *See Seif,* 132 F.3d at 933.

**22.** *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 947 (3d Cir.1985).

**23.** The other *Cort* factors are: (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted,—that is, does the statute create a federal right in favor of the plaintiff"; and (2) whether the cause of action is "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." 422 U.S. at 78, 95 S.Ct. at 2088 (citations and internal quotation marks omitted). Clearly, CRCQL satisfies the first. The second is irrelevant because Title VI is federal law. [Footnote 10 in *Seif*].

[Note: "CRCQL" is an acronym for the *Seif* Plaintiffs].

**24.** Section 601 of Title VI prohibits any "program or activity" receiving Federal funds from discriminating on various grounds. *See* 42 U.S.C. § 2000d. [Footnote 11 in *Seif*].

**25.** Courts have regarded Title IX and Title VI jurisprudence as, more or less, interchangeable. *See Cannon v. University of Chicago,* 441 U.S. 677, 694–96, 99 S.Ct. 1946, 1956–57, 60 L.Ed.2d

560 (1979) ("Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefitted class.... The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." (footnotes omitted)). [Footnote 12 in *Seif*].

**26.** The United States quotes the following observations of Senator Hatch:

The failure to provide a particular share of contract opportunities to minority-owned businesses, for example, could lead Federal agencies to undertake enforcement action asserting that the failure to provide more contracts to minority-owned firms, standing alone, is discriminatory under agency disparate impact regulations implementing Title VI .... Of course, advocacy groups will be able to bring private lawsuits making the same allegations before federal judges.

134 CONG.REC. 4,257 (1988).

The United States also quotes a portion of the following statement by Representative Fields: "If a greater percentage of minority than white students fail a bar exam or a medical exam ... will a State be subject to private lawsuits because the tests have a disproportionate impact on minorities[.]" .

1984: Hearings on S. 2568 Before the Subcomm. on the Const. of the Senate Comm. on the Judiciary, 98th Cong., 2d Sess. 23–24, 153–54, 200 (1984); Civil Rights Restoration Act of 1985: Joint Hearings on H.R. 700 Before the House Comm. on Educ. Labor and the Subcomm. on Civil & Const. Rights of the House Comm. on the Judiciary, 99th Cong., 1st Sess. 734, 1095, 1099 (1985). The first compilation contains, inter alia, a memorandum by the Office of Management and Budget ("OMB") which states OMB's opinion that "every licensed attorney would be empowered to file suit to enforce the 'effects test' regulations of agencies, challenging practices in every aspect of every institution that receives any Federal assistance." Civil Rights Act of 1984: Hearings on S. 2568 Before the Subcomm. on the Const. of the Senate Comm. on the Judiciary, 98th Cong., 2d Sess. 527 (1984).

PADEP presents two responses.[27] First, PADEP emphasizes that the purpose of the amendment of Title VI was to address the Supreme Court's decision in *Grove City,* not to confirm or announce the existence of a private right of action. Second, PADEP reminds the court that many of the above-cited comments may only reflect the views of individual members of Congress. PADEP does not, however, cite to any statements in the Congressional Record or elsewhere that would undermine those cited by the United States.[28] We therefore find that there is some indication in the legislative history, here uncontroverted, of an intent to create a private right of action, in satisfaction of the *Cort* factors.

This finding, however, does not end our inquiry. The *Cort* factors also require a court to determine whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff[.]" 422 U.S. at 78, 95 S.Ct. at 2088. Relevant to this inquiry is PADEP's argument that section 602 and the regulations situate the EPA as, in essence, a gatekeeper to enforcement, and that the implication of a private right of action would be inconsistent with this legislative scheme. According to PADEP, section 602 imposes what PADEP terms as "strict preconditions" on the use of that section's enforcement apparatus.[29] Specifically, section 602 provides:

> [N]o such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days

---

130 CONG.REC. 18,880 (1984). [Footnote 13 in *Seif*].

27. "PADEP" is an acronym for the Pennsylvania Department of Environmental Protection.

28. Nor do Defendants in this action point to any contradictory legislative history. In the case at bar, the private right of action arguments of both Parties are not well-developed, and neither side discusses legislative history in this context. Defendants cite and only superficially discuss *Suter* and *Blessing* in support of their conclusory contention that Plaintiffs have no private right of action. Plaintiffs cite *Guardians* and *Elston* in support of their contention that they do, although they fail to support their citation with meaningful exposition of those cases.

29. Section 602 provides for the following enforcement apparatus:

> Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law....

42 U.S.C. § 2000d–1. [Footnote 14 in *Seif*].

have elapsed after the filing of such report.

42 U.S.C. § 2000d–1. EPA enforcement action can occur only after the agency has negotiated these procedural requirements. Should we find that it is appropriate to imply a private right of action, PADEP emphasizes that private plaintiffs would not have to negotiate these requirements.

In addition, PADEP emphasizes that the EPA's regulations expressly provide private parties with an administrative mechanism through which they can raise allegations of unintentional discrimination. *See* 40 C.F.R. §§ 7.120–7.130. These regulations provide, in relevant part:

> A person who believes that he or she or a specific class of persons has been discriminated against in violation of this Part may file a complaint. The complaint may be filed by an authorized representative. A complaint alleging employment discrimination must identify at least one individual aggrieved by such discrimination. Complaints solely alleging employment discrimination against an individual on the basis of race, color, national origin, sex or religion shall be processed under the procedures for complaints of employment discrimination filed against recipients of federal assistance. Complainants are encouraged but not required to make use of any grievance procedure established under § 7.90 before filing a complaint. Filing a complaint through a grievance proce-

dure does not extend the 180 day calendar requirement of paragraph (b)(2) of this section.

40 C.F.R. § 7.120(a) (citation omitted). In PADEP's estimation, section 602 and the regulations situate the EPA as a gatekeeper to enforcement, with private parties submitting their allegations to the agency and its discretion. PADEP contends that a private right of action is inconsistent with this legislative scheme.

We recognize that PADEP's argument has some force. There is, however, a more convincing counter-argument. The procedural requirements in section 602 provide a fund recipient with a form of notice that the agency has begun an investigation which may culminate in the termination of its funding. We note that a private lawsuit also affords a fund recipient similar notice. If the purpose of the requirements is to provide bare notice, private lawsuits are consistent with the legislative scheme of Title VI. Furthermore, unlike the EPA, private plaintiffs do not have the authority to terminate funding.[30] As a result, the purpose that the requirements serve is not as significant in private lawsuits, where the potential remedy does not include the result (i.e., termination of funding) at which Congress directed the requirements. Stated differently, the requirements were designed to cushion the blow of a result that private plaintiffs cannot effectuate. Based on the foregoing, we find that the implication of a private right of action would be consistent with the legislative scheme of Title VI.[31]

**30.** While it is well established that private plaintiffs do not have the authority to compel a termination of funding, we make no determination at this time as to what alternative remedies offer appropriate relief for plaintiffs who prevail in actions to enforce agency regulations brought pursuant to section 602. *See NAACP v. Medical Center, Inc.,* 599 F.2d 1247, 1254 n. 27 (3d Cir. 1979). *See also Cannon,* 441 U.S. at 711–17, 99 S.Ct. at 1965–68 (discussing the legislative history of Title VI as it relates to the implication of a private remedy for victims of discrimination). Rather, should relief prove warranted in this case, we leave the determination of the appropriate remedy to the district court in the first instance. (Footnote 15 in *Seif*).

**31.** Although in the case at bar, the Defendants do not argue that the statute and regulations situate the federal agencies providing funds to the Department as a "gatekeeper" as was argued of the

EPA in *Seif,* the Defendants do contend that "[i]f the Department were to violate the terms of the grant, [the relevant agency], not the general public, should enforce compliance." (Defs.' Mem. at 12.) The Department makes this unsupported assertion in the context of citing to *Suter* and *Blessing,* and while arguing that a particular grant did not provide "particularized benefits" to the Plaintiffs. (*Id.*)

This court agrees with the *Seif's* court reasoning and ultimate conclusion as it relates to the enforcement scheme outlined in § 2000d–1 and as to regulations enacted pursuant to that statutory provision. In *Seif,* PADEP relied on 40 C.F.R. §§ 7.120–7.130 in support of its argument. Here, 49 C.F.R. § 21.11(b) is applicable and closely analogous:

· (b) *Complaints.* Any person who believes himself or any specific class of persons to be subjected to discrimination prohibited by this part may by himself or by a representa-

In sum, we find that there is some indication in the legislative history of an intent to create a private right of action and that the implication of a private right of action would be consistent with the legislative scheme of Title VI, in accordance with the relevant *Cort* factors. Accordingly, we find that "'the statute under which the rule was promulgated properly permits the implication of a private right of action,'" *Polaroid Corp.*, 862 F.2d at 994 (quoting *Angelastro*, 764 F.2d at 947),[32] and that the second prong of the test is satisfied.[33]

### iii.

The third prong of the test requires the court to inquire "'whether implying a private right of action will further the purpose of the enabling statute.'" *Id.* (quoting *Angelastro*, 764 F.2d at 947). The United States contends that this prong is satisfied because the implication of a private right of action under section 602 and the regulations will further the dual purposes of Title VI, which are to: (1) combat discrimination by entities who receive federal funds; and (2) provide citizens with effective protection against discrimination. *See Cannon*, 441 U.S. at 704, 99 S.Ct. at 1961. A private right of action will further these purposes, the argument goes, because it will deputize private attorneys general who will enforce section 602 and its implementing regulations. The United States, moreover, points out that the EPA itself lacks sufficient resources to achieve adequate enforcement.

We agree with the United States that, to the extent that a private right of action will increase enforcement, the implication of that right will further the dual purposes of Title VI. Consequently, we find that the third prong of the test is also satisfied.[34]

### iv.

Lastly, although no other court of appeals has rendered a holding on the precise issue before this court, we note that the decisions of other courts of appeals indicate support for our reasoning. *See, e.g., Latinos Unidos De Chelsea v. Secretary of Hous. & Urban Dev.*, 799 F.2d 774,

---

tive file with the Secretary a written complaint. A complaint must be filed not later than 180 days after the date of the alleged discrimination, unless the time for filing is extended by the Secretary.

49 C.F.R. § 21.11(b). The regulations are remarkably similar.

In addition, and in contrast to the EPA regulation at issue in *Seif*, this DOT regulation does not "encourage" complainants to make use of a grievance procedure before filing a complaint. Cf. 40 C.F.R. § 7.120(a) with 49 C.F.R. § 21.11(b). The DOT regulations merely provide that a person who believes himself or a specific class of persons to be subjected to discrimination "may" file a complaint. 49 C.F.R. § 21.11(b). Nothing in the regulations would lead to the conclusion that enforcement mechanisms allowed in the regulations were mandatory or conditions precedent to filing suit. Accordingly, the Third Circuit's reasoning, based on an analysis of § 2000d–1 and a virtually identical regulation, is applicable here.

Further, although not raised here or in *Seif*, the court notes that the statutory and regulatory provisions encouraging informal attempts at obtaining compliance prior to filing suit do not support the "gatekeeper" argument either. *See, e.g.,* § 2000d–1; 49 C.F.R. §§ 21.11(d), 21.13(a). As *Cannon, Alexander* and *Guardians* note, the statute itself contains an implied private right of action, even though § 2000d–1 mandates informal attempts at securing compliance. 49 C.F.R. § 21.13(a) provides that "if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected ... by any other means authorized by law." In contrast to the statute (§ 2000d–1), this regulatory provision is permissive; it does not require complainants to comply with its provisions.

Finally the court notes that in this action, as discussed in *Seif*, private litigants are not seeking the termination of funding, but the cessation of activity that violates Title VI's prohibition of discrimination in federally funded programs or activities. As the Third Circuit noted, "the [procedural] requirements were designed to cushion the blow of a result that private plaintiffs cannot effectuate [termination of funding]." *Seif*, 132 F.3d at 936.

**32.** *Polaroid Corp. v. Disney*, 862 F.2d 987 (3d Cir.1988).

**33.** For the reasons outlined above, this court agrees with the Third Circuit's conclusion that under an analysis of the legislative history and the relevant *Cort* factors, "the statute under which the rule was promulgated properly permits the implication of a private right of action." *See Seif*, 132 F.3d at 936 (citations omitted); *see also Lowrey*, 117 F.3d at 253; *see further supra* note 20.

**34.** This court agrees and so finds.

785 n. 20 (1st Cir.1986) ("Under the statute itself, plaintiffs must make a showing of discriminatory intent; under the regulations, plaintiffs simply must show a discriminatory impact." (citation omitted)); *New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1036 (2d Cir.1995) ("Courts considering claims under analogous Title VI regulations have looked to Title VII disparate impact cases for guidance. A plaintiff alleging a violation of the DOT regulations must make a prima facie showing that the alleged conduct has a disparate impact." (citations omitted)); *Castaneda by Castaneda v. Pickard*, 781 F.2d 456, 465 n. 11 (5th Cir.1986) ("Thus a Title VI action can now be maintained in either the guise of a disparate treatment case, where proof of discriminatory motive is critical, or in the guise of a disparate impact case, involving employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another. In this latter type of case, proof of discriminatory intent is not necessary." (citation omitted)); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 n. 5 (6th Cir.1996) ("A plaintiff may pursue a claim under a disparate impact theory as well. However, a disparate impact theory is not applicable in the case at hand." (citation omitted)); *David K. v. Lane*, 839 F.2d 1265, 1274 (7th Cir.1988) ("It is clear that plaintiffs may maintain a private cause of action to enforce the regulations promulgated under Title VI of the Civil Rights Act. Moreover, plaintiffs need not show intentional discriminatory conduct to prevail on a claim brought under these administrative regulations. Evidence of a discriminatory effect is sufficient." (citation omitted)); *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1044–45 (7th Cir. 1987) ("Although the voting of the Justices may be difficult for the reader to discern at first, a majority of the Court in *Guardians Association* concluded that a discriminatory-impact claim could be maintained under those regulations, although not under the statute." (citations omitted)); *Larry P. by Lucille P. v. Riles*, 793 F.2d 969, 981–82 (9th Cir.1984) ("[P]roof of discriminatory effect suffices to establish liability when the suit is brought to enforce regula-

tions issued pursuant to the statute rather than the statute itself." (footnote omitted)); *Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir.1996) ("Although Title VI itself proscribes only intentional discrimination, certain regulations promulgated pursuant to Title VI prohibit actions that have a disparate impact on groups protected by the act, even in the absence of discriminatory intent." (citation omitted)); *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir.1993) ("While Title VI itself, like the Fourteenth Amendment, bars only intentional discrimination, the regulations promulgated pursuant to Title VI may validly proscribe actions having a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory." (citations omitted)); *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir.1985) ("There is no doubt that the plaintiffs predicated this cause of action on the regulations. As a result, the district court correctly applied disparate impact analyses to their Title VI claims." (footnote omitted)).

### v.

In conclusion ... we hold that private plaintiffs may maintain an action under discriminatory effect regulations promulgated by federal administrative agencies pursuant to section 602 of Title VI of the Civil Rights Act of 1964....

*Seif,* 132 F.3d at 936–37.

In addition to the foregoing, the court also notes that Title VI relationships are, essentially, contractual in nature. *See United States Dept. of Transp. v. Paralyzed Veterans of America,* 477 U.S. 597, 605–06, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986) ("Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision"); *see also Moore v. Sun Bank of North Florida, N.A.,* 923 F.2d 1423, 1432 (11th Cir. 1991) (noting contractual nature of Title VI relationship). Because of these contractual relationships, the court finds that Plaintiffs retain a private right of action as third-party

beneficiaries to contracts entered into by the Department that contain provisions requiring the Department to comply with federal non-discrimination laws as a condition of receiving federal funds.

■ Title VI "is not a regulatory measure, but an exercise of the unquestioned power of the Federal Government to fix the terms on which Federal funds shall be disbursed." *Guardians*, 463 U.S. at 599, 103 S.Ct. 3221; *see also Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (noting that it was well established that Congress has the power to fix the terms under which it disburses federal money to the states); see further *Suter*, 503 U.S. at 356, 112 S.Ct. at 1366. Title VI liability, therefore, is based on the contractual-type relationship between the federal government and the recipient of federal funds. *See, e.g., Godby v. Montgomery County Board of Education*, 1998 WL 119956 * 21 (M.D.Ala.1998); *(see also* Defs.' Add. Auth. at 1 (acknowledging that federal funds received by state pursuant to grants are "fundamentally, contracts between a federal agency and the State of Alabama").)

Congress utilizes its spending power "to induce governments and private parties to cooperate voluntarily with federal policy" *Fullilove v. Klutznick*, 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). When a state accepts federal money, it also accepts the conditions Congress has attached to its offer. *See South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987); *Davis*, 120 F.3d at 1399. These conditions include the promise to not discriminate. As the *Davis*, court noted:

> A prospective recipient is free to decline a grant of federal funding.... Similarly, a current recipient may withdraw from a federal program and decline further funding if it so chooses.... The freedom of

recipients to decline prospectively or to terminate retrospectively a grant of federal funding ensures that they will remain responsive to the preferences of their local constituents.

*Davis*, 120 F.3d at 1399 (citations omitted). When the foregoing is put in the vernacular, it is clear that "he who pays the piper calls the tune." *See Guardians*, 463 U.S. at 599, 103 S.Ct. 3221 (White, J.) ("Stop the discrimination, get the money; continue the discrimination, do not get the money").

■ The relevance of the contractual nature of Title VI relationships to whether § 2000d–1 regulations allow for private rights of action is as follows: The purpose of Title VI is to ensure that "no person" is subject to discrimination in federally funded programs. *See* 42 U.S.C. § 2000d. When states enter into contracts containing provisions that hinge funding on compliance with federal non-discrimination laws, including Title VI, the "persons" protected by Title VI are intended third-party beneficiaries to these contracts.[35] *See Bossier Parish School Board v. Lemon*, 370 F.2d 847, 850 (5th Cir.1967) ("Defendants by their contractual assurances have afforded rights to [plaintiffs] as third-party beneficiaries"); *see also Guardians*, 463 U.S. at 633, 103 S.Ct. 3221 (Marshall, J., dissenting); *Id.* at 603, n. 24, 103 S.Ct. 3221 (Stewart, J.); *Lau v. Nichols*, 414 U.S. 563, 571 n. 2, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (Stewart, J. concurring); *Soberal–Perez v. Heckler*, 717 F.2d 36, 40–41 (2d Cir.1983), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984). Private persons subjected to discrimination in violation of Title VI, although not parties to the applicable contracts, are those for whose benefit the promise not to discriminate is secured. These third-parties may bring viable causes of action pursuant to contractual pro-

---

**35.** For determining whether an implied private right of action exists pursuant to a statute, the first *Cort* factor queries who the intended beneficiaries of a regulation—such as a disparate impact regulation—are. The inquiry is whether the plaintiff at bar is a member of the special class for whose benefit the regulation was enacted. *Cort*, 422 U.S. at 78, 95 S.Ct. 2080. It is clear that disparate impact regulations are enacted for the benefit of those "persons" protected by § 2000d's prohibition of discrimination based on

race, color or national origin. *See Lowrey*, 117 F.3d at 250. Consequently, the court can conclude that by extension, contractual provisions requiring compliance with Title VI and its regulations, are entered into for the benefit of those same "persons" for whom disparate impact regulations are promulgated, and Title VI (§ 2000d) was enacted. Those persons are the "intended" third-party beneficiaries of contractual compliance provisions.

visions securing promises to comply with Title VI and applicable regulations. *See Lemon,* 370 F.2d at 850–51; *Beverly v. Macy,* 702 F.2d 931 (11th Cir.1983); *see also Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Howard v. Uniroyal, Inc.,* 719 F.2d 1552, 1555, n. 4 (11th Cir. 1983); *Bryan v. Koch,* 627 F.2d 612, 616 (2d Cir.1980); *Collins v. International Dairy Queen, Inc.,* 1998 WL 136501 *3 (M.D.Ga. Mar 23, 1998); Block, Arthur R., *Enforcement of Title VI Compliance Agreements By Third–Party Beneficiaries,* 18 Harvard C.R.–C.L.L.Rev. 1. (1983).

The Department has entered into contractual-type grant agreements containing assurance of compliance provisions. A typical assurance of compliance provisions provides:

The applicant/recipient hereby agrees that, as a condition to receiving any Federal financial assistance from the Department of Transportation, it will comply with Title VI of the Civil Rights Act of 1964, related nondiscrimination statutes, and applicable regulatory requirements to the end that no person in the Unites States shall, on the grounds of race, color, national origin, sex, handicap or age, be excluded from participation in, be. denied the benefits of, or otherwise be subjected to discrimination under any program or activity for which the applicant/recipient receives Federal financial assistance. The specific requirements of the United States Department of Transportation standard Civil Rights assurances with regard to the States' highway safety program (required by 49 CFR 21.7 and on file with the U.S. DOT) are incorporated into this grant agreement.

(*See* Pls.' Opp'n, Ex. 27 at 2, ¶ 11; *see also* Pls.' Tr. Ex. 27 at 4, ¶ 4.) Consequently, as intended third-party beneficiaries to contractual provisions like the one cited above, Plaintiffs have standing to enforce the Department's promise to comply with Title VI and applicable regulatory requirements. *See Lemon,* 370 F.2d at 851 (holding in class action educational desegregation case that "[w]hen defendants received and accepted federal funds ... they became bound by· Section 601 [§ 2000d] ... [c]onsequently, plaintiffs are entitled to bring this class action suit either under Section 601 of the Civil Rights Act of 1964 [§ 2000d] or under the contractual assurances by which defendants are estopped to deny them the ... rights to attend desegregated schools"); *see. also United States v. Frazer,* 297 F.Supp. 319, 324 (M.D.Ala.1968).

Finally, the court notes that when Congress intends to limit a private right of action for civil rights violations, it does so explicitly. *See* Title II and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(d) and 2000–e. Congress has not done so in the Title VI context, and the disparate impact regulations at issue here were promulgated pursuant to an express grant of rulemaking authority and are properly within the scope of that authority. *See* 42 U.S.C. § 2000d–1; *Alexander,* 469 U.S. at 292, 105 S.Ct. 712; *Elston,* 997 F.2d at 1394. Accordingly, there is no principled basis upon which to distinguish the established statutory implied right of action from the right of action at issue here. *See Lowrey,* 117 F.3d at 253. Therefore the court concludes that the private right of action created by Title VI incorporates the disparate impact regulations found, among other places, at 49 C.F.R. § 21.5(b)(2) and 28 C.F.R. § 42.104(b)(2). *See Id.* (utilizing similar reasoning to reach similar finding in Title IX context); *see also Cannon,* 441 U.S. at 694–96, 99 S.Ct. 1946 (noting interchangeability of Title VI and Title IX jurisprudence).

Based on the foregoing, the following factors lead the court to the finding that a private cause of action may be brought pursuant to regulations enacted pursuant to § 2000d–1: (1) the implicit reasoning of the Supreme Court in *Guardians, Alexander,* and *Lau;* (2) the implicit reasoning of the Eleventh Circuit in *Elston* and *Georgia State Conference;* (3) the implicit reasoning of the Eleventh Circuit in *Doe* and *Harris* (Title VI in conjunction with the regulations); (4) the explicit reasoning of the Third Circuit in *Seif* and the reasoning of other courts that have addressed the issue; and (5) the Department's contractual guarantees. All, any one, or two or more of these factors in combination, lead the court to the conclusion and finding that private causes of action may be brought pursuant to disparate impact regulations enacted via § 2000d–1.

### 3. Plaintiffs have the requisite standing to bring suit

The court now turns to Defendants' contention that even if the Department is a recipient of federal funds within the meaning of Title VI, and even if private causes of action may be brought pursuant to Title VI disparate impact regulations, the Plaintiffs at bar lack the requisite standing to bring the claims asserted.

■■■ "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This inquiry involves both constitutional limitations on federal-court jurisdiction, such as Article III's "case or controversy" requirement, and prudential limitations on its exercise. *Id.*

In *Bennett v. Spear,* 520 U.S. 154, ——, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997), the Court summarized the constitutional requirements of standing:

> [The] "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* 520 U.S. at ——, 117 S.Ct. at 1163 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "When the suit is one challenging the legality of government action or inaction, ... standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130. Plaintiffs bear the burden of establishing each of the elements of constitutional standing. *Id.*

■■■ Plaintiffs' Complaint alleges, and, as outlined below, the evidence in this matter establishes, that Plaintiffs at bar have suffered and will continue to suffer an actual, concrete, particularized injury in that, simply put, non-English speaking residents of Alabama are not given the opportunity to prove their knowledge of the rules of the road and are thus prevented from completing the entire examination process and obtaining a license.

The Complaint alleges, and the court finds, as outlined below, a causal connection between the injury complained of by the Plaintiffs and the conduct of the Defendants. While it is undoubtedly true that some non-English speakers would fail the written examination even if it were provided in an applicant's native language, it is also true that, by requiring that examinations be administered only in English, non-English speakers are not even provided with the opportunity to pass that portion of the testing process, and, consequently, such individuals are precluded from obtaining a license.

Finally, the court finds that the Plaintiffs' injury is capable of redress via a favorable decision. Indeed, enjoinment of the offensive conduct will cure the injuries complained of. Consequently, the court finds the Plaintiffs have met their burden of establishing Article III standing.

■■■ Prudential standing requirements are not mandated directly by Article III but, as the word "prudential" indicates, are judicious limits on the exercise of jurisdiction by federal courts. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Church of Scientology Flag Service Org., Inc. v. City of Clearwater,* 2 F.3d 1514, 1526 (11th Cir. 1993). Prudential considerations include the requirement that a plaintiff's grievance arguably fall within the "zone of interest" protected by the statute or constitutional right invoked, the principle that courts should avoid deciding generalized grievances, and the requirement that a litigant assert his or her

own rights or interests and not those of a third party. *Bennett,* 520 U.S. at ——, 117 S.Ct. at 1161; *see also Hill v. Butterworth,* 941 F.Supp. 1129, 1137 (N.D.Fla.1996) (listing prudential limitations on standing). The zone of interest and generalized grievance considerations are implicated here.

Turning first to the zone of interest inquiry, the court's task is limited to the examination of "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected ... by the statute." *National Credit Union Admin. v. First Nat. Bank & Trust Co.,* —— U.S. ——, ——, 118 S.Ct. 927, 935, 140 L.Ed.2d 1 (1998) (quoting *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). To so determine, the court need not find an "indication of congressional purpose to benefit the would be plaintiff." *Id.* 118 S.Ct. at 935 ("Our prior cases ... have consistently held that for a plaintiff's interests to be arguably within the "zone of interests" to be protected by a statute, there does not have to be an "indication of congressional purpose to benefit the would-be plaintiff" " (citations omitted)). In other words, courts need not ask "whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff." [36] *Id.*

---

**36.** The majority's statement in *National Credit Union* that specific congressional intent to benefit the plaintiff need not be shown, seemingly contradicts previous Supreme Court and Eleventh Circuit cases describing the proper analysis as entailing the ascertainment of "whether the ... statutory provision confers rights *intended* by the legislature to be enforceable under the remedial statute." *Church of Scientology,* 2 F.3d at 1526 (quoting *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 287, 112 S.Ct. 1311, 1328, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring) (zone of interests test is an "element of statutory standing")).

In *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1378 (11th Cir. 1997), the Eleventh Circuit stated that the zone of interest test requires courts to examine the "nature and source" of the plaintiff's allegations and inquire whether the Congress, in passing the laws at issue, intended to confer the right to sue upon individuals in the position of the Plaintiffs. *Id.* (quoting *Warth,* 422 U.S. at 500, 95 S.Ct. 2197). Of course, *National Credit Union* speaks of not inquiring into whether Congress intended to benefit the Plaintiff when it passed the statute at issue, while *Brooks* and *Church of Scientology* (citing to Supreme Court cases) speak of an inquiry into whether Congress intended to provide for a private right of action. Nevertheless, both Eleventh Circuit pronouncements were asserted in the context of determining statutory standing.

Having to show congressional intent seems intertwined with the analysis of whether a particular statute or regulation allows for a private right of action. *See Brooks,* 116 F.3d at 1378 (concluding that Congress did not intend to create a private cause of action under the statute at issue and thus that plaintiffs at bar lacked prudential standing to pursue their claim). It is clear that Title VI itself provides for an implicit private right of action, and the court has found above that private causes of action may be brought pursuant to regulations effectuating the purpose of Title VI. As part of the court's findings above, the court noted that Plaintiffs, among others, fall within the class of intended beneficiaries of Title VI's prohibition of discrimination in federally funded programs or activities on the basis of race, color or national origin. Consequently, based on the court's private right of action analysis, the court can conclude that the Plaintiffs at bar meet the prudential statutory standing requirement; Plaintiffs' interests "arguably" fall within the zone of interest protected by the statute. *Camp,* 397 U.S. at 153, 90 S.Ct. 827.

To further confuse or perhaps enlighten the congressional intent issue, the Supreme Court and the Eleventh Circuit have noted that the test does not require the plaintiff to show an identifiable "legal interest" that may entitle him or her to relief, *Camp,* 397 U.S. at 153–56, 90 S.Ct. 827; *see also Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *Church of Scientology,* 2 F.3d at 1526, but only that the relationship between the plaintiff's alleged interest and the purposes implicit in the substantive provision be more than "marginal[ ]." *Church of Scientology,* 2 F.3d at 1526 (quoting *Clarke,* 479 U.S. at 399, 107 S.Ct. 750).

If the text of a statute is not dispositive, it is not clear to the court how a plaintiff is to establish that they "arguably" fall within the zone of interests protected by the statute or that their alleged interest is more than "marginally" related to the substantive statutory provisions without an examination of congressional intent. Otherwise, courts would be left to their own devices in construing ambiguous statutes. This outcome is inconsistent with the overlapping analysis of whether legislative or administrative enactments contain implied private rights of action (although they were intertwined in *Brooks* and *Church of Scientology* ). A finding of no implied private right of action necessarily entails a finding that the plaintiff's interests do not fall within the zone of interests protected by the statute. Indeed, the first of the *Cort* factors utilized to determine whether a statute provides for a private right of action, examines whether the statute at issue was passed for the "especial benefit" of the plaintiff at bar, and the second factor examines legislative

Plaintiffs seek relief from the discrimination on the basis of national origin engendered by the Department's English-only policy. As the court noted earlier in its private right of action analysis, Plaintiffs' interests clearly more than "arguably" fall within the zone of interest protected by the statute and the regulations. In fact, even though not necessary to meet the requirements of statutory standing, the court finds the specific Congressional intent, in Title VI, to benefit the Plaintiffs' class at bar. Their interests are squarely addressed by the statute. Accordingly, the court finds that under the zone of interest inquiry, Plaintiffs meet prudential statutory standing requirements. *See Lemon*, 370 F.2d at 852 (finding that plaintiffs there "as beneficiaries of the Act, have standing to assert their section 601 [§ 2000d] rights").

As for prudential standing prohibitions on court's deciding "generalized grievances," Defendants argue that "[t]he absence of any link between the federal grants and the injuries plaintiffs claim to have suffered attenuates their standing." (Defs.' Reply at 14.) This argument is based on Defendants' erroneous position, (as discussed above), that Title VI only applies to the specific program or activity receiving federal funds. Accordingly, on that basis alone, Defendants' argument fails.

Nevertheless, Defendants point to language in *United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995), which notes that "we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Hays*, 515 U.S. at 743, 115 S.Ct. 2431. A thorough reading of *Hays* discloses, however, that in noting the prohibition of generalized grievances, the Supreme Court was merely reiterating the fact that injuries inflicted by governmental actors "accord[ ] a basis for standing only to 'those persons who are personally denied [the constitutional, statutory or other legal protection]' by the challenged discriminatory conduct." *Id.* at 743–44, 115 S.Ct. 2431 (quoting *Allen v. Wright*, 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Accordingly, the Court rejected the proposition that "anybody in the State has a claim." *Hays*, 515 U.S. at 744, 115 S.Ct. 2431.

■ The rule against generalized grievances merely prevents citizens from suing if their only injury is as a taxpayer or citizen seeking to stop allegedly unconstitutional governmental conduct. *See Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citing to *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Ex Parte Levitt*, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937) as examples); *see also Schrenko*, 109

---

intent. *See Cort*, 422 U.S. at 78, 95 S.Ct. 2080. In making this analysis, the Supreme Court has noted that congressional intent is the touchstone of the court's analysis. *See Thompson*, 484 U.S. at 174, 108 S.Ct. 513.

*National Credit Union* clearly states that congressional intent to benefit the plaintiff need not be shown. Cases such as *Holmes, Warth, Church of Scientology* and *Brooks*, however, indicate otherwise. Indeed, the four dissenters in *National Credit Union* accused the majority of "eviscerat[ing]" or "abolishing" the zone of interest requirement altogether. *National Credit Union*, —— U.S. at ——, ——, 118 S.Ct. at 940, 943 (O'Connor, J., dissenting). The majority's response to the dissent's concerns noted that:

the test we have articulated—discerning the interests "arguably ... to be protected" by the statutory provision at issue and inquiring whether the plaintiff's interests affected by the agency action in question are among them— differs only as a matter of semantics from the

formulation that the dissent has accused us of "eviscerating" or "abolishing."
*Id.* 118 S.Ct. at 936 n. 7. At least one court has noted the confusion over whether *National Credit Union's* "restatement" of the state of the law is actually a restatement, or, as the *National Credit Union* dissenters argue, the evisceration of the court's zone of interest inquiry. *See Bryant v. New Jersey Dept. of Transp.*, 998 F.Supp. 438, 444 (D.N.J.1998) (noting confusion in doctrine and predicting that note 7 in *National Credit Union* [quoted above] "will engender considerable debate in the future").

Regardless of whether congressional intent is a relevant element of the analysis, which *National Credit Union* unequivocally states that it is not, the court notes that under either analysis, Plaintiffs meet the prudential statutory standing requirements. At the least, it is clear that "the relationship between the [Plaintiffs'] alleged interest and the purposes implicit in the substantive provision [are] more than [marginal]." *Church of Scientology*, 2 F.3d at 1526.

F.3d at 689 n. 19 ("in order to have standing to sue in federal court, a plaintiff must allege an injury in fact distinct from that suffered by all or a large class of citizens" (citing *Warth,* 422 U.S. at 499, 95 S.Ct. 2197)). All of these actions involved plaintiffs suing not on the basis of an injury to their personal rights but instead as taxpayers or citizens objecting to government conduct. Here, in contrast, Plaintiffs allege, as a class, the specific violation of their personal right, provided by Title VI, to be free from discrimination in federally funded programs or activities. Their suit is not brought as citizens or taxpayers, but as a legally cognizable protected class of individuals subjected to unlawful discrimination. The court finds that Plaintiffs are "persons who are personally denied [the statutory protections] ... by the challenged discriminatory conduct," *Hays,* 515 U.S. at 743–44, 115 S.Ct. 2431, and accordingly rejects Defendants' generalized grievance argument.

### 4. The Eleventh Amendment does not bar Plaintiffs' suit

Having found that the Department is a recipient of federal funds within the meaning of Title VI; that disparate impact regulations allow for private causes of action; and that Plaintiffs at bar possess the constitutional and prudential standing necessary to prosecute this action, the court now turns to the consideration of whether the Eleventh Amendment bars Plaintiffs' claims. Having gone through the foregoing analysis, predictably, the court concludes that it does not.

In this action, Plaintiffs have named as Defendants both the Department of Public Safety and its Director, in his official capacity. Separate immunity analyses apply to each named Defendant. *See Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1039 (7th Cir.1987) (noting different analyses for State School Board and its Superintendent).

■ Addressing the Department first, it is an agency of the state, and it is clear that absent its consent or waiver, a state may not be sued in federal court unless Congress has clearly and unequivocally abrogated the state's Eleventh Amendment immunity. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 240–41, 105 S.Ct. 3142, 87 L.Ed.2d 171

(1985); *DeKalb County School District v. Schrenko,* 109 F.3d 680, 688 (11th Cir.1997). In the Rehabilitation Act Amendments of 1986, 100 Stat. 1845, 42 U.S.C. § 2000d–7, Congress did just that: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title VI of the Civil Rights Act of 1964." 42 U.S.C. § 2000d–7.

Until recently, this express statutory language would have ended the court's inquiry. In § 2000d–7, Congress has unequivocally expressed its intent to abrogate the State's immunity under Title VI. *See* 42 U.S.C. § 2000d–7(a)(1); *Lane v. Pena,* 518 U.S. 187, 198, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) ("by enacting [§ 2000d–7], Congress sought to provide the sort of unequivocal waiver that our precedents demand"); *see also Id.* at 200, 116 S.Ct. 2092 (noting that Congress "craft[ed] an unambiguous waiver of the States' Eleventh Amendment immunity in [§ 2000d–7]"); *see further Clark v. State of California,* 123 F.3d 1267, 1269–70 (9th Cir. 1997). Consequently, it is clear that "Congress has abolished the states' immunity for causes of action grounded in Title VI.... Thus, the State could be forced to defend a Title VI action in federal court without its consent." *Schrenko,* 109 F.3d at 688; *see also Lane,* 518 U.S. at 200, 116 S.Ct. 2092.

■ The Supreme Court's decision in *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), however, requires courts, after first asking "whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,'" *Id.* at 55, 116 S.Ct. 1114 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)), which it has in § 2000d–7, to then ask "whether Congress has acted 'pursuant to a valid exercise of power'" in abrogating the immunity. *Id. Seminole Tribe* held that the only valid source of constitutional power that permits Congress to abrogate states' Eleventh Amendment immunity is § 5 of the Fourteenth Amendment. *Id.* at 59, 116 S.Ct. 1114.

It is not clear, however, that the *Seminole Tribe* analysis applies in the context of this action. Specifically, Title VI is Spending

Clause legislation that does not force abrogation upon unwilling states, but rather induces states to voluntarily waive sovereign immunity in exchange for federal funds. The key distinction is that at all times, the states are free to choose whether to waive their immunity as opposed to the forced unilateral abrogation that concerned the Court in *Seminole Tribe*. *See Beasley v. Alabama State Univ.*, 3 F.Supp.2d 1304, 1308 (M.D.Ala.1998) (declining to apply *Seminole Tribe* in Title IX context because like Title VI, "it is a spending clause enactment and therefore does not thrust abrogation upon potentially unwilling states, but rather conditions the receipt of federal funds ... upon the states' voluntary waiver of sovereign immunity"); *see also Cannon*, 441 U.S. at 694–96, 99 S.Ct. 1946 (noting interchangeability of Title VI and Title IX jurisprudence).

The *Beasley* court found that "because no 'abrogation' is involved in the Title IX context, the *Seminole Tribe* test is inapplicable here," and focused its analysis on whether Congress could validly condition federal funding on a voluntary waiver of immunity under the Spending Clause. *Beasley*, 3 F.Supp.2d at 1310. After an exhaustive review of applicable case-law, the *Beasley* court concluded that "the spending clause does empower Congress to require that states waive their eleventh amendment immunity when they accept the use of federal funds." *Beasley*, 3 F.Supp.2d at 1316; *see also Lau*, 414 U.S. at 568, 94 S.Ct. 786 (where the Court approved the conditioning of federal funds on voluntary compliance with non-discrimination requirements: "The federal regulations reviewed in *Lau*, primarily regulated state action in the use of federal funds voluntarily sought and accepted by the grantees subject to statutory and administrative conditions." *Fullilove v. Klutznick*, 448 U.S. 448, 479, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), *abrogated on other grounds by Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)).

The well-developed analysis in *Beasley* is appealing, and the court finds it applicable to the case at bar, particularly because the Supreme Court's inquiry in *Seminole Tribe* was "narrowly focused" on the source of Congressional power "to abrogate unilaterally the States' immunity." *Seminole Tribe*, 517 U.S.

at 59, 116 S.Ct. 1114. In contrast to unilateral abrogation, nowhere does *Seminole Tribe* address voluntary consent to suit or waiver of Eleventh Amendment immunity by a state, except, tellingly, to note the "unremarkable, and completely unrelated, proposition that the States may waive their sovereign immunity." *Id.* at 65, 116 S.Ct. 1114.

It is clear that the Department has entered into contracts conditioning the receipt of federal funds on its agreement to comply with federal non-discrimination statutes and regulations. Title VI clearly prohibits such discrimination, and clearly abrogates state immunity. By entering into those contracts, the Department has waived any immunity to which it may be entitled. Because the federal government may condition the receipt of federal funds on state waiver of immunity under the Spending Clause, the court finds that the Eleventh Amendment does not bar Plaintiffs' suit. *See Beasley*, 3 F.Supp.2d at 1308.

Assuming *Seminole Tribe* applies, however, it is clear that "Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,'" *Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. 1114 (citation omitted); 42 U.S.C. § 2000d–7. Consequently, the court turns to the analysis of whether Congress, in enacting 42 U.S.C. § 2000d–7, has acted "'pursuant to a valid exercise of power'" in abrogating states' immunity. *Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. 1114 (citation omitted). This inquiry is "narrowly focused on one question: Was the Act in question passed pursuant to a constitutional provisions granting Congress the power to abrogate?" *Id.* at 59, 116 S.Ct. 1114 (citation omitted).

*Seminole Tribe* does not clearly articulate what "the Act in question" is. *Id.* In *Seminole Tribe*, the Court addressed the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2702, which contained an express abrogation provision at the time of enactment. *See* 25 U.S.C. § 2710(d)(7); *Seminole Tribe*, 517 U.S. at 57, 116 S.Ct. 1114. Title VI, however was passed in 1964, while the abrogation provision, § 2000d–7, was passed in 1986. Does the court examine the act abrogating immunity or does the court examine the ex-

isting, substantive act to which the abrogation applies?

In *Seminole Tribe,* the Court cited to *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–56, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), as an example of previous inquiries into the constitutional source of Congress' power to abrogate. In *Fitzpatrick,* the Court examined the 1972 Amendments to Title VII of the Civil Rights Act of 1964, and concluded that "in enacting the 1972 Amendments to Title VII ... Congress exercised its power under § 5 of the Fourteenth Amendment." *Id.* at 453 n. 9, 96 S.Ct. 2666. In contrast, Title VII of the Civil Rights Act of 1964 was enacted pursuant to Congress' commerce power. *United Steelworkers of America v. Weber,* 443 U.S. 193, 207 n. 6, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *see also Johnson v. Transportation Agency, Santa Clara, California,* 480 U.S. 616, 628, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *Edwards v. City of Houston,* 37 F.3d 1097, 1110 n. 9 (5th Cir. 1994); *but see Regents of the University of California v. Bakke,* 438 U.S. 265, 366–67, 98 S.Ct. 2733, 57 L.Ed.2d 750 (Blackmun, White, Marshall, JJ., concurring in the judgment in part and dissenting in part) (stating the Title VII was enacted pursuant to the Commerce Clause and § 5 of the Fourteenth Amendment); *Davis v. Monroe County Board of Education,* 120 F.3d 1390, 1400 n. 13 (11th Cir.1997) (stating that Title VII was enacted pursuant to the Commerce Clause and § 5 of the Fourteenth Amendment).

*Fitzpatrick* and *Seminole Tribe* indicate that where a statutory provision is enacted abrogating state immunity in relation to an earlier passed statute, courts are to examine the constitutional source of power of the "act" abrogating immunity, and not the constitutional source of power of the existing statute. If this is the rule, and § 2000d–7 was enacted pursuant to § 5 of the Fourteenth Amendment, then in enacting § 2000d–7, Congress was acting pursuant to a constitutional provision granting Congress the power to abrogate. *Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. 1114; *Fitzpatrick,* 427 U.S. at 452–56, 96 S.Ct. 2666.

In spite of the literal language of *Seminole Tribe* and *Fitzpatrick,* however, other courts have examined the constitutional source of power of the underlying, existing substantive statute rather than the source of power of the later enacted abrogation provision. *See, e.g., Crawford v. Davis,* 109 F.3d 1281, 1282–84 (8th Cir.1997) (holding that Title IX was enacted pursuant to § 5 of the Fourteenth Amendment, consequently under *Seminole Tribe,* Title IX [42 U.S.C. § 2000d–7] abrogated States' Eleventh Amendment immunity); *see also Franks v. Kentucky School for the Deaf,* 142 F.3d 360 (6th Cir.1998) (similar); *Doe v. University of Illinois,* 138 F.3d 653 (7th Cir.1998) (similar); *Clark v. State of California,* 123 F.3d 1267 (9th Cir.1997) (similar). None of these courts addressed the question of which "act" to evaluate. Instead, after outlining *Seminole Tribe,* they proceeded to address the substantive statute at issue. Indeed, the question of which "act" to evaluate seems fallacious given that the abrogation provision at issue (§ 2000d–7) is necessarily tied to the substantive statute to which it applies. Nevertheless, the literal terms of *Seminole Tribe* and its reliance upon *Fitzpatrick* indicate such an inquiry. Under such, the *Seminole Tribe* test is met, and Congress has validly abrogated states' immunity under Title VI.

If courts are to examine the existing, substantive act, however, rather than the act providing abrogation, the law of this circuit is that Title VI was enacted pursuant to the Spending Clause of Article I. *Davis v. Monroe County Board of Education,* 120 F.3d 1390, 1398 (11th Cir.1997) ("In [*Guardians* ], at least six members of the Supreme Court agreed that Title VI was enacted under the Spending Clause"), *id.* at 1399 (finding "Title IX, like Title VI, was enacted under Congress' power to spend for the general welfare of the United States").[37] *Seminole Tribe* provides that "Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe,* 517 U.S. at 73, 116 S.Ct. 1114. Should the inquiry be focused on the existing, sub-

**37.** Although other Courts of Appeals disagree with the conclusion that Title IX and Title VI were enacted solely pursuant to the Spending Clause, and make persuasive arguments in support of their holdings, this court is bound by the mandates of the Eleventh Circuit. *See, e.g., Crawford,* 109 F.3d at 1282–84; *Franks,* 142 F.3d 360.

stantive act (Title VI), rather than the later enacted abrogation provision (§ 2000d–7), and should the analysis cease at this point, without examining whether Congress *could have* acted pursuant to another constitutional provision, or whether the state has waived its immunity, the court would be compelled to conclude that Congress' abrogation of immunity under Title VI was ineffective, and, consequently, that in this action, the Eleventh Amendment barred Plaintiffs' claims against the Department.

Despite this finding however, two factors, besides the court's reliance on *Beasley,* operate to preserve Plaintiffs' claims. First, those courts analyzing the source of power of the underlying, existing substantive statute, have also defined the inquiry as not reliant solely on the source of power under which Congress was explicitly acting; they have also examined whether Congress *could have* utilized other constitutional powers in enacting specific legislation. *See, e.g., Crawford v. Davis,* 109 F.3d 1281, 1282–84 (8th Cir.1997) (defining the inquiry as "whether Congress could have enacted the legislation at issue pursuant to a constitutional provision granting it the power to abrogate. As long as Congress had such authority as an objective matter, whether it also had the specific intent to legislate pursuant to that authority is irrelevant"); *Franks v. Kentucky School for the Deaf,* 142 F.3d 360 (6th Cir.1998) ("question is whether Congress actually had the authority to adopt the legislation pursuant to that provision, not whether Congress correctly guessed the source of its authority"); *see also Doe v. University of Illinois,* 138 F.3d 653 (7th Cir.1998); *Clark v. State of California,* 123 F.3d 1267 (9th Cir.1997). The Eleventh Circuit has never addressed whether an inquiry into whether Congress *could have* acted pursuant to another constitutional provision, is proper. If such an inquiry is proper, the Eleventh Circuit's pronouncement that Title VI was exclusively enacted pursuant to the Spending Clause would not automatically bar this action under *Seminole Tribe,* because Congress *could have* acted pursuant to § 5 of the Fourteenth Amend-

ment, a legitimate source of power pursuant to which state immunity may be abrogated. *See, e.g., Crawford,* 109 F.3d at 1282–84; *Franks,* 142 F.3d 360.

Second, even assuming *Seminole Tribe* applies, and even assuming that because Title VI is Spending Clause legislation, Congress has not validly abrogated a state's immunity under the Eleventh Amendment, a state may still waive its immunity, and the court finds that the Department has done so here.[38] *Seminole Tribe,* 517 U.S. at 63, 65, 116 S.Ct. 1114; *Atascadero,* 473 U.S. at 238 n. 1, 247, 105 S.Ct. 3142; *Clark,* 123 F.3d at 1271; *Gomez,* 811 F.2d at 1038–39; *Beasley,* 3 F.Supp.2d at 1315.

Immunity may be waived, for example, when a state accepts federal funds and the funding statute "manifest[s] a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Atascadero,* 473 U.S. at 247, 105 S.Ct. 3142; *see also Clark,* 123 F.3d at 1271. In *Seminole Tribe,* "the Court recognized that the long-settled notion that states may voluntarily waive their immunity did not run afoul of the principles of federalism upon which the holding in *Seminole Tribe* rested." *Beasley,* 3 F.Supp.2d at 1315.

Here, Title VI manifests a clear intent to condition a state's receipt of federal funds on its consent to waive its Eleventh Amendment immunity. Section 2000d–7 provides that "a State shall not be immune under the Eleventh Amendment ... from suit in Federal court for a violation of ... title VI ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d–7. The Supreme Court has described § 2000d–7 as "an unambiguous waiver of the States' Eleventh Amendment immunity." *Lane,* 518 U.S. at 200, 116 S.Ct. 2092. Accordingly, the court finds that because the Department accepts federal funds under Title VI, and "the spending clause does empower Congress to require that states waive

---

**38.** To clarify, the court, relying on *Beasley,* found above that *Seminole Tribe* was inapplicable, and that under the Spending Clause Congress may validly require states to waive their immunity as

a condition of receiving federal funds. This discussion of state waiver notes that even under *Seminole Tribe,* states may still waive their immunity.

their eleventh amendment immunity when they accept and use federal funds," *Beasley*, 3 F.Supp.2d at 1316, in this action, the state has waived its immunity under the Eleventh Amendment. *See Clark*, 123 F.3d at 1271 (applying identical analysis).

■ To further complicate matters, Defendants also argue that assuming the Eleventh Amendment does not bar Plaintiffs' claims, § 2000d–7's abrogation of state immunity applies only to Title VI itself, and not to regulations enacted pursuant to § 2000d–1. (*See* Defs.' Post–Tr. Br. at 9.) Although no court has directly addressed this issue, several factors lead the court to conclude that the Eleventh Amendment does not operate as a bar to disparate impact causes of action. First, the court agrees with the Plaintiffs' observations that:

In enacting 42 U.S.C. § 2000d–7, there is no reason to think that Congress distinguished between action to enforce the Title VI statutory prohibition against intentional discrimination, 42 U.S.C. § 2000d, and the regulations prohibiting disparate impact discrimination. The Title VI regulations were issued pursuant to the directive to federal agencies contained in 42 U.S.C. § 2000d–1. The regulations are not separate and apart from the statute. Rather, they "effectuate the provisions of section 2000d," the statutory prohibition against discrimination. 42 U.S.C. § 2000d–1; *see Lau v. Nichols*, 414 U.S. 563, 566–569, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). By the time Congress passed 42 U.S.C. § 2000d–7, it had already "rebuffed efforts to overturn the Title VI disparate-impact regulations" and "with full awareness of how the agencies were interpreting Title VI, ha[d] modeled later statutes on § 601 of Title VI, thus indicating approval of the administrative definition." *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582, 593 n. 14, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (White, J.) Just as 42 U.S.C. § 2000d–7 abrogates Eleventh Amendment immunity for claims brought directly under the stat-ute, so it abrogates immunity for claims brought pursuant to the disparate-impact regulations that effectuate the statute.

(Pls.' Supp. Post–Tr. Br. at 2–3.)

As noted in the court's private right of action analysis, above, and as Plaintiffs note, Title VI includes § 2000d–1, which specifically provides for the promulgation of rules and regulations to "effectuate the provisions" of Title VI. 42 U.S.C. § 2000d–1. These regulations, including disparate impact regulations, are valid exercises of agency authority. *See Alexander*, 469 U.S. at 292–94, 105 S.Ct. 712.[39] As the *Alexander* Court noted:

By the time Congress enacted the Rehabilitation Act in 1973 [the statute at issue there], nearly a decade of experience had been accumulated with the operation of the nondiscrimination provisions of Titles VI and VII. By this time, model Title VI enforcement regulations incorporating a disparate-impact standard had been drafted by a Presidential task force and the Justice Department, and every Cabinet Department and about 40 federal agencies had adopted standards in which Title VI was interpreted to bar programs with a discriminatory impact. *See Guardians*, 463 U.S., at 629–630, 103 S.Ct., at 3247 (MARSHALL, J., dissenting). These regulations provoked some controversy in Congress, and in 1966 the House of Representatives rejected a proposed amendment that would have limited Title VI to only intentional discrimination. *Id.*, at 630–631, 103 S.Ct., at 3247–3248. Thus, when Congress in 1973 adopted virtually the same language for § 504 that had been used in Title VI, Congress was well aware of the intent/impact issue and of the fact that similar language in Title VI consistently had been interpreted to reach disparate-impact discrimination. In refusing expressly to limit § 504 to intentional discrimination, Congress could be thought to have approved a disparate-impact standard for § 504. *See United States v. Ruther-*

---

**39.** Indeed, as the Eleventh Circuit noted in *Doe* and *Harris*, regulations could "further defin[e] and flesh[] out the content of the statutory right," as do, as the court has found, the disparate impact regulations at issue here. *See Doe*, 136 F.3d at 717; *Harris*, 127 F.3d at 1008–09.

Further, as the Eleventh Circuit noted in *Floyd*, 133 F.3d at 791 n. 9, "federal statutes *and regulations* may be modified and, therefore, change the liability attributable to a grant recipient." (emphasis added).

*ford,* 442 U.S. 544, 554, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 698–699, 99 S.Ct. 1946, 1958–1959, 60 L.Ed.2d 560 (1979).

*Alexander,* 469 U.S. at 294 n. 11, 105 S.Ct. 712.

Knowing of the existence of administrative disparate impact regulations at the time § 2000d–7 was contemplated and enacted, were it Congress' intent to maintain state immunity from disparate impact suits but abrogate immunity for suits under Title VI itself, it would have done so. *See Franklin,* 503 U.S. at 71, 112 S.Ct. 1028 (noting that if Congress intend to deny a damage remedy, it would have done so, particularly "because Congress was legislating with full cognizance" of an earlier Supreme Court decision implicitly and contextually allowing a damage remedy); *Alexander,* 469 U.S. at 294 n. 11, 105 S.Ct. 712. It did not, instead enacting a blanket abrogation of States' Eleventh Amendment immunity under Title VI, including § 2000d–1 which directs federal agencies to promulgate regulations effectuating the provisions and purposes of the statute. 42 U.S.C. § 2000d–1. Other courts have reached the same conclusion that § 2000d–7 abrogation applies to regulations enacted pursuant to Title VI as well. *See Grimes v. Sobol,* 832 F.Supp. 704, 707 (S.D.N.Y.1993) ("Contrary to NYSED's erroneous assertion, it is not immune from suit where, as here, plaintiffs allege violations of Title VI and its regulations"), *aff'd* 37 F.3d 857 (2d Cir.1994). The court finds that § 2000d–7 applies to disparate impact regulation enacted pursuant to § 2000d–1.

■ Defendants' citation to and reliance upon *Davis v. Monroe County Board of Education,* 120 F.3d 1390 (11th Cir.1997) (en banc), in support of their argument that the Department failed to receive proper notice that it may be subject to suit under Title VI regulations, is misplaced. (*See* Defs.' Mot. For Leave To Submit Add. Auth.) *Davis* addressed the novel question of whether a school board could be held liable under Title IX for failing to prevent sexual harassment among students. *Id.* at 1392. The Eleventh Circuit examined whether the school board had adequate notice of possible liability to justify waiver of immunity under Title IX.

The court's notice analysis went to whether the school board was on notice that "they, rather than society as a whole, would accept responsibility for remedying student-student sexual harassment when they chose to accept federal financial assistance under Title IX." *Id.* at 1406. The Eleventh Circuit noted that:

[In *Franklin,* 503 U.S. at 74–75, 112 S.Ct. 1028,] [t]he Court stated that the plain language of Title IX imposes on schools a duty not to discriminate on the basis of sex, and when a school teacher sexually harasses a student, that teacher is discriminating on the basis of sex. *Id.* at 75, 112 S.Ct. at 1037. Appellant argues that a school employee is intentionally discriminating on the basis of sex when he or she fails to prevent one student from sexually harassing another.... Hence, appellant asserts that the school board here had sufficient notice, for purposes of the Spending Clause, that it could be held liable. We disagree....

The terms of Title IX gave educational institutions notice that they must prevent their employees from themselves engaging in intentional gender discrimination. *See Franklin,* 503 U.S. at 75, 112 S.Ct. at 1037. Thus, school administrators cannot deny admission to female applicants because of their gender. *See Cannon,* 441 U.S. at 709, 99 S.Ct. at 1964. School administrators cannot discriminate against teachers on account of sex. *See North Haven Bd. of Educ.,* 456 U.S. at 530, 102 S.Ct. at 1922–23. Teachers cannot sexually harass their students. *See Franklin,* 503 U.S. at 74–75, 112 S.Ct. at 1037.

The present complaint, however, does not allege that a school employee discriminated against [plaintiff] in any of the foregoing ways. The complaint does not allege, for example, that [employees] sexually harassed [plaintiff]. Rather, the complaint alleges that these individuals failed to take measures sufficient to prevent a non-employee from discriminating against [plaintiff]. We do not think that the Board was on notice when it accepted

federal funding that it could be held liable in this situation.

*Davis,* 120 F.3d at 1400–01.

Title IX prohibits a school employee from discriminating on the basis of sex. *Franklin,* 503 U.S. at 75, 112 S.Ct. 1028; *Davis,* 120 F.3d at 1399. *Davis* queried whether the rigorous notice requirements applicable to Spending Clause provisions were met when plaintiffs attempted to assert a claim that a school employee was discriminating on the basis of sex "when he or she fails to prevent one student from sexually harassing another." *Davis,* 120 F.3d at 1399. After noting that nothing in the language or legislative history of Title IX would support a claim for student-student liability, the court noted that "[i]n the absence of any supporting legislative history, statutory construction of ambiguous language cannot support a finding of notice as required by the Spending Clause." *Id.* at 1401 n. 15.

As the above passages show, *Davis,* in essence, concerned whether a school board was provided with sufficient notice of possible liability under a cause of action that was unsupported in the text or legislative history of Title IX. Here, in contrast, the question is whether the Department was on notice that it could be liable under established causes of action for violations of Title VI and its regulations. Plaintiffs do not seek to proceed under a heretofore untried theory of statutory construction. Rather, they merely assert that the Department's conduct creates an unjustified disparate impact on the basis of national origin, a cause of action long recognized. *See Elston,* 997 F.2d 1394; *Georgia State Conference,* 775 F.2d 1403. Accordingly, a much simpler question faces the court here than faced the court in *Davis,* and the only relevant portion of *Davis* to the case at bar is its recitation of the general rule that states must be aware of the conditions and consequences of accepting federal funds. *Davis,* 120 F.3d at 1399; *see also, Floyd,* 133 F.3d at 789.

"To ensure the voluntariness of participation in federal programs, the Supreme Court has required Congress to give potential recipients unambiguous notice of the conditions they are assuming when they accept federal funding." *Davis,* 120 F.3d at 1399 (citing *Pennhurst,* 451 U.S. at 17, 101 S.Ct.

1531). Spending power provisions "must read like a prospectus and give funding recipients a clear signal of what they are buying." *Id.* "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (citing *Canutillo Indep. Sch. Dist. v. Leija,* 101 F.3d 393, 398 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997)).

Defendants cite *Davis* for the proposition that in this action, the Department did not receive unambiguous notice that "it must . . . provide tests for Class D driver's licenses in languages other than English so as to avoid discrimination on the basis of national origin." (Defs.' Mot. For Leave .To Submit Add. Auth. at 3.) In this action, however, all *Davis,* and the cases cited therein require, are that the Department be aware of the fact that by accepting federal funds, it could be held liable for violations of Title VI or its regulations. *See generally, Davis,* 120 F.3d at 1399, 1401. In other words, the question is whether, when the Department accepted federal funds, it was on notice that it had to comply with, and could be held liable for, violations of Title VI and its regulations.

The contractual provisions in the record clearly state that the "applicant/recipient hereby agrees that, as a condition to receiving any Federal financial assistance from the Department of Transportation, it will comply with Title VI of the Civil Rights Act of 1964 . . . and applicable regulatory requirements." (*See* Pls.' Opp'n, Ex. 27 at 2, ¶ 11; *see also* Pls.' Tr. Ex. 27 at 4, ¶ 4.) Further, the court has already found that 42 U.S.C. § 2000d–7 clearly informs the Department of its lack of immunity. Finally, the court also notes that apart from the legal notice requirements, which have been met, the Department was advised that its English-only policy probably violated Title VI and the Equal Protection Clause via an official Attorney General's Opinion. The court finds that the Department had the required notice that it could be liable for violations of Title VI and its regulations.

*Davis* does not hold, as Defendants would have the court read, that provisions must be

placed in every disbursement of federal funds addressing every single state program or activity, under the gamut of Title VI, that is or may be in non-compliance with federal non-discrimination requirements. Indeed, both *Franklin* and *Davis* noted that the terms of Title IX "gave educational institutions notice that they must prevent their employees from themselves engaging in intentional gender discrimination." *Davis*, 120 F.3d at 1401 (citing *Franklin*, 503 U.S. at 75, 112 S.Ct. 1028). A specific program by program review is nowhere mentioned. Nor does *Davis* require the federal government to notify the state of specific actions that must be taken to ensure compliance. Defendants cite no law, regulation, or holding of any court that a state agency or department is only subject to Title VI liability, in this context, if the state agency or department is told by the federal government that one of its specific programs or activities violated federal law, is given instructions to modify the program or activity and the extent of those modifications, and the department or agency then fails to comply with the federal government's requirements. Such a procedure is more akin to the termination of funding procedures mandated by 42 U.S.C. § 2000d–1 and interpretive case-law. As noted, private litigants cannot secure the termination of funding. Accordingly, the court declines to place such a notice requirement on the private litigants—only seeking injunctive relief—in the case at bar. The Department receives federal funds and as a condition of receiving those funds, agrees to comply with Title VI and its regulations. The court finds that the Department was on notice that it was required to comply with Title VI's prohibition against discrimination based on national origin, as well as DOT and DOJ regulations, among others, prohibiting practices leading to an unjustified disparate impact on the basis of national origin.[40]

Whether the Eleventh Amendment bars Plaintiffs' claims against the Department, may, however, be a redundant issue. In *Cone Corp. v. Florida Dept. of Transp.*, 921 F.2d 1190, 1201 (11th Cir.1991), highway construction contractors challenged Florida statutory and regulatory set-aside provisions by suing the Florida Department of Transportation ("FDOT") and its Secretary. Although the action was ultimately dismissed for lack of standing, the Eleventh Circuit addressed the jurisdictional posture of the case:

> [The plaintiffs sought relief under 42 U.S.C. §§ 1981, 1983 and 42 U.S.C. § 2000d (Title VI).] ... the district court dismissed the section 1983 and section 1981 claims, finding that the FDOT was immune from suit under the eleventh amendment of the United States Constitution. The court allowed plaintiffs to proceed against the FDOT on their section 2000d [Title VI] claim, however, under the express abrogation of eleventh amendment immunity found in 42 U.S.C. § 2000d–7(a)(1). We agree with the district court that section 2000d gives plaintiffs an implied private right of action against the FDOT and the Secretary.
>
> ...
>
> ... although plaintiffs may sue both the Secretary and the FDOT under section 2000d, they may receive only declaratory and injunctive relief.[41] Their action against the FDOT is, therefore, redundant. The FDOT may act only through its human agents. If a court were to issue an injunction purporting to bind the FDOT, the Secretary would be responsible for ensuring that the agency obeyed the injunction, and would bear the risk of civil contempt proceedings to enforce its terms. ...

**40.** The court finds it odd that the Department asserts the position that the federal government should micro-manage state programs and activities so as to ensure compliance with federal law. In essence, the Department's position is that when federal funds are disbursed, the federal government should review every single program of the Department to ensure compliance with federal non-discrimination laws and require modification of those programs that are or could be in non-compliance. The Department has given no indication that it has or will cease seeking federal funds, and, accordingly, in essence, is conceding that it would welcome federal micromanagement of its activities.

**41.** *But see Lane v. Pena*, 518 U.S. 187, 191, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (noting that Title VI allows for monetary damage awards) (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 70, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)).

This opinion, accordingly, will refer to the Secretary as the sole defendant.

*Cone Corp.,* 921 F.2d at 1201.

Further, in *Seminole Tribe,* the Supreme Court noted that even if Congress failed to properly abrogate States' immunity, "several avenues remain open for ensuring state compliance with federal law.... Most notably, an individual may obtain injunctive relief under *Ex parte Young* in order to remedy a state officer's ongoing violation of federal law." *Seminole Tribe,* 517 U.S. at 72 n. 16, 116 S.Ct. 1114; *see also Id.* at 71 n. 14, 116 S.Ct. 1114. As the Fourth Circuit recently noted in *CSX Transp., Inc. v. Board of Public Works of the State of West Virginia,* "[a]n injunction under the *Ex parte Young* doctrine may provide the [plaintiffs] with complete relief regardless of whether the state is immune from suit under the Eleventh Amendment." 138 F.3d 537, 539 (4th Cir. 1998). And in *Kimel v. State of Florida Board of Regents,* 139 F.3d 1426 (11th Cir. 1998), although the Eleventh Circuit held that the Eleventh Amendment barred private suits against states under the ADEA, it noted that "[t]he ADEA is enforceable against the States, despite sovereign immunity, through forms of relief other than direct suits by citizens in federal court." The *Kimel* court cited to note 14 in *Seminole Tribe* for support. *Id.* 139 F.3d at 1432; *see also Id.* n. 13 ("For examples of other methods of ensuring the States' compliance with federal law, *see Seminole,* 517 U.S. at 71 n. 14, 116 S.Ct. 1114"); *Clark,* 123 F.3d at 1271.

 *Seminole Tribe, Cone Corp., CSX Transp., Clark* and *Kimel* establish that in this action, even if the Department is immune from suit, its Director, in his official capacity, is not. Accordingly, the court now turns to the Department's Director, sued in his official capacity. As a general rule, "the

Eleventh Amendment insulates states from suit in Federal court," *Welch v. Laney,* 57 F.3d 1004, 1008 (11th Cir.1995), however, it "does not insulate state officials acting in their official capacities from suit in federal court, at least to the extent the complainant seeks prospective injunctive relief." *Id.*

 This exception to the general rule that the Eleventh Amendment bars suit in federal court unless the state consents or Congress clearly expresses its intent to abrogate immunity, *see Seminole Tribe,* 517 U.S. at 53–54, 116 S.Ct. 1114; *Pennhurst,* 465 U.S. at 99, 104 S.Ct. 900, was formulated in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). There, the Supreme Court held that the Eleventh Amendment does not bar a federal court from enjoining an unconstitutional action by a state official, even though the state may be immune, because the state does not "impart to [the official] any immunity from responsibility to the supreme authority of the United States." *Id.* at 160, 28 S.Ct. 441; *see also Schrenko,* 109 F.3d at 690 (citing *Milliken v. Bradley,* 433 U.S. 267, 289, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)); *see further Lassiter v. Alabama A & M Univ.,* 3 F.3d 1482, 1485 (11th Cir. 1993) ("[The] Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief"); *Wu v. Thomas,* 863 F.2d 1543, 1549–50 (11th Cir.1989), *reh'g and reh'g en banc denied* March 8, 1989 ("The eleventh amendment does not ... bar suits for equitable relief against state officers in their official capacity...."); *Cross v. State of Alabama, State Department of Mental Health & Mental Retardation,* 49 F.3d 1490, 1503 (11th Cir.1995) (noting same).[42] The *Ex parte Young* exception applies to violations of both federal statutory and constitutional rights. *See, e.g.,*

---

**42.** Congress' express abrogation of the states' Eleventh Amendment immunity in § 2000d–7 may itself abrogate any official capacity immunity asserted by a state official. The Ninth Circuit has noted that "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess." *Duffy v. Riveland,* 98 F.3d 447, 452 (9th Cir.1996) (citing *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Thus, Congress's abrogation of the states' Eleventh Amendment immunity from suit

under Title VI similarly precludes assertion of immunity by state officials sued in their official capacity. *Id.; see also Pena v. Gardner,* 976 F.2d 469, 473 (9th Cir.1992) ("An official sued in his official capacity has the same immunity as the state ...").

Should the Department maintain its Eleventh Amendment immunity, however, *Ex parte Young* would still apply, and Director Hagan, in his official capacity, would not be immune from a suit requesting declaratory and injunctive relief.

*Natural Resources Defense Council v. California Dept. of Trans.*, 96 F.3d 420, 422 (9th Cir.1996).

■ This exception is narrow, and is tailored to preventing ongoing violations of federal law rather than compensating injuries caused by past violations. *Papasan v. Allain*, 478 U.S. 265, 278, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). As the Supreme Court explained the exception, "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (citations omitted). Consequently, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *see also Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

■ This exception, by extension, permissibly leads to ancillary expenditures of funds from state treasuries where the fiscal consequences are "the necessary result of compliance with decrees which by their terms were prospective in nature." *Edelman v. Jordan*, 415 U.S. 651, 667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). What the Eleventh Amendment does bar, are suits seeking compensation for past injuries caused by past violations of federal law by a state official, whether that compensation is characterized as damages, equitable restitution, or something else. *See Papasan*, 478 U.S. at 278, 106 S.Ct. 2932; *Green*, 474 U.S. at 69–70, 106 S.Ct. 423. Accordingly, courts must discern whether the relief requested is prospective or retrospective in nature and whether monetary damages are sought.

■ In the case at bar, Plaintiffs are seeking declaratory and injunctive relief against the Department and its Director; no monetary damages are sought for past violations. Consequently, the Supreme Court's concerns in *Papasan* are not implicated, and this action falls squarely within the *Ex parte Young* exception. *Cf. Schrenko*, 109 F.3d at 691. Accordingly, the court finds that this action is not, in essence, "one for recovery of money from the state," that "the state is [not] the real, substantial party in interest," and, consequently, it "is [not] entitled to invoke its [Eleventh Amendment] immunity from suit...." *Schrenko*, 109 F.3d at 690 (citing *Pennhurst*, 465 U.S. at 101, 104 S.Ct. 900; *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)). The court finds that the Eleventh Amendment does not bar Plaintiffs' claims against Director Hagan in his official capacity.

**C. Findings Of Fact And Conclusions Of Law**

**1. Legal Framework**

■ Having cleared the procedural hurdles, the court now turns to the merits of this action. Plaintiffs' claims are brought solely on a disparate impact theory. (*See* Pls.' Opp'n at 31.) Courts analyzing Title VI disparate impact claims have looked to elements developed under Title VII for guidance. *See, e.g., New York Urban League*, 71 F.3d at 1036; *City of Chicago v. Lindley*, 66 F.3d 819, 829 (7th Cir.1995); *Elston*, 997 F.2d at 1407 n. 14; *Larry P. v. Riles*, 793 F.2d 969, 982 nn. 9, 10 (9th Cir.1984); *Georgia State Conference*, 775 F.2d at 1417; *NAACP v. Medical Center, Inc.*, 657 F.2d 1322, 1331 (3d Cir.1981) (en banc). Recent Eleventh Circuit decisions, however, have called into question the use of Title VII's disparate impact framework in Title VI disparate impact analyses.

In *Floyd v. Waiters*, 133 F.3d 786, 790 n. 5 (11th Cir.1998) and *Davis v. Monroe County Board of Education*, 120 F.3d 1390, 1400 n. 13 (11th Cir.1997), the Eleventh Circuit questioned whether Title VII's framework should be utilized to resolve questions of liability under Title IX. As noted, Title IX and Title VI analyses are generally consistent. *See Floyd*, 133 F.3d at 790 n. 5. In both *Floyd* and *Davis*, however, the Eleventh Circuit examined standards of vicarious liability for sexual harassment, and concluded that Title VII sexual harassment standards were incompatible with Title IX, in part because of the different language of the statutes and the different constitutional bases for each statutes' enactment. *See Id.; Davis*, 120 F.3d at 1400 n. 13.

In *Elston,* 997 F.2d at 1407 n. 14 (1993) and *Georgia State Conference,* 775 F.2d at 1417 (1985), in contrast, the Eleventh Circuit expressly utilized Title VII's disparate impact framework in analyzing Title VI disparate impact claims brought pursuant to § 2000d–1 disparate impact regulations. "The law in this circuit is emphatic that 'only a decision by this court sitting en banc or the United States Supreme Court can overrule a prior panel decision.'" *United States v. Kaplan,* 133 F.3d 826, 831 (11th Cir.1998) (quoting *United States v. Woodard,* 938 F.2d 1255, 1258 (11th Cir.1991) (per curiam) (quoting *United States v. Machado,* 804 F.2d 1537, 1543 (11th Cir.1986))). It is not clear that *Floyd* and *Davis* are applicable to this action given the unique nature of those cases; there the Eleventh Circuit examined whether liability should be imputed to school boards/districts. And, *Elston* and *Georgia State Conference* are directly on point. Accordingly, the court will utilize the Title VII disparate impact framework explicitly outlined in *Elston* and *Georgia State Conference. Elston,* 997 F.2d at 1407; *Georgia State Conference,* 775 F.2d at 1417; *see also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d. 280 (1975); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *but see Godby v. Montgomery County Board of Education,* 1998 WL 119956, *22 n. 17 (M.D.Ala.1998) (declining to apply Title VII framework in Title VI case because of *Floyd* ).

 To bring a viable cause of action under disparate impact regulations enacted pursuant to Title VI, Plaintiffs must establish by a preponderance of the evidence that they are members of a class protected by the statute and that defendants have promulgated a facially neutral practice that has a disproportionate adverse effect. *See Elston,* 997 F.2d at 1407 (citing *Georgia State Conference,* 775 F.2d at 1417). If the plaintiff makes such a prima facie showing, the defendant must then prove that there exists a "substantial legitimate justification" for the practice in order to avoid liability. *Id.* To do so, the defendant must show that the challenged policy was "necessary to meeting a

goal that was legitimate, important, and integral to the defendant's institutional mission." *Id.* at 1413. The justifications must bear a "manifest demonstrable relationship" to the challenged policy. *Id.* at 1412 (citing *Georgia State Conference,* 775 F.2d at 1418). If the Defendants meet this burden, the Plaintiffs may still prevail by offering a comparably effective alternative practice which results in less disproportionality or by showing that the proffered justifications are actually a pretext for discrimination. *Id.*

2. Plaintiffs have established by a preponderance of the evidence that they are members of a class protected by the statute and that Defendants have promulgated a facially neutral practice that has a disproportionate adverse effect

 a. *Plaintiffs are members of a class protected by the statute*

 The crux of this case is whether discrimination on the basis of language can lead to an unjustified disparate impact on the basis of national origin, and thus lead to a violation of Title VI.

 Defendants argue that "[t]he English-only policy distinguishes between those who speak English and those who do not. This classification is not based on national origin, so plaintiffs' claims under ... the Civil Rights Act ... fail." (Defs.' Mot. at 4; *see also* Defs.' Resp.. at 2.) Defendants are correct in noting that the policy discriminates on the basis of language, and if Plaintiffs were alleging intentional discrimination, their argument would perhaps have some merit.[43] However, Plaintiffs' claims are brought under a disparate impact theory. Intent to discriminate need not be shown. Therefore, the fact that the policy is facially neutral in relation to race, color or national origin, is not relevant to the question of whether the policy has a "disproportionate adverse effect" on the basis of race, color, or, as in this case, national origin. *See Elston,* 997 F.2d at 1407 (citing *Georgia State Conference,* 775 F.2d at 1417).

 Defendants also argue that:
 Language is not equivalent to national origin, and the plaintiffs cannot make it so by

---

43. Plaintiffs could of course, show that discrimination on the basis of language was a pretext for discrimination on the basis of race, color or national origin. They could also show, as they have done here, a comparably effective alternate practice. *See Elston,* 997 F.2d at 1407.

affidavit. A showing that one of the plaintiffs speaks Spanish does not show which country that plaintiff is from. Is the Department discriminating against that plaintiff because she is from Spain? Mexico? Argentina? or one of a number of other nations? Conversely, some applicants who do not appear to speak English fluently, nonetheless, pass the English-language examination.... The classification does not distinguish on the basis of language *per se,* but rather on the basis of something else. Plaintiffs assert that the "something else" is language proficiency but knowledge of the tested material may also be at work and cannot be excluded.

(Defs.' Reply at 13.) Plaintiffs' reply, which the court adopts as part of its opinion, asserts that:

First, the defendants suggest that the plaintiffs' claim is somehow infirm because they have not precisely identified the foreign countries whose natives are adversely affected by the English-only policy. Second, the defendants claim that because at least some persons who do not appear to speak English fluently may actually pass the driver's license exam, the policy does not have a disparate impact. Third, the defendants speculate that something other than a lack of proficiency in English may be the real cause of the difficulty that non-English speaking persons have with the test. None of these arguments has any merit.

English-only rules typically have a disparate impact on the basis of national origin. *See, e.g.,* 29 C.F.R. § 1606.7(a) (EEOC regulations) (English only rules limit "opportunities on the basis of national origin"); [44] 24 C.F.R. Part 100, App. B at IV. L & M, V.D., VI.B (Department of Education guidelines requiring accommodation of persons with limited English skills in vocational programs receiving federal financial assistance to prevent discrimination on the basis of national origin under Title VI). The fact that the plaintiffs have not identified the particular country of origin of every person who cannot get drivers' licenses as a result of the defendants' English-only rule is not a bar to their claim. There is no dispute over the fact that persons who are not fluent in English are much more likely than those who are fluent to have been born in a foreign country. Whether persons who are fluent only in Spanish are natives of Spain, Mexico, or Argentina, to borrow the defendants' hypothetical (*see* Defendants' Reply at 13), is irrelevant. Whatever foreign country they may be from, an English-only rule would have a disparate impact on the basis of their national origin.[45]

Contrary to the defendants' view, the fact that "some applicants who do not appear to speak English fluently ... pass the English-language examination," Defendants' Reply at 13, does not mean that the English-only rule does not have a disparate impact. Disparate impact occurs when a seemingly "neutral practice detrimentally affects" a protected group "to a greater extent than" others. *Georgia State Conference of Branches of NAACP v. State of Georgia,* 775 F.2d at 1421. The fact that *some* members of a protected group are not screened out by the practice does not mean that the practice does not have a disparate impact.[46] A simple example

---

**44.** In determining whether a practice has a disparate impact under Title VI, courts have routinely looked to employment cases decided under Title VII for guidance. *See, e.g., Georgia State Conference of Branches of NAACP v. State of Georgia,* 775 F.2d 1403, 1417, 1421 (11th Cir. 1985). [Plaintiffs' Footnote 1].

**45.** As outlined below, the testimony of the named Plaintiff, Martha Sandoval, as well as the testimony of Lorenzo Leon, Brenda Bullock and Floria Salazar, among others, established the concrete link between national origin and the lack of English skills. Their testimony, in essence, established, by a preponderance, that the majority of non-English speakers in the state of Alabama are natives of a foreign country.

In addition, Dr. Bogie, Plaintiffs' demographics expert, testified that in Alabama, approximately forty-one percent of non-English speakers are Hispanic and twenty-three percent are Asians and Pacific Islanders. (Pls.' Opp'n, Ex. 19, Bogie Report at 2.)

**46.** Defendants ignore the fact that many non-English speaking applicants cannot even attempt the written examination because of their inability to speak English. While knowledge of the subject matter, is, of course, relevant to whether an applicant passes the examination, the Plaintiffs have shown, as discussed below, that regardless of an applicant's proficiency with the subject matter of the examination, many non-English

proves the point. If a police department were to adopt a rule requiring officers to be 6 feet tall, the fact that some women could meet the height requirement would not imply that the requirement does not have a disparate impact on women.

The defendants also claim that the fact that some persons pass the examination despite their apparent limited English proficiency suggests that something else other than the English-only policy—something like inadequate test preparation—may be the true reason why non-English speaking persons cannot pass an English-only test. Defendants' Reply at 13. Assuming that this contention is a serious one, it is sufficient at this stage to point out that the plaintiffs have submitted evidence that the defendants' English-only policy impedes the ability of persons who are not fluent in English to pass the drivers' license examination. Although the defendants will be free to present evidence at trial that something other than a lack of fluency in English is the reason why non-English speaking persons do not pass an exam given only in English (plaintiffs eagerly await such remarkable proof), their speculation about the matter cannot be a basis for granting summary judgment.[47]

(Pls.' Supp. at 3–5.)

The Defendants' argument is flawed for additional reasons. First, under the Defendants' analysis, if the Department had promulgated a policy stating, for example, that Norwegian speakers could not obtain driver's licenses unless they spoke English, the disparate impact based on national origin would be discrete and readily identifiable. Because only Norway utilizes Norwegian as its official language, one could readily discern a disparate impact on Norwegians, and in turn, an unjustified disparate impact on the basis of national origin. Just because the country of origin of those effected by the English-only policy is not readily identifiable, does not mean that a disparate impact does not exist. Conversely, the fact that individuals from a multitude of foreign nations are effected by the English-only policy shows its far-reaching discriminatory impact.

Second, the Defendants seek to frame the analysis as whether language *equals* national origin, arguing that it does not. (Interestingly, although Defendants argue that language is not a proxy for national origin, in at least one instance, the Department has viewed it as such. *See, infra,* page 1285). The correct analysis, however, is not whether language equals national origin, but whether the policy of the Department, (here a policy based on language), has an unjustified disparate impact on the basis of national origin. The court would apply the same analysis for any policy enacted by the Department challenged under Title VI. It is not the nature of the policy that is examined, but its effect. If its effect is an unjustified disparate impact on the basis of race, color, or national origin, the policy violates Title VI. *See Vialez v. New York City Housing Authority,* 783 F.Supp. 109, 124 n. 15 (S.D.N.Y. 1991) (noting that test is effect of policy rather than its provisions).

Although the court looks to the policy's effect rather than solely to its terms, the court's finding that the English-only policy has an unjustified disparate impact on the basis of national origin is bolstered by the multitude of cases that find a strong nexus between language and national origin. Although no court has explicitly held that language is a proxy for national origin, in the equal protection context, the Supreme Court has recognized that language may serve as an adjunct for an immutable characteristic: "It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis." *Hernandez v. New York,* 500 U.S. 352, 371–72, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). And, the Supreme Court and many lower courts have recognized the significant overlap and inherent correlation between language and national origin. *See, e.g. Lau,* 414 U.S. at 568–69, 94 S.Ct. 786 (holding that failure to provide educational assistance to non-English-speaking students constituted national origin discrimination under Title VI); *Espinoza v. Fa-*

---

speakers cannot take the examination because it is offered solely in English.

**47.** The Defendants presented no such evidence at trial.

*rah Mfg. Co.*, 414 U.S. 86, 92–93 & n. 5, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) (in finding no evidence of discrimination against persons of Mexican national origin, the Court noted there was "no suggestion, for example, that the company refused to hire aliens of Mexican or Spanish-speaking background while hiring those of other national origins"); *Hernandez v. Texas*, 347 U.S. 475, 480 n. 12, 74 S.Ct. 667, 98 L.Ed. 866 (1954) ("just as persons of a different race are distinguished by color, these Spanish names provide ready identification of the members of this class" of Mexican–Americans); *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 528, 46 S.Ct. 619, 70 L.Ed. 1059 (1926) (invalidating ordinance requiring that accountant records of businesses be kept in English, Spanish, or local dialects of the Philippines, thereby excluding the use of Chinese); *Farrington v. Tokushige*, 273 U.S. 284, 298, 47 S.Ct. 406, 71 L.Ed. 646 (1927) ("the Constitution protects [the Japanese] as well as those who speak another tongue"); *Meyer v. Nebraska*, 262 U.S. 390, 403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (noting the fundamental individual right of choice of language); *Yniguez v. Arizonans For Official English*, 69 F.3d 920, 948 (9th Cir.1995) ("Since language is a close and meaningful proxy for national origin, restrictions on the use of languages may mask discrimination against specific national origin groups or, more generally, conceal nativist sentiment"), *vacated on other grounds*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 601 (9th Cir.1993) ("accent and national origin are obviously inextricably intertwined"); *United States v. Alcantar*, 897 F.2d 436, 440 (9th Cir.1990) (recognizing "how closely tied Spanish language is to Hispanic identity"); *Fragante v. City and County of Honolulu*, 888 F.2d 591 (9th Cir.1989) (holding accent discrimination may be actionable as national origin discrimination under Title VII, citing, with approval, EEOC guidelines defining national origin discrimination to include discrimination based on the "linguistic characteristics of a national origin group"), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990); *Gutierrez v. Municipal Court*, 838 F.2d 1031, 1039 (9th Cir.1988), *vacated as moot*, 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989) (noting that "the cultural identity of certain minority groups is tied to the use of their primary tongue," and that "rules which have a negative effect on . . . non-English speakers, may be mere pretexts for intentional national origin discrimination"); *Carino v. Univ. of Okla. Bd. of Regents*, 750 F.2d 815 (10th Cir.1984) (finding that adverse employment decision based on Filipino accent constitutes national origin discrimination); *Berke v. Ohio Dep't of Pub. Welfare*, 628 F.2d 980 (6th Cir.1980) (per curiam) (holding that refusal to hire woman with Polish accent violated Title VII); *Craig v. County of Los Angeles*, 626 F.2d 659, 661 n. 1 (9th Cir.1980) (plaintiff class defined by district court as "Spanish–Surnamed" or "Spanish Language" persons), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981); *United States v. Uvalde Consol. Indep. School Dist.*, 625 F.2d 547, 553 (5th Cir.1980) ("the fourteenth amendment clearly extends to protection of any group of persons invidiously discriminated against by state law including groups identifiable by ethnic, national origin, or linguistic characteristics"); *Garcia v. Gloor*, 618 F.2d 264, 270 (5th Cir.1980) ("To a person who speaks only one tongue or to a person who has difficulty using another language than the one spoken in his home, language might well be an immutable characteristic like skin color, sex or place of birth"); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970 (10th Cir.1979) (recognizing "Spanish speaking or Spanish-surnamed Americans as a minority for purposes of sections 1981, 1983 and 1985(3)"); *Smothers v. Benitez*, 806 F.Supp. 299 (D.P.R.1992) (discussing equal protection analysis of language based discrimination); *Asian Am. Business Group v. City of Pomona*, 716 F.Supp. 1328 (C.D.Cal.1989) (holding that ordinance restricting use of foreign languages on business signs "overtly discriminates on the basis of national origin"); *Saucedo v. Brothers Well Service, Inc.*, 464 F.Supp. 919 (S.D.Tex.1979) (holding that Speak–English–Only rule violated Title VII because defendant could not show business necessity and uniform enforcement); *Hernandez v. Erlenbusch*, 368 F.Supp. 752 (D.Or.1973) (finding that a tavern's rule against speaking foreign languages amounted to racial discrimination against Mexican–Americans); *Castro v. Beecher*, 334 F.Supp. 930, 934 n. 2 (D.Mass.1971) (definition of class of "Spanish surnamed persons" encom-

passed those "whose primary language is Spanish"), *aff'd in part, rev'd in part,* 459 F.2d 725 (1st Cir.1972); *Ruiz v. Hull,* 1998 WL 203081, \*15–18 (Ariz. April 28, 1998) (holding that State Official English Law violated the First Amendment and the Fourteenth Amendment's guarantee of Equal Protection, under a strict scrutiny analysis, "because it impinges upon both the fundamental right to participate equally in the political process and the right to petition the government for redress").

In *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), a language barrier "effectively foreclosed" non-English-speaking Chinese pupils from access to the educational opportunities offered by the San Francisco public school system. *Id.* at 564–566, 94 S.Ct. 786. No intentional discrimination was shown. Nevertheless, the Supreme Court upheld a federal disparate impact regulation applicable to public school systems receiving federal funds that prohibited the utilization of "criteria or methods of administration which have the effect of subjecting individuals to discrimination" or have "the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin." *Id.* at 568, 94 S.Ct. 786. Essentially, the Court held that the failure of the San Francisco school system to provide English-language instruction to students of Chinese ancestry who did not speak English, or to provide them with instruction in Chinese, constituted a violation of Title VI. The Court in *Lau* clearly struck down an English-only language policy as violative of Title VI because it resulted in an unjustified disparate impact on non-English speakers.

Further, as Plaintiffs' passage adopted by the court above discloses, federal agency regulations and guidelines frequently equate linguistic characteristics with national origin. *See* 29 C.F.R. § 1606.7(a) (EEOC regulations) (English only rules limit "opportunities on the basis of national origin"); 24 C.F.R. Part 100, App. B at IV. L & M, V.D., VI. B (Department of Education guidelines requiring accommodation of persons with limited English skills in vocational programs receiving federal financial assistance to prevent discrimination on the basis of national origin under Title VI); Pls.' Supp. Auth, Ex. 1, U.S. Dept. of Health and Human Services' Office of Civil Rights Memorandum entitled "Title VI Prohibition Against National Origin Discrimination—Persons with Limited–English Proficiency" (stating that discrimination on the basis language may violate Title VI's prohibition of discrimination based on national origin).

Finally, statistics demonstrate the correlation between national origin and language. For example, approximately ninety-seven percent of individuals who speak Spanish are Hispanic. *See* Memullen, *The "Official English" Movement And The Demise Of Diversity: The Elimination Of Federal Judicial And Statutory Minority Language Rights,* 32 Land & Water L.Rev. 789, 813 (1997) (citing Estrada, Leonardo F., *The Extent of Spanish/English Bilingualism in the United States,* 15 Aztlan Int'l J. Chicano Stud.Res. 379, 381 (1984); *Statistical Record of Asian Americans* (Susan B. Gall & Timothy L. Gall eds., 1983)). And, for Asians and Pacific Islanders, one researcher has noted that:

the correlation between language and national origin is also very high. As of 1989, 72.5% of Chinese Americans speak a language other than English at home. Comparable figures for other Asian Pacific Islander groups exist for Cambodians (81.9%), Vietnamese (80 .7%), Laotians (77.4%), Thai (72.5%), Koreans (69.7%), Filipinos (59.9%), Indians (55.3%), and Japanese (40.5%).

*See* Chen, Edward M., *Garcia v. Spun Steak Co.: Speak–English–Only Rules And The Demise Of Workplace Pluralism,* 1 Asian L.J. 155, 165 (citing Gall, *Statistical Record of Asian Americans,* and 1990 census data). As Mr. Chen perceptively noted, "in one respect, the relationship between language and ethnicity is more specific for Asian Pacific Islanders than for Latinos. Given the myriad of Asian languages, each peculiar to a particular country of origin, language is an integral part of an Asian Pacific Islander's specific national origin identity." *Id.* These statistics are reflected in Alabama's population: In the 1990 census, Hispanics comprised the largest number of adults who did not speak English well or at all, and Asians and Pacific Islanders comprised the next largest group. (*See* Pls.' Opp'n, Ex. 19, Bogie Aff.; Bogie Test.)

In this action, as further outlined below, Plaintiffs have produced substantial evidence establishing that the Department's English–Only policy discriminates on the basis of national origin. The evidence establishes that the vast majority of those falling within the regulation's provisions are from a country of origin other than the United States. Many of the cases cited above that noted a nexus between language and national origin were also cited by the Plaintiffs in their pleadings. Based on the evidence and case-law proffered in Plaintiffs' pleadings, as well as the evidence produced at trial, the court finds that Plaintiffs have met their burden of establishing, by a preponderance of the evidence, that Plaintiffs are members of a class protected by the statute. *See Elston*, 997 F.2d at 1407 (citing *Georgia State Conference*, 775 F.2d at 1417). That class is made up of "all legal residents of the State of Alabama who are otherwise qualified to obtain a Class D private vehicle driver's license but cannot do so because they are not sufficiently fluent in English." (*See* Oct. 17, 1997 Order.)

b. *The Defendants have promulgated a facially neutral practice that has a disproportionate adverse effect* [48]

■ To obtain an Alabama driver's license, a new applicant must go through four distinct steps. First, the applicant must fill out an application and provide appropriate identification to the examiner. Second, the applicant must pass a vision examination. Third, the applicant must pass a written examination that tests an applicant's knowledge of traffic signs and the rules of the road. Finally, an applicant must pass a performance examination where their driving skills are evaluated. Driver's License examinations are administered by the Alabama Department of Public Safety's Driver's License Division. The Driver's License Division has seven district offices and a total of approximately eight-five full and part-time offices where driver's license examinations are given.

For the purposes of this Memorandum Opinion, applicants for driver's licenses may be fairly broken down into four major categories: (1) applicants who, for the purposes of the examinations, have little or no problem reading, writing, or speaking English; (2) applicants who, for the purposes of the examinations, can speak English, but cannot read or write English (illiterate applicants); [49] (3) applicants who, for the purposes of the examinations, are handicapped (including those applicants that are deaf); and (4) applicants who cannot, for the purposes of the examinations, speak, read or write English.[50]

As explored below, it is undisputed that the State of Alabama, through both official policy and practice, provides substantial assistance to illiterate English speaking applicants and to handicapped applicants, includ-

---

**48.** The policy is facially neutral in only that it does not explicitly classify individuals on the basis of race, color or national origin.

**49.** On February 12, 1996, the Governor of Alabama issued Executive Order 15 which stated that "adult illiteracy has grown to alarming proportions in Alabama, with some 931,180 adults lacking a high school diploma or GED, and some 456,278 adults who are functionally illiterate (performance below the 9th grade level) .... and, ... Alabama ranks as one of the four states having the lowest high school graduation rates in the nation." (*See* Pls.' Mot. To Supp. Record, Ex. 33 (Executive Order 15).) With an approximate adult population of 2,680,255, this means that approximately 34.7% of Alabama's adults do not have a high-school diploma or equivalent, and approximately 17% are "functionally illiterate." (*Id.*)

Defendants contend that according to the 1990 census, the voting age population of Alabama was 2,981,799. (*See* Defs.' Supp. To Record at

1.) Utilizing Defendants' statistics, 31.2% of Alabama's adults lack a high school diploma or its equivalent, and 15.2% are functionally illiterate.

Whatever data is utilized, however, it is clear that not only does Alabama's educational system fail to adequately provide for a significant portion of its population, but that a significant portion of those seeking driver's licenses, for whom English is their native language, may require special accommodation during the examination process.

**50.** In 1980, approximately 4,287 Alabama residents reported that they did not speak English well or at all. (*See* Pls.' Tr.Ex. 19 (*citing* 1980, 1990 Census (18+).)) That number rose to 10, 158 in 1990 and is projected to reach 24,069 by 2000. (*Id.; see also* Defs.' Mot. To Supp. Record, Ex. 7 (1990 census data).) As Plaintiffs' expert Dr. Bogie testified, these numbers are probably low because of the documented census undercount.

ing those applicants that are deaf. In sharp contrast, the State of Alabama renders no aid whatsoever to those applicants who, for the purposes of the examinations, cannot speak, read and/or write in English. In fact, Alabama's official policy is that all Driver's License Examinations must be administered only in English.[51]

 i. Implementation and review of the Department's English–Only Policy

On July 13, 1990 the Alabama Legislature ratified Amendment 509 to the Alabama Constitution of 1901. Amendment 509 provides:

### ENGLISH AS OFFICIAL LANGUAGE OF STATE.

 English is the official language of the state of Alabama. The legislature shall enforce this amendment by appropriate legislation. The legislature and officials of the state of Alabama shall take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced. The legislature shall make no law which diminishes or ignores the role of English as the common language of the state of Alabama.

 Any person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision. The legislature may provide reasonable and appropriate limitations on the time and manner of suits brought under this amendment.

Ala. Const. Amend. 509.

 At the time the Amendment passed, the Alabama Department of Public Safety administered written driver's license examinations in approximately fourteen foreign languages.[52] Additionally, former Assistant Director of the Department Lieutenant Colonel Harold Hammond testified at trial that during his tenure as Acting Director from 1989 to 1991, the Department would attempt to develop new foreign language examinations if the demand was great enough, and that translations of the English examinations[53] into various foreign languages were done at no cost to the Department.[54] (*See also* Pls.' Opp'n, Ex. 1, pp. 24, 30–31 (Hammond Dep.) (no cost for translations).) Colonel Hammond also testified that: (1) the Department did not experience any significant problems in administering foreign language examinations; (2) there was no evidence that non-English speakers were more likely to cheat on the written examination or otherwise compromise the examination's integrity; and (3) there was no evidence that non-English speakers caused more accidents or posed a greater safety risk than English speakers.[55]

---

**51.** As explored below, evidence introduced at trial shows that some districts or divisions within the Department allow the use and possession of a translation dictionary in direct contravention of official policy.

**52.** A survey conducted by the Plaintiffs found that forty-eight other states and Washington D.C. "make some kind of accommodation for non-English-speaking applicants, either br providing written, automated or audio tests in foreign languages, offering a picture test . . ., or by allowing applicants to use interpreters or translation aids." (*See* Pls.' Tr.Ex. 21 at 1.) In the southeast region of the United States, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Tennessee, Texas, and South Carolina all administer their driver's license examination in languages other than English. (*Id.* at 2.) The Defendants did not object to the introduction of this survey into the evidentiary record.

**53.** Both the record before the court and evidence produced at trial show that the English examination is given in six different formats. From a pool of certified questions, a certain number are selected and placed in various orders to create the six different examinations.

**54.** Colonel Hammond testified that from 1987 to 1991, the Department actually expanded its use of foreign language examinations. In addition, then Major Hammond served as the Chief of the Driver's License Division from 1978 to 1987. The policy and practice of giving examinations in foreign languages was in place when he became Chief of the Driver's License Division. He has also served in various other positions within the Department of Public Safety since 1959. (*See also* Pls.' Opp'n, Ex. 1, Hammond Dep. at 8.)

**55.** The substance of Colonel Hammond's testimony is bolstered by the deposition testimony of Major Ralph Cottingham—Chief of the Department's Driver's License Division from 1989 to 1994. (*See* Pls.' Opp'n, Ex. 2 at 40–41 (Cottingham Dep.).)

In December of 1991 the Department issued "Driver License Policy Order No. 40." (Pls.' Tr.Ex. 7.) The Policy Order cited Amendment 509 as its source, and stated that "[i]t is the policy of the Director and the Driver License Division that all driver license examinations will be printed and administered in English."[56] (*Id.*) At approximately the same time, the Department also revised its Examiner's Guide—the main reference used by driver's license officials and examiners in performing their duties. (Pls.' Tr.Ex. 1.) As revised, the Examiner's Guide provided in pertinent part that:

Amendment Number 509 to the Constitution of the state of Alabama states, "English is the official language of the state of Alabama." To ensure the role of English as the official and common language of the state of Alabama is preserved and enhanced, all driver license examinations will be printed and administered in English.

If an interpreter is present allow them to interpret the eye examination and application questions asked by the examiner. However, at no time will an interpreter assist the applicant on the knowledge examination.

(Pls.' Tr.Ex. 1.) The current Examiner's Guide, however, does not allow for the use of an interpreter during the vision examination. It provides in pertinent part that:

No interpreters will be allowed to participate in any portion of the examination, to include, vision examination, written examination, oral examination, or driving skills examination.

(Pls.' Tr.Ex. 6.) This total prohibition on the use of interpreters was reiterated in a January 26, 1996 memorandum from then Chief Examiner of the Driver's License Division of the Department of Public Safety Captain Roscoe Howell. (*See* Pls.'s Opp'n, Ex. 4.) The memorandum was to "All District Commanders," and was in reference to "Foreign Examinations." (*Id.*) The memorandum stated that "[a]t no time will an interpreter be allowed to assist the applicant with any portions of the driver license testing process."[57] (*Id.*)

In addition, official policy is that applicants are not allowed to use dictionaries during the written examination. Even though the Departments' Examiner's Guide allows the use of a dictionary under limited circumstances,[58] Captain Howell's January 26, 1996 memorandum states that "[a]t no time will any applicant, foreign or domestic, be allowed to use a dictionary or any type of printed reference material in taking the examination." (*Id.*) Interestingly, the Examiner's Guide, quoted in note 58, provides that a dictionary may be utilized by "any individual, regardless of *nationality;* " here, the Defendants themselves utilize language as a proxy for nationality.

Despite the official prohibition of the use of interpreters and dictionaries during examinations, representatives of the Department tes-

---

**56.** Although neither Party offered evidence of the total annual foreign language examinations given prior to the implementation of the Department's English Only Policy, the Huntsville and Mobile District Offices combined gave approximately five thousand foreign language examinations annually. (*See* Pls.' Tr.Ex. 12.)

**57.** Arguably, the current Examiner's Guide and Captain Howell's January 26, 1996 memorandum would also prohibit the use of interpreters during the application process in addition to all three of the examinations.

**58.** The Examiner's Guide provides that:

Any individual, regardless of nationality, may at the time of the written examination provide the Driver License Examiner with a dictionary to be used during the examination. The dictionary may be used as a reference guide but not as a translation guide.

During the written examination, the dictionary is to be maintained under control of the Driver License Examiner, it is not to be maintained by the applicant during the test.

Prior to the beginning of the written examination, the Driver License Examiner is to inspect the dictionary to ensure that there is no handwriting, printed materials not a part of the dictionary, or any other marks, objects, or signs that are not part of the bound and printed dictionary.

No hand written dictionaries will be permitted.

. . .

Use of the dictionary is not permitted during the driving skills examination. This is not to preclude instructions administered in a foreign language prior to the actual examination with our Department. The applicant must be able to understand and communicate with the Driver License Examiner. This ability to communicate is required for the safety of the Driver License Examiner, applicant, pedestrians, and other motoring public.

(Pls.' Tr.Ex. 6 at 42–43.)

tified at trial that in practice, non-English speaking applicants are allowed to utilize both. The use of interpreters is allowed during the initial application process and during the vision examination. Further, the Departmental representatives testified that applicants are allowed to utilize dictionaries—both reference and translation—and are also allowed to retain possession of the dictionaries during the written examination, as opposed to leaving them with the examiner. Not only is the use of dictionaries in violation of official policy as expressed in Captain Howell's January 26, 1996 memorandum, the use of translation dictionaries, as opposed to reference dictionaries, and their retention with the applicant as opposed to the examiner, is in violation of the more lenient standards articulated in the Examiner's Guide.[59]

In July of 1992, even though the Department had already modified its examination policies to conform with its reading of Amendment 509, then Director of the Department Colonel Ned W. McHenry, requested an opinion from the Attorney General's office on the issue of "whether Amendment No. 509 to the Constitution of the State of Alabama of 1901 prohibits the Department from giving driver license tests in any language other than English." (Pls.' Tr.Ex. 2; *see also* Pls.' Tr.Ex. 3.) The Attorney General issued an Attorney General Opinion in September of 1992 that stated in pertinent part:

> This amendment requires all officials of the state of Alabama to take all steps necessary to insure that the role of English as the common language of the State of Alabama is preserved and enhanced. Thus, to the extent possible, officials of this state should require the use of English in all state actions and programs.

**59.** The Defendants admit that the Department allows the use of dictionaries in violation of official policy. In their Post–Trial Brief, the Defendants argued that: "The Department is not inflexible. It allows applicants who do not speak or read English well to use translation dictionaries...." (Defs.' Post–Tr.Br. at 6, ¶ 7.)

**60.** The reason for requesting an Attorney General Opinion months after the Department instituted its English Only Policy is not entirely clear, although certain evidence seems to point to the conclusion that the Department was trying to protect its legal interests as opposed to instituting a genuine review of its Policy. As the court noted in its Introduction, above, although the

*While requiring an ability to understand English as a requirement to participate in some state programs might be a violation of Title VI of the Civil Rights Act of 1964, or the Equal Protection Clause of the Fourteenth Amendment, consideration of safety and the integrity of the licensing process would support a requirement that driver license examinations be given in English.* Safety considerations would include the person's ability to read and understand highway signs and to understand the directions of law enforcement officers.

It would be practically impossible for the state to accommodate the wide variety of languages of persons applying for a license. To allow such persons to use their own interpreters would, of course, jeopardize the integrity of the test.

*CONCLUSION*

All persons applying for a driver's license should be required by the Director of the Department of Public Safety to take their licensing tests in English.

(Pls.' Tr.Ex. 5 (emphasis added).) In August of 1992, an "Opinion Review Committee" within the Attorney General's office reviewed and commented on the opinion prior to its issuance. (Pls.' Tr.Ex. 4.) One member of that Review Committee noted that "[w]e use international highway signs [and] shapes therefore safety is not such an issue. I don't think that we can refuse to issue licenses to non [E]nglish speaking people who understand highway signs—An AG's opinion will not protect Major Henry on this issue—some accommodation needs to be made." Another high-ranking reviewer observed that "I am going along with this opinion—but it is dumb." [60] (*Id.*)

request for an Attorney General's opinion was signed by Director McHenry, it was written by Jack Curtis—then the Department's General Counsel and an Assistant Attorney General. (*See* Pls.' Supp., Ex. 30 at 15 (Curtis Dep.).) Mr. Curtis also drafted the Attorney General's Opinion that responded to the Department's request. (*Id.* at 9, 21.) In other words, he drafted both the Department's request for an opinion and the Attorney General's Opinion itself. Members of the Department gave him input as to how they wanted the Opinion to come out, and "if it were legally possible to do so, [he] drafted it to protect the interests of the department." (*Id.* at 21, 33.)

ii. The Department's accommodation of English speaking applicants

For the purposes of this Memorandum Opinion, and in line with the major categories of applicants articulated above, the court assumes that those applicants who can speak, read, and write English, for purposes of the examination, and are not handicapped, constitute the majority of driver's license applicants in the State of Alabama. These applicants go through the initial application process, vision examination, written examination and performance examination without the need for any special accommodations or deviation from the standard examination procedure. In contrast, illiterate and handicapped English speaking applicants, for example, require accommodations and deviations from the standard examination procedure. Official Department policy is to render substantial aid, and provide substantial assistance above and beyond the standard examination procedure for illiterate and handicapped English speaking applicants, while providing no accommodation for non-English speaking applicants.

For example, the Department's Examiner's Guide provides for oral or audio cassette examinations for illiterate English speaking applicants, and instructs examiners to take time to assure illiterate applicant are at ease, and to assist them with the examination:

ORAL EXAMINATION

Illiterate applicants are entitled to an oral examination, the same as literates are entitled to the written examination. Illiterate applicants must make the same score to qualify; they may miss six (6) questions and still pass the drivers license examination.

1. The examination will be given orally in a courteous manner by the examiner.

2. When interviewing the applicant, the Examiner should speak in an understandable manner and allow the applicant to answer accordingly.

What is clear is that given the comment of one member of the Opinion Review Committee that "[a]n AG's opinion will not protect Major Henry on this issue," as well as the comments in the AG Opinion itself that the policy may well be in violation of Title VI and the Equal Protection

3. Read the questions verbatim with the knowledge examination being taken.

4. Take time to put the applicant at ease, and don't downgrade, or demoralize the applicant because he/she cannot read or write.

5. If the applicant fails the oral examination, take the time to suggest methods for study, and explain the questions the applicant missed.

6. If time permits the applicant should be given the oral examination again, the same as a literate is allowed to retest.

7. The instructions for scheduling oral examinations should be given to you by your immediate supervisor.

8. Many offices may administer the oral examination by using cassette recorders. Through routine observations, assure the applicant experiences no difficulties with the device.

(See Pls.' Tr.Ex. 6 at 38 (Examiner's Guide).) The Department of Public Safety's Driver's License Division's District Commanders for the Huntsville and Mobile, Alabama Districts testified at trial that illiterate applicants either are administered the road rules examination via audio cassette, or an examiner orally reads the written examination to the applicant, utilizing verbiage to help the applicant understand the examination.

The Examiner's Guide also requires examiners to provide special attention and accommodation to handicapped applicants:

DISABILITY EXAMINATIONS

The Rehabilitation Act of 1973 and the Americans With Disabilities Act protect disabled persons (defined as persons with physical or mental impairments that substantially limit major life activities) from discrimination in all *services*, programs, and activities provided by state and local governments.

Clause, high-ranking members of the Alabama Department of Public Safety were concerned with the possible legal ramifications of its English Only Policy, and at least some of the members of the Attorney General's office were aware of the potential legal problems.

In order to comply with these acts the following guidelines and procedures will be followed.

Applicants with disabilities will be evaluated on their ability to successfully pass the knowledge and skills examinations. Examiners are to make no assumptions or speculation of an applicant's driving ability based on observation of the applicant's disability.

Examiners will make a thorough evaluation of the applicant's abilities. Examiners will alert the applicant to his limitations and need for special compensating devices.

Reasonable accommodations of the applicant's vehicle such as built-up seat, hand operated accelerator and brake, steering wheel know [sic], etc., will be noted and appropriate restrictions added to the license. Examiners should be careful not to *over* restrict an applicant with disabilities.

Restrictions are not to keep an applicant with disabilities from driving or create an inconvenience or hardship but to help the applicant be a better and safer driver. (*See* Pls.' Tr.Ex. 6 at 39 (Examiner's Guide) (emphasis in original).) [61]

Alabama allows hearing impaired or deaf applicants that can read and write English to operate motor vehicle with certain restrictions. (*Id.* at 44.) The State also provides special accommodations for hearing impaired applicants that are illiterate:

### HEARING IMPAIRED APPLICANT

If it is determined the deaf applicant is illiterate, you may set an appointment for a sign language examination.

When a hearing impaired applicant needs a sign language examination, the following procedure *shall* be followed.

1. No interpreter from outside the Department of Public Safety will be used with the execption [sic] of the screening process.

2. If possible, complete the application form, obtaining a good mailing address and phone number, determine if the applicant is eligible to be tested.

3. If item two (2) is "yes", advise the applicant it will be necessary for them to report to the District Driver License office to have access to the Hearing Impaired video examination.

4. Notify your District Commander or his designee, giving them all pertinent information necessary to set up the appointment for the applicant. (If possible do this by telephone while the applicant and their interpreter is present).

5. Provide the applicant with directions to the District office. Also, provide the applicant with a written statement advising the date and time of the examination, if applicable. Hearing impaired examinations are available to "walk in's" [sic] at the District office. Field offices will assist with scheduling exams if the applicant prefers an appointment.

(*See* Pls.' Tr. Ex. 6 at 44–45 (Examiner's Guide).) The Department of Public Safety's Driver's License Division's District Commanders for the Huntsville and Mobile, Alabama Districts testified at trial that although some hearing impaired applicants are able to take the written examination, the Department utilizes video-taped sign language examinations for those hearing impaired applicants that cannot adequately read or write English. For the performance examination, examiners utilize flash cards picturing what the examiner would like the applicant to do, hand gestures, and written notes to communicate with hearing impaired applicants. (*See, e.g.,* Pls.' Tr. Ex. 9; Hamilton and Byers Testimony).[62]

---

**61.** Alabama Code § 32–6–7.1 also requires that the Department accommodate handicapped applicants and prohibits refusal of a license or permit:

on the grounds of physical appearance, speculations or generalizations that the individual's physical impairment would impede that person's ability to operate a motor vehicle in a safe manner without probable cause to believe the person's ability to operate a motor vehicle in a safe manner is in fact impaired.

Ala.Code § 32–6–7.1 (1975).

**62.** In fact, the District Commander for the Huntsville District testified that examiners try to make the performance test for *all* applicants as simple as possible; examiners are taught to be patient, repeat instructions if necessary, and otherwise do everything possible to help the applicant pass.

...

New residents of Alabama must procure an Alabama driver's license within 30 days after establishing residence in the state. (*See* Pls.' Tr. Ex. 6 at 44 (Examiner's Guide)); *see also* Ala.Code § 32–6–1(a). Alabama allows new residents with a valid license from another state, Canada or Puerto Rico, to simply exchange their out-of-state license for an Alabama license, under certain conditions, without requiring them to take the written examination or the performance examination.[63] (*See* Pls.' Tr. Ex. 6 at 54–56 (Examiner's Guide).) The applicant must simply present a valid out-of-state license. (*Id.; see also* Defs.' Post Tr. Br. at 11 ("The evidence shows that drivers who are licensed in another state are not required to take a written examination to obtain an Alabama driver's license.").)

Alabama also recognizes valid driver's licenses from a plethora of foreign countries under the Geneva Road Traffic Convention of 1949 and the 1943 Convention On The Regulation Of Inter–American Automotive Traffic. (*Id.* at 67.) Alabama Code § 32–6–2(3) exempts from the requirements for procuring a license "[a] nonresident who is at least 16 years of age and who has in his immediate possession a valid driver's license issued in his home state or country." Ala.Code § 32–6–2 (1975). Alabama Code § 32–6–10 empowers the Director of Public Safety to "enter into reciprocal agreements, when not in conflict with law, with other states or countries constituting an exchange of rights or privileges in the use of drivers' licenses within this state by people who hold a valid driver's license in another state or country." Ala.Code § 32–6–10 (1975). According to the Examiner's Guide, the list of exempted foreign countries includes the following:

| | | |
|---|---|---|
| Aden | Greece | Poland |
| African Locations & Provinces | Grenada | Portugal · |
| Albania | Guatamala [sic] | Portugese Oversea Prov. |
| Algeria | Guernsey | Rhodesia |
| Andorra | Guyana | Romania |
| Argentina | Haiti | Rwanda |
| Austria | Honduras | St. Lucin [sic] |
| Bahamas | Hong Kong | St. Vincent |
| Barrados [sic] | Hungary | San Marino |
| Belgium | India | Senegal |
| Botswana | Ireland | Seychelles |
| Brazil | Isle of Man | Sierra Leone |
| British Honduras | Israel | Singapore |
| Bulgaria | Italy | S.W. Africa |
| Cambodia | Ivory Coast | Spain |
| Cameroons | Jamaica | Surinam |
| Canada | Japan | Swaziland |
| Central African Republic | Jersey | Sweden |
| Caylon [sic] | Jordan | Switzerland |
| Chile | Korea | Syria |
| China | Laos | Thailand |
| Columbia | Luxembourg | Tobacco [sic] |
| Congo (Grazzaville) | Malagasy Republic | Togo |
| Congo (Kinshasa) | Malawi | Trinidad |
| Costa Rica | Malaya | Tunisia |
| Cuba | Mali | Turkey |
| Cyprus | Malta | Uganda |
| Czechoslovakia | Mauritius | Union of S. Africa |
| Dehomey [sic] | Mexico | United Arab Republic |

63. These applicants must take the vision examination. (*See* Pls.' Tr. Ex. 6 at 54 (Examiner's Guide).)

Denmark
Dominican [sic]
Equador
Egypt
El Salvador
Fiji
Finland
France
French Overseas Territories
Gambia
Germany Federal Republic
Ghana
Gibraltar

Monaco
Morocco
Netherlands
Netherlands Antilles
New Guinea
Nicaragua
Niger
Norway
Panama
Papua
Paraguay
Peru
Philippines

United Kingdom
United States
Uruguay
Urandi [sic]
U.S Territories
Vatican City
Venezuela
Vietnam
Western Samoa
Yugoslavia
Zambia
Zanzibar

---

(*See* Pls.' Tr. Ex. 6 at 67 (Examiner's Guide).) The Departments' Drivers' Manual is even more expansive. (*See* Pls.' Tr. Ex. 32 (Alabama Drivers' Manual).) It provides in pertinent part that:

### AN ALABAMA DRIVER LICENSE IS NOT REQUIRED FOR THESE PEOPLE

The following persons may drive a motor vehicle upon the streets or highways in Alabama without an Alabama driver license.

. . .

3. A non-resident at least 16 years old who has in his immediate possession a valid driver license issued to him in his home state or country. This includes military personnel from other states and their families stationed in Alabama, even though their assignment in Alabama may be of long duration.

4. A non-resident at least 16 years old whose home country does not require licensing of drivers may operate a motor vehicle as a driver for not more than 90 days in any calendar year, if the vehicle operated is duly registered for the current year in the home country of the non-resident.

5. A new resident who has a valid driver license from the state of previous residence may drive without an Alabama license for 30 days after becoming a resident of the state.

6. Any non-resident fulltime student, properly enrolled and registered in a school, college, university, or trade school in this state, who holds a valid license from his home state or country.

(*See* Pls.' Tr. Ex. 19 at 1.)

From a review of the foregoing, it is clear that Alabama provides special accommodations for residents of Alabama that are illiterate, handicapped, hearing impaired or deaf, or who otherwise are unable to take the standard written examination. Alabama also allows individuals with valid licenses from other states, territories and foreign countries to drive in Alabama, without requiring them to obtain an Alabama driver's license and without requiring them to take either the written examination or the performance examination. It cannot be seriously disputed that not every individual who possesses a valid driver's license from one of the other forty-nine states, territories, or from a foreign country, speaks, reads and writes English. Nevertheless, Alabama will honor their license, and will not require them to take and pass the written examination or the performance examination. A non-English speaker from out-of-state can either drive in Alabama on their valid foreign license, or, upon becoming an Alabama resident, can exchange their valid foreign license for an Alabama license without taking Alabama's written or performance examination. Non–English speaking residents of Alabama, however, cannot get an Alabama driver's license unless they learn the English necessary to pass Alabama's examination process.[64] By providing special accommoda-

---

**64.** Under Alabama's current licensing rules, a non-English speaking Alabama resident could go to another state or country, obtain a driver's license in that state or country, return to Alabama, and then exchange his or her foreign license for an Alabama license without being

tions to illiterate applicants, handicapped applicants, out-of-state drivers with valid licenses and even foreign nationals with valid licenses, Alabama singles out resident non-English speaking applicants by ·requiring them to take their examination in English only, without the aid of interpreters or translation aids.

### iii. Impact of the Department's English–Only Policy

The foregoing outlines the ·regulatory framework which led to this action. In their pleadings and at trial, Plaintiffs produced substantial evidence showing the impact of the Department's English–Only Policy on non-English speaking applicants for Alabama driver's licenses that are residents of Alabama.

Brenda Bullock, Director of the Hispanic Ministry of the Catholic Diocese of Birmingham, provided an Affidavit, and Floria Salazar, Director of the Hispanic Ministry of the Catholic Archdiocese of Mobile,[65] both provided an Affidavit and testified at trail regarding the impact .of the Department's English Only Policy on Alabama's non-English speaking population. (*See, e.g.* Pls.' Opp'n, Exs. 9, 10.)

Both Ms. Bullock and Ms. Salazar stated that they were aware of hundreds of adult residents of the state, who were born in other countries, and are unable to obtain a driver's license because they do not speak or read English fluently. (*Id.,* Ex. 9, Bullock Aff. at 1; Ex. 10, Salazar Aff. at 1; Salazar Trial Test.) Ms. Salazar testified, for example, that through her work with the Mobile

Ministry, she personally was aware of approximately three hundred individuals who were legal residents of the state of Alabama, and were unable to take the examinations. She testified that of these three hundred, many drove without licenses. She·testified that although they were all anxious to comply with the law, many had to drive· to, get to work, and could not rely on friends who were not always available, nor on Mobile public transportation because it was, as she described it, "poor."

Ms. Salazar also testified that the named Plaintiff, Martha Sandoval, was typical of many adult legal residents who could not obtain driver's licenses. Many of these individuals arrived in the United States at an older age and learning .a foreign language (English) is, in many instances, more difficult for these older individuals than it is, for example, their children. Further, the schooling level of many these individuals is such that they are not well acquainted with the grammar of their native language, which adds to the difficulty of learning a new language. Ms. Salazar testified that of the individuals she had dealt with, it was not that they were opposed to learning English, it was .just that they found it very difficult, if not impossible, to do so. One example she gave was of a sixty-five year Cuban male who attempted to get an Alabama driver's license but could not do so. He drove trucks for the Cuban army for a long period of time, then spent ten years in jail as a political prisoner before coming to the United States in political exile. He has no English language capabilities, and, consequently, could not obtain an Alabama driver's license.[66]

---

required to take either the written or performance examination.

**65.** The Hispanic Ministry of the Catholic Diocese of Birmingham is an outreach group serving Hispanics in approximately thirty-nine counties in northern Alabama. The Hispanic Ministry of the Catholic Archdiocese of Mobile is an outreach group serving Hispanics in the Mobile metropolitan area. Both Ministries are part of a nationwide network that, in part, aids newcomers with limited English skills become acclimated to their new location. The Ministries also coordinate outreach services with other Ministries in the national network and with other local charitable groups.

Ms. Salazar testified that the Mobile Ministry serves approximately 2,500 to 3,000 Spanish speakers from over twenty different foreign

countries that reside in several counties in central and southern Alabama. Most of these individuals read and write primarily in Spanish and cannot read or write well in English. Ms. Salazar testified that she had frequent contact with the Birmingham Ministry and that she was familiar with its operations. Ms. Salazar testified that the Birmingham Ministry served a larger client base than the Mobile Ministry.

**66.** In this action Plaintiffs proffered the testimony of Doctor Roseann Dueñas González, a Professor of English at the University of Arizona; Director of the National Center for Interpretation Testing, Research and Policy; and the Director and Principal Investigator for the Federal Court Interpreter and Certification Project. The Federal Court Interpreter Certification Project is responsible for certifying all federal court interpreters pursuant to 28 U.S.C. § 1827, which

Both witnesses observed that this inability to obtain a license has limited these individuals' job opportunities, hampered their ability to perform basic tasks such as going to work, the grocery store or the pharmacy, or taking their children to school, and has limited their ability to respond quickly in an emergency.[67] (Bullock Aff. at 2–3; Salazar Aff. at 2.) Ms. Bullock and Ms. Salazar stated that for the vast majority of these individuals, public transportation was not a viable alternative because of Alabama's inadequate or non-existent public transportation system.[68] (*Id.*) In addition, Ms. Bullock and Ms. Salazar stated that although many non-English speaking residents who could not get Alabama driver's licenses walk to their destinations or rely on others for transportation, many of these individuals drive without a license out of sheer necessity. Finally, Ms. Salazar testified that not being able to obtain driver's licenses also had an effect on their ability to obtain employment. In many cases, for example, work was not within walking distance, and public transportation did not provide service to the area where they were employed. Or, for example, many of these individuals provide child-care services, and because both parents usually work, the parents require that the care-giver be able to drive in case of an emergency with the child or children.

Also in the record is the Affidavit of Perla Raines, Secretary of the Montgomery Annex of the Catholic Hispanic Ministry in Montgomery, Alabama. She states that she is "aware of approximately 50 individuals who are adult legal residents of the Montgomery area but who are unable to obtain a driver's license because they do not speak or read English fluently." (Pls.' Mot. For Class Cert., Ex. 4, Raines Aff. at 1.) Boyd F. Campbell, an attorney practicing law in Montgomery, Alabama also provided an Affidavit in his capacity as chairman of the International Assistance Project of Alabama, Inc., a nonprofit, public service, volunteer organi-

---

provides procedures for the use of interpreters in the courts of the United States. The National Center for Interpretation Testing, Research and Policy, where Dr. Gonzalez serves as Director, aids state agencies in developing language policies. In the driver's license context, the Center would determine what the administering agency wanted to test, and then would work with the agency in developing and/or modifying training policies for its personnel, test language, test translation, and test administration policies. In other words, the state agency tells the Center its goals, and the Center helps the agency reach those goals.

At trial, Dr. Gonzalez was qualified as an expert in the fields of sociolinguistics—the study of the relationship between language and society, and as an expert in second language acquisition—the study of how people learn second/foreign languages. For purposes of this action, Dr. Gonzalez reviewed and analyzed the Department's English–Only Policy and the procedures utilized by the Department in issuing driver's licenses.

Dr. Gonzalez testified that it is much more difficult for working adults to acquire proficient English skills than it is for their children, who have many more opportunities to practice English skills. Dr. Gonzalez also testified that employment is the most important causal factor in helping people to learn a new language: "The possession of a driver's license is a requirement for many jobs and certainly expands employment opportunities. Therefore restricting access to the Alabama driver's license exam for limited and non-English speakers will limit work oppor- tunities and significantly retard language shift." (Pls.' Opp'n, Ex. 20, Gonzalez Report at 2.)

Her observations are bolstered by the observations of Colonel Hammond: "Having a driver's license is important to earning a livelihood in this state," (*Id.*, Ex. 1, Hammond Dep. at 18), and the observations of several courts: "Automobile travel is a basic, pervasive, and often necessary mode of transportation." *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); "The right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the nation's history.'" *Wells v. Malloy*, 402 F.Supp. 856, 858 (D.Vt.1975), *aff'd*, 538 F.2d 317 (2d Cir.1976) ("a driver's license is an important property right in this age of the automobile"). Even the Department recognizes the necessity of access to automobiles. (*See* Pls.' Tr.Ex. 10 at 27.)

**67.** Dr. Gonzalez noted the same type of impact. (Pls.' Opp'n, Ex. 20, Gonzalez Report at 1.)

**68.** Plaintiffs also presented testimony from Robert J. Jilla, Manager of the Public Transportation Section in the Bureau of Multimodal Transportation of the Alabama Department of Transportation. At trial, Mr. Jilla detailed Alabama's extremely limited public transportation system, and he reiterated his Affidavit statement that in the limited areas of Alabama that enjoy some sort of public transportation, those systems "[do] not provide service to the majority of residents or employers." (Pls.' Opp'n, Ex. 11, Jilla Aff.) His testimony confirmed evidence presented by the Plaintiffs regarding Alabama's meager or nonexistent network of public transportation.

zation "that helps non-citizens adapt to life in Alabama, to overcome cultural differences, language, literacy, and legal problems, and to interact successfully with public officials, government agencies and businesses." (*Id.*, Ex. 3, Campbell Aff. at 1.) He stated that he was also aware of "numerous hard-working foreign nationals whose only disability appeared to be a lack of facility with the English language. Of these, few had been able to obtain Alabama driver's licenses." (*Id.*)

Ms. Bullock's, Ms. Salazar's, Ms. Raines' and Mr. Campbell's observations were bolstered by the testimony of the named Plaintiff Martha Sandoval and Lorenzo Leon, two Alabama residents with limited English proficiency. Ms. Sandoval is a permanent resident of the United States who moved to Mobile, Alabama in 1987. She speaks and understands very limited English; Spanish is her primary language. Ms. Sandoval testified that she would like to learn English because it would aid in her everyday life activities such as interacting with non-Spanish speakers at the store or when her children are sick and she needs to communicate with a doctor or nurse. Although she understands limited English phrases such as "thank you," "stop," "come here," "turn right," and "turn left," Ms. Sandoval testified that she could not, for example, read a book in English. To that end, Ms. Sandoval testified that she began taking English classes at a Baptist Church in Mobile, but that she had to stop attending because the classes conflicted with her work schedule. She does not have an Alabama driver's license although she tried to obtain one in September of 1996. Her attempt failed because she did not speak enough English to meet the examination requirements, and the Department would not let her utilize the services of an interpreter.

Ms. Sandoval cleans homes early in the morning five days per week. She then returns home to clean-up and change before going to work at the restaurant and store that she and her husband own. She works at the restaurant and store from approximately 11:30 A.M. to 9:00 P.M., seven days per week. For the past year or so, Ms. Sandoval has either driven illegally to her jobs, or has waited for friends or her husband to provide her with transportation. Prior to either driving illegally or waiting until relatives or friends could provide transportation, however, Ms. Sandoval would spend hours each day walking to and from work and other locations, whatever the weather. Although her husband has an Alabama driver's license, his work schedule differs from Ms. Sandoval's, (Mr. Sandoval works approximately 4:00 A.M. to 9:00 P.M. daily), no one else in her home has a driver's license, and she has no other relatives in the Mobile area that she could rely on for transportation. Ms. Sandoval started driving illegally because she developed various medical problems and could no longer walk, and also because she had to get her son to school and these was no bus service. Her son' school is close to her restaurant.

Ms. Sandoval learned to drive by taking driving classes, and testified that she only drives when necessary. She testified that she has never driven on the interstate or outside of the Mobile, Alabama area. At trial, she demonstrated her knowledge of several Alabama road-signs that are also used internationally (stop / yield / do not enter), and testified that she has never gotten into an accident, and has never received a ticket. She also stated that she knew that what she was doing was illegal, but that she felt she had no other option. Aside from her current medical condition, several times, for example, emergency situations arose where either she or a family member needed medical attention and she could not call an ambulance because she could not communicate well enough to ask for an ambulance. She had to wait several hours until someone was available to provide transportation. Finally, although she has utilized public transportation in Mobile, the service does not meet her transportation needs.

Lorenzo Leon is a Mexican-born legal alien who moved to the Mobile, Alabama area in 1992. His primary language is Spanish, although he speaks and understands a limited amount of English. Like Ms. Sandoval, English classes conflict with his work schedule, although he does try to utilize his limited English skills on a daily basis. Mr. Leon owns four restaurants: two in Mobile, Alabama, one in Fairhope, Alabama, and one in Ohio. He visits the Mobile restaurants daily,

the Fairhope restaurant once or twice a week and the Ohio restaurant rarely. Besides supervising employees, he does any maintenance work that is needed and cooks occasionally. He works seven days per week, sometimes fourteen hours per day.

Mr. Leon does not have an Alabama driver's license, although he testified that he tried to get an Alabama driver's license on approximately five different occasions but failed each time. He was able to go through the initial application process with the aid of an interpreter and was able to pass the vision examination without the aid of an interpreter. However, on each occasion, he failed the written examination because he did not understand enough English. He never took the skills examination (road test).

Like Ms. Sandoval, Mr. Leon drives without a license. And, like Ms. Sandoval, he testified that he knew that what he was doing was illegal, but that he drove out of necessity. No one else in his house has a valid license, and he testified that he needs to take his children to school, go to work, and participate in other life activities where the ability to use an automobile was necessary. He testified that he could not rely on friends and relatives because they were not always available. Nor could he rely on public transportation because it did not meet his transportation needs. Finally, Mr. Leon testified that he very much wanted a driver's license both for his and his family's sake, and so that he could obtain insurance for his vehicles.

The testimony of Ms. Salazar, Ms. Bullock, Ms. Gonzalez, Ms. Sandoval and Mr. Leon was quantified by Doctor Donald Bogie, a Professor of Sociology at Auburn University at Montgomery; the Director of the Center for Demographics and Cultural Research also located at Auburn University at Montgomery; and the President–Elect of the Alabama–Mississippi Sociological Association.[69] At trial, Dr. Bogie was established as an expert in the analysis of demographic data.

(*See also*, Pls.' Tr. Ex. 16 (Dr. Bogie's Curriculum Vitae).) Demography, as explained by Dr. Bogie, is the study of, among other things, population distribution and characteristics. Demographers study, for example, the race, age, sex, occupation, educational level, and economic status of certain populations, and draw various socioeconomic and factual conclusions. For example, a demographer could determine migratory trends among discrete population groups or determine which geographical areas show gains or losses in population. A demographer could also determine specific characteristics of discrete populations. For purposes of this trial, Dr. Bogie's testimony was focused on Alabama's non-English speaking population.

Dr. Bogie's Affidavit and trial testimony were based, in part, on data collected by the United States Department of Commerce, Bureau of the Census, in 1980 and 1990.[70] This census data became a point of controversy between the Parties because of Dr. Bogie's contention that the census data inaccurately reflects minority populations in the state of Alabama. The Defendants argued several times that the 1980 and 1990 census data was complete in and of itself and should not be qualified in any way by any evidence of an "undercount." Defendants argue that Plaintiffs' attempt to "impeach or modify the Census Results ... is legally irrelevant" because of the Supreme Court's decision in *Wisconsin v. City of New York*, 517 U.S. 1, 116 S.Ct. 1091, 134 L.Ed.2d 167 (1996). (Defs.' Obj. To Pls.' Tr. Ex. at 1, ¶ 2.) There, the Supreme Court held that the Secretary of Commerce was not constitutionally obligated to adjust census data. *Id.* at 23, 116 S.Ct. 1091.

That holding, however, was based on the discretion bestowed by Congress upon the Secretary through the Census Act, and not on any constitutional or statutory mandate that official census data be regarded as definitive. *Id.* at 23–24, 116 S.Ct. 1091. In re-

---

**69.** Doctor Bogie has over thirty years of experience in the analysis and interpretation of census and population related data. (Pls.' Opp'n, Ex. 19, Bogie Aff. at 1, ¶ 1.)

**70.** The federal Constitution requires an "actual Enumeration" of the population of the United States every ten years. U.S. Const., Art. I, § 2,

cl. 3. Congress is empowered to conduct the census "in such Manner as they shall by Law direct." *Id.* Through the Census Act, 13 U.S.C. § 1 et seq., Congress has delegated this responsibility to the Department of Commerce, and, more specifically, to the Bureau of the Census. 13 U.S.C. §§ 2, 21.

jecting the argument that the Court should review *de novo*, the Secretary's determination not to adjust census data, the Supreme Court stated:

> Respondents' argument fundamentally misapprehends the basis for our deference to the Secretary's determination that the adjusted census results do not provide a more distributively accurate count of the population. Our deference arises not from the highly technical nature of his decision, but rather from the wide discretion bestowed by the Constitution upon Congress, and by Congress upon the Secretary. Regardless of the Secretary's statistical expertise, it is he to whom Congress has delegated its constitutional authority over the census. For that same reason, the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision.
>
> . . .
>
> [T]he Secretary's conclusion ... was ... a reasonable choice in an area where technical experts disagree ... we conclude that his decision not to adjust the 1990 census was "consonant with, ... the text and history of the Constitution...." *Franklin*, 505 U.S., [sic] at 806.[71]

*Id.* at 24, 116 S.Ct. 1091.

The Plaintiffs argued at trial that *Wisconsin* is not amenable to the interpretation given by the Defendants, and that actually, it aids their position because in *Wisconsin*, the Supreme Court noted that historically, each census suffered from an "undercount." The Plaintiffs also argued that Dr. Bogie is an expert giving his opinion and interpretation of the census data and that evidence of an undercount is, consequently, admissible. The court agreed with Plaintiffs at trail, and readopts its previous ruling here.[72]

■ Defendants' reliance on *Wisconsin* is misplaced; nothing in that opinion precludes Plaintiffs from offering testimony or evidence, be it expert or otherwise, that calls into question the reliability of census data, or, consequently, a court finding that particular census data is indeed incomplete. *Wisconsin* merely holds that the Secretary of Commerce was not constitutionally obligated to alter data. Accordingly, the court views Dr. Bogie's Affidavit and trial testimony as the testimony of a qualified expert under Federal Rules of Evidence 702, 703 and 705, and will weigh Dr. Bogie's testimony along with all other evidence presented, including the proffered census data, in making its findings of fact.[73]

Dr. Bogie's Affidavit and trial testimony addressed three main issues: (1) the census undercount; (2) the number of non-English speaking residents of Alabama and the growth rate of this population; and (3) the primary languages spoken at home by these

---

**71.** *Franklin v. Massachusetts*, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992).

**72.** Further, the court is somewhat mystified at Defendants insistence that the official census numbers, and those numbers only, apply in this action. This court would be just as willing, and just as obligated, to exercise its constitutional and statutory powers to remedy a proven disparate impact on non-English speaking resident of Alabama based on Defendants' proffered census numbers. Consequently, whether the court relies on the exact numbers stated in the 1980 and 1990 census, as Defendants would have the court do, or whether the court believes the numbers to be subject to modification due to various factors, including an undercount, is really of no import. All that is required is that Plaintiffs show a disparate impact—the exact number of those effected is not dispositive.

**73.** Federal Rule of Evidence 702 provides:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Federal Rule of Evidence 703 reads:
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Finally, Federal Rule of Evidence 705 provides:
> The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

non-English speaking residents. Regarding the census undercount and the number of non-English speaking residents of Alabama, Dr. Bogie stated:

CAUTIONARY NOTES IN INTERPRETING CENSUS DATA

8. It is widely accepted that the census undercounts certain segments of the population. Members of minority groups and individuals with limited education, for example, are often undercounted due to their relatively low response to the census questionnaire.[74]

9. The 1990 census data regarding Hispanic residents likely represent an undercount of the actual numbers. In 1980, the census count for Hispanic residents of Alabama was 33,299. In 1990, the reported count declined to 24,629. Virtually all of this decline occurred in the Mexican component of the Hispanic population. It is theorized that the decline resulted from concerns on the part of many newly-arrived Mexican immigrants that the census data might be used in a way that would adversely affect their continued residence in the United States. The low educational levels that characterize many members of this group may also contribute to the group's apparently low response to the census questionnaire. Independent observers who work directly with various segments of the Hispanic population in Alabama contend that the number of Hispanics is actually much larger than the total reported in the 1990 census and significantly greater than a later estimate of 30,913 that was prepared in 1994 by the Bureau of Census.[75]

(Pls.' Opp'n, Ex. 19, Bogie Aff. at 3–4; see also Pls.' Mot. For Class Cert., Ex. 1, Bogie Aff., ¶ 3.)

In support of his opinion, Dr. Bogie testified at trial that in 1996, the Bureau of the Census estimated that there were 35,857 Hispanic residents of Alabama. (See Bogie Tr. · Test.; Pls.' Ex. 18, (citing Bureau of the

Census, *Estimates of the Population of Counties By Age, Sex, Race and Hispanic [sic] origin: 1990 to 1996* (December 18, 1997 release))). He also testified that it was difficult for him to believe that there was a twenty-five percent drop in the number of Alabama's Hispanic residents between 1980 (33,299) and 1990 (24,629) because it was not in line with the "roller-coaster" of numbers that he has observed in his thirty years of analyzing census data. He testified that he believed that the number may be as high as two times the 1990 (24,629) and 1996 (35,857) figures. He also based his opinion, in part, on the following factors: (1) the census has documented that there is an undercount in the Hispanic population; (2) there is a high degree of mobility in the Hispanic population and not all individuals may be counted; (3) there may be language problems on the census forms and those with limited English skills are more likely not to report; (4) as expressed in his Affidavit, there is a disproportionate fear of supplying information; and (6) some Hispanic residents, as is true for all residents, are just missed, or don't respond.

Without taking into account this undercount, however, Dr. Bogie quantified census data regarding non-English speaking Alabama residents. Dr. Bogie testified that according to data from the 1990 census, of those Alabama residents sixteen and older that were not foreign-born, 2.1 percent spoke a language other than English at home. (See also Pls.' Tr. Ex. 17.) Of those Alabama residents sixteen and older that were foreign-born, 49.5 percent spoke a language other than English at home. (See also Id.). Dr. Bogie also testified that because of the heightened problems associated with counting non-English speakers outlined above, he believed that the 49.5 percent statistic may be low.

Dr. Bogie then translated these percentages into concrete figures based on data from

---

74. In *Wisconsin*, the Supreme Court acknowledged the perpetual existence of an "undercount" and noted that "[s]ince at least 1940, the Census Bureau has thought that the undercount affects some racial and ethnic minority groups to a greater extent than it does whites." 517 U.S. at 6–8, 116 S.Ct. 1091.

75. All of Dr. Bogie's statistics came from the 1980 and 1990 census as well as other reports from the Bureau of the Census. (Pls.' Opp'n, Ex. 19, Bogie Aff. at 1, ¶ 3.)

the 1980 and 1990 census regarding Alabama residents over the age of eighteen:

### ABILITY TO SPEAK ENGLISH

4. In 1980 and 1990, the Bureau of Census collected information concerning "ability to speak English" by asking the following three-part question:

(a) "Does this person (referring either to the respondent or other persons in the household for whom the respondent is supplying information) speak a language other than English at home (yes, no)?";

(b) "What is this language?"; and

(c) "How well does this person speak English (very well, well, not well, or not at all)?"

5. The census findings indicate that from 1980 to 1990, the number of Alabama residents aged 18 years or older who "did not speak English well" or "did not speak English at all" more than doubled. In the 1980 census, 4,287 persons aged 18 years or older indicate that they "did not speak English well" or "did not speak English at all." In the 1990 census, the number was 10,158—an increase of 136.9 percent. If the same rate of increase is maintained throughout the 1990s, there will be a projected 24,069 adult Alabama residents in the year 2000 who will not be proficient in English.

6. In the 1990 censes, Hispanics comprised the largest number of adults (4,205) who "did not speak English well" or "did not speak English at all." Asians and Pacific Islanders comprised the next largest defined group (2,302).[76]

(Pls.' Opp'n, Ex. 19, Bogie Aff. at 1–2.)

Also relying solely on census data, Dr. Bogie addressed the growth rate of these population groups:

### PROJECTED NUMBER OF HISPANICS AND ASIANS AND PACIFIC ISLANDERS

7. As indicated above, adults who spoke a foreign language at home and "did not speak English well" or "did not speak English at all" were most likely to speak Spanish or an Asian or Pacific language. These two groups represent the fastest growing racial or ethnic groups in Alabama.[77] The Bureau of Census projects that the number of Hispanics aged 15 or older will increase by 10,227 during the 1990s—a gain of 61.3 percent. During the years 2000 to 2010, the Hispanic population in the state is expected to increase by 32.4 percent (i.e. by 8,715 individuals). Likewise, the population of Asians and Pacific Islanders is expected to increase by 55.8 percent (i.e. by 9,238 persons) during the 1990s, and by 32.2 percent (i.e. 8,300 persons) during the years 2000 to 2010.

(Pls.' Opp'n, Ex. 19, Bogie Aff. at 2–3.) In all, Dr. Bogie estimates that according to 1990 census data, over 13,000 adult residents of Alabama would have difficulty in obtaining an Alabama driver's license because of the Department's English–Only Policy. (*See* Pls.' Mot. For Class Cert., Ex. 1, Bogie Aff., ¶ 2.)

Based on the foregoing, it is clear that the Department's English–Only Policy disproportionately impacts resident non-English speaking foreign nationals. Plaintiffs have established "a causal link between the defendant's challenged practice and the disparate impact identified;" the evidence *does not* show that "even had the defendants not engaged in the challenged practice, the same disparate impact would nonetheless have existed." *Elston,* 997 F.2d at 1407. Of the non-English speakers in the State of Alabama, the majority are from foreign countries. Although only approximately one per-

---

**76.** There were also 3,650 adults who indicated that they spoke "other languages," but "did not speak English well" or "did not speak English at all." Neither the identity of these "other languages" nor the nationalities of the respondents was specified in the published data. A similar report on individuals aged 5 years or older indicated that Hispanics (5,965), Indo–Europeans (4,436), and Asians or Pacific Islanders (2,769) were most likely to "not speak English well" or

"not speak English at all." [Footnote number 2 in original].

**77.** For purposes of the census, individuals were asked to identify themselves as members of one of the following racial/ethnic groups: (1) White, (2) Black, (3) American Indian, Eskimo, or Aleut, (4) Hispanic and (5) Asian or Pacific Islander. [Footnote number 3 in original].

cent of Alabama residents are Hispanics or Asian/Pacific Islanders, almost two-third of Alabama residents who do not speak English fluently are of such a background. The testimony of Dr. Bogie, among others, established the state-wide nature of the disparate impact, and the testimony of Ms. Salazar, Ms. Bullock, Ms. Sandoval, Mr. Leon, and Mr. Campbell, established the individualized nature of the impact on non-English speaking residents of Alabama. Finally, it is clear that by providing special accommodations to illiterate and handicapped resident applicants, as well as out-of-state and foreign drivers with valid licenses, Alabama singles out resident non-English speakers through its English–Only Policy. The court finds that the Department's English–Only Policy works an unjustified disparate impact on the basis of national origin in violation of Title VI.

3. The Defendants have not proven that there exists a "substantial legitimate justification" for the English–Only Policy in order to avoid liability. Alternatively, if the Defendants have met this burden, the Plaintiffs have offered comparably effective alternative practices which result in less disproportionality

As a threshold matter, the court notes that prior to this lawsuit, the sole justification offered for the Department's English–Only Policy was Amendment 509. Colonel McHenry's request for an Attorney General's Opinion asked only if Amendment 509 required the English–Only Policy. (Pls.' Opp'n, Ex. 6.) The Departments' amendment to its Examiner's Guide cited only Amendment 509 as the source of the English–Only Policy, as did Captain Howell's Memorandum to All District Commanders. (*Id.*, Exs. 3, 4.) Major Cottingham, Chief of the Driver's License Division at the time the English–Only Policy went into effect testified that Amendment 509 was the only reason for the policy change. (Pls.' Opp'n, Ex. 2 at 27.) Lieutenant Hamilton, District Commander for the Mobile District Office and Lieutenant Byers, District Commander for the Huntsville District Office, testified at trial that the Amendment was the sole reason for the policy change.

The Attorney General's Opinion notes that the sole question presented was whether Amendment 509 "prohibit[s] the [Department] from giving driver license tests in any language other than English?" (Pls.' Tr. Ex. 5 at 1.) After opining that Amendment 509 required the Policy, and noting that the Policy probably violated Title VI and the Equal Protection Clause, the Attorney General then cited highway safety, administrative accommodation, and test integrity concerns as justifying the policy. (*Id.* at 2.)

In their pleadings leading up to trial, however, Defendants offered more justifications for the Policy. In addition to the proffered justifications that the Policy: (1) is required by Amendment 509; (2) is justified by highway safety concerns; (3) is justified by administrative accommodation problems; and (4) is justified by examination integrity concerns, the Defendants argue that the English–Only Policy: (5) reflects the national policy that English is the official language of the United States; and (6) is justified by funding concerns.

In their Post–Trial Brief, however, Defendants seem to have abandoned all of their justification arguments but two. They argue that "Defendants' practice of testing in English vindicates two important principles: the English language as an organizing principle, and Alabama's interest in the safety of its roads." (Defs.' Post–Tr. Br. at 12.)

Despite Defendants' scatter-shot assertions, in an abundance of caution and with due respect for the concerns of the Department, the court will address all asserted justifications. An examination of those justifications discloses, however, that the Defendants have failed to meet the threshold of proving that there exists a "substantial legitimate justification" for the English–Only Policy in order to avoid liability, *Elston*, 997 F.2d at 1407 (citing *Georgia State Conference*, 775 F.2d at 1417).

a. *The English–Only Policy is not required by Amendment 509*

With all due respect to the Attorney General's determination that Amendment 509 and highway safety, administrative accommodation, and test integrity concerns justify the English–Only Policy, the Supremacy Clause of the United States Constitution states that "This Constitution, and the Laws of the United States which shall be made in Pursuance

thereof ... shall be the supreme Law of the Land ... any Thing in the ... Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI. Cl. 2.

■■■■■ The Supremacy Clause deprives the States of the power to pass laws that conflict with federal statutes. *See Maryland*

*v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Irving v. Mazda Motor Corp.,* 136 F.3d 764 (11th Cir.1998). To the extent the Department's English–Only Policy could be read as a requirement of Alabama's Amendment 509, the requirements of Title VI would trump that policy via the Supremacy Clause.[78]

78. Other states with official English laws still provide state services in foreign languages. In Arizona, for example, the Attorney General issued an opinion regarding that State's Official English law. In discussing the opinion, the United States Supreme Court noted that:

> In Opinion No. I89-009, the Attorney General said it was his obligation to read Article XXVIII "as a whole," in line "with the other portions of the Arizona Constitution" and "with the United States Constitution and federal laws." App. 61. While Article XXVIII requires the performance of "official acts of government" in English, it was the Attorney General's view that government employees remained free to use other languages "to facilitate the delivery of governmental services." *Id.*, at 62. Construction of the word "act," as used in Article XXVIII, to mean more than an "official ac[t] of government," the Attorney General asserted, "would raise serious questions" of compatibility with federal and state equal protection guarantees and federal civil rights legislation. *Id.*, at 65–66.

*Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 1061, 137 L.Ed.2d 170. The Court went on to note that:

> Specifically addressing "[t]he handling of customer inquiries or complaints involving state or local government services," the Attorney General elaborated:
> "All official documents that are governmental acts must be in English, but translation services and accommodating communications are permissible, and may be required if reasonably necessary to the fair and effective delivery of services, or required by specific federal regulation. Communications between elected and other governmental employees with the public at large may be in a language other than English on the same principles." App. 74.

*Id.* 117 S.Ct. at 1061, n. 7.

California's Attorney General issued an opinion on that State's almost identical Official English law noting that:

> translations as an aid to understanding the official English text or a purely informational or educational use of a foreign language by a public agency in a nonofficial context (i.e., a use not intended to have intrinsic legal significance) would not be constitutionally prohibited under section 6(b).

(Pls.' Opp'n, Ex. 16 at 12.)

The Alaska Attorney General, when queried whether Alaska's Department of Public Safety could prohibit the use of interpreters and disallow oral testing for persons who do not read English, concluded that:

> [U]nless you provide a satisfactory alternative for persons who do not read English to demonstrate their qualifications for a driver's license, you may not prohibit the use of interpreters or disallow oral testing. Our answer is founded on the universally accepted proposition that the privilege to drive an automobile is too important to an individual to permit its denial as a whole to a linguistic minority.
> It is not only possible but, on the whole, probable that a person who can drive can also recognize traffic signs and signals in the English language even if otherwise unable to read English. Therefore, to deny these people an opportunity to take the driver's license test would deny them the equal protection of the laws.

(Pls.' Supp., Ex. 32 (1978 Alas. Op. Att'y. Gen. J-66–623–78 (1978).))

Similarly, Utah's Department of Public Safety requested an opinion from that State's Attorney General regarding whether a State statute required individuals with limited English language skills to meet the same minimum licensing examination required of people who have no such limitation. Utah's Attorney General noted that although non-English speakers had to meet similar standards of road safety, an "individuals inability to read and speak English must be related to his competence as a driver." (Pls.' Supp., Ex. 35, (1980 Utah Op. Att'y Gen. 80–80 (1980).)) The Utah Attorney General went on to note that the State could deny a license to an individual "[w]here inability to read English would jeopardize an individual's ability to safely operate an automobile on the public highways," but warned that:

> this competence ... may not be related in any way to the individual's ability to speak English or successfully take a written examination in the English language, without the aid of a translator. Neither of these abilities is specifically required by statute, and if either were it might raise a question of whether or not it violated equal protection since it may not be related to the purpose of promoting competent and safe driving.
> While an immigrant or alien may not speak English, it is possible that he was a very competent driver in his own country, and it is also possible for such an individual to learn all of the various warning signs and direction signs (through a combination of shape and color identification with memorization of commonly-

**b.** *The Defendants have offered no proof that resident non-English speakers are a greater safety risk on Alabama highways than English speakers*

Although the Defendants consistently argue that the English–Only Policy is justified by safety concerns, (Defs.' Mem. at 11; Defs.' Reply at 10; Defs.' Post–Tr.Br. at 12), they have produced no evidence that resident non-English speakers constitute a greater risk on Alabama's roads, either quantitatively or proportionally, than English speakers. Indeed, Colonel Hammond, Assistant Director of the Department from 1987 to 1991 and Chief of its Driver's License Division from 1978 to 1987, testified both in his deposition and at trial, that during his tenure at the Department, he was not aware of any evidence showing that non-English speaking drivers were more likely to get into accidents than English speaking drivers or that accidents involving non-English speaking drivers were more severe than accidents involving English speaking drivers. (Pls.' Opp'n, Ex. 1, Hammond Dep. at 13–14.) Nor were there any instances where an accident occurred while a Department examiner was administering the road skills portion of the examination to a non-English speaking applicant. (*Id.* at 16.)

Major Cottingham, Chief of the Driver's License Division from 1989 until 1994, bolstered Colonel Hammond's testimony. Major Cottingham testified that he was aware of no evidence showing: (1) that non-English speakers are more likely to get into accidents than people who do not speak English; (2) that non-English speakers have difficulty comprehending traffic signals; or (3) that non-English speakers were involved in accidents during the road skills portion of the examination. In fact, Major Cottingham was unaware of any problems with non-English speaking persons driving in Alabama. (Pls.' Opp'n, Ex. 2, Cottingham Dep. at 40–41.) Finally, Colonel McHenry, former Director of the Department of Public Safety, testified that he was unaware of any safety problems associated with issuing driver's licenses to persons who were not fluent in English. (Pls.' Opp'n, Ex. 7, McHenry Dep. at 19–20.)

Given the lack of evidence proffered by the Defendants in support of their safety justification, and the testimony of Colonel Hammond, Colonel McHenry and Major Cottingham, the court finds that the Defendants have failed to meet their evidentiary burden. A bare conclusory assertion is certainly not a "substantial legitimate justification" as contemplated by *Elston,* 997 F.2d at 1407 (citing *Georgia State Conference,* 775 F.2d at 1417).

In addition, a close examination of Defendants' safety rationale discloses internal inconsistencies. The Defendants' contend that:

The Department's belief that, as the Attorney General's Opinion states, "[c]onsideration of safety ... would support a requirement that driver license examinations be given in English. Safety considerations include the person's ability to read and understand highway signs and to understand the directions of law enforcement officers," *see* Exhibit H, is not irrational. The belief dovetails with 49 C.F.R. § 391.11(b)(2)'s focus on the understanding

used words) even though he may not easily read or speak English.

In many areas, the so-called "international" symbols have been included on most public highway signs, to facilitate driving for the non-English-speaking person. Many countries also honor an international driver's license, recognizing that the nonnative-language speakers are still safe drivers.

(*Id.*)

Georgia's Attorney General concluded that Georgia's Official English law did not "either mandate the exclusive use of the English language or prohibit the use of other languages." (Pls.' Supp., Ex. 33 (1995 Ga. Op. Att'y Gen 95–44 (1995).)) Georgia's Attorney General noted that Georgia's Department of Public Safety currently administered its driver's license examination in fourteen different languages and was considering expanding its foreign language program. Because the State statute was silent, the Attorney General concluded that whether to continue the program "is a decision of policy to be made by the Department." (*Id.*)

Although Defendants object to the opinions of Attorneys General from other states, arguing those opinions to be "irrelevant," (Defs.' Resp. at 3), the court notes those opinions as indicative of the competing state and federal interests inherent in such Official English laws, and indicative of the disagreement—apparently between Alabama, and perhaps Georgia on the one hand, and Utah, Alaska, California, and Arizona on the other—over the scope and applicability of such laws.

of traffic signs and signals and responding to official inquiries.

(Defs.' Reply at 10.) The court notes that the *only* safety rationales offered by the Defendants, anywhere in their pleadings, are the one's proffered by the Attorney General; the ability to read traffic signs and the ability to communicate with law enforcement officers. In specific support of the communication aspect of their safety argument, they cite only to 49 C.F.R. § 391.11(b)(2)—federal regulations requiring operators of commercial vehicles to demonstrate limited English proficiency. As noted below, that regulation is not only easily distinguishable from the instant action, but it has been challenged as violative of Title VI and is currently under review by the federal Department of Transportation.

Defendants fail to address why their same safety concerns are not raised when it comes to Alabama's illiterate and deaf population. No matter what language they speak, illiterates, by definition, cannot read. Therefore, illiterate English speakers, like *some* non-English speakers, cannot read road signs. In fact, given the demographic statistics noted above, a higher percentage of Alabama's driving-age population are illiterate than are non-English speaking. (*See* Defs.' Post–Tr. Br. at 5 ("As Plaintiffs have shown, there are far more functionally illiterate Alabamians than there are speakers of foreign languages who do not speak English well or at all.").) Nevertheless, the Department apparently sees no safety concerns with the higher percentage of illiterate drivers that ostensibly cannot read road signs.

Further, after reviewing the Department's licensing procedures, Dr. Gonzalez noted that:

> [The Department regards driving as] a skill that does not rely on reading, but that relies on the comprehension of symbols and the physical execution of driving according to highway safety rules. The *Alabama Driver's Manual* itself states that more symbols and pictures are being used for road signs, which advantageously allows for quicker recognition. This is especially significant in that many non-English speaking individuals have learned to drive in their own countries and can easily adapt

to driving rules that are obvious and reinforced through visual signs.

> The overwhelming majority of signs tested in the written exam are universally understood international symbols. Out of twenty-eight different signs included in the six English test versions, an examinee would only have to recognize one abbreviation ("RR") and two words ("soft shoulder"). Dependence on these symbols for driving is the reason that any one of us can drive when we travel in Mexico, on the Autobahn in Germany, or on the Appian Way in Italy. For the non-English speaker in the United States, the role of language in this visual recognition task is significantly diminished.

(Pls.' Opp'n, Ex. 7, Gonzalez Report at 7.)

The ability to read road signs, however, may be a nonissue because of Alabama's utilization of international highway symbols that are understood without the need for proficiency in a specific language. Martha Sandoval and Lorenzo Leon demonstrated at trial how those with limited English skills could still understand road signs utilized in Alabama and around the world. Their testimony was bolstered by Dr. Gonzalez, who explained how the reading and comprehension of traffic signs is not impaired by the inability to speak a particular language. (*See* Pls.' Tr.Ex. 15, Gonzalez Report at 6–7.) As one reviewer of the Attorney General's Opinion regarding the Department's English–Only Policy noted: "We use international highway signs and shapes therefore safety is not such an issue." (Pls.' Tr., Ex. 4, Opinion Review Committee Memorandum.) Indeed, Martha Sandoval was able to successfully complete driver's education training, even with her lack of English proficiency.

Another inconsistency in Defendants' safety rationale is that deaf drivers, like some non-English speakers, cannot communicate orally, in English, with law enforcement officials. It is safe to assume that many, if not most law enforcement officials in the State of Alabama do not speak, read, write, or understand a foreign language, and are probably not conversant in Sign Language. Further, the Defendants have produced no evidence establishing that non-English speakers do not understand the directions of law enforcement officers. It is undoubtedly true that

some non-English speakers, like some deaf driver's, would not understand the oral, English language directions of law enforcement officials. Nevertheless, Lieutenants Byers and Hamilton testified that while performing law enforcement duties on Alabama roads and while administering the road skills examination, alternate methods of communication are utilized with those who cannot communicate orally, in English. (*See* Byers Test.) For example, Lieutenants Byers and Hamilton testified that while serving as troopers, they utilized hand signals and other non-English communication skills to communicate with these individuals. Lieutenants Byers and Hamilton also testified that they experienced no problems when relying on flash cards, hand signals, and pointing, rather than oral communication in English, to administer the road skills examination. In fact, as noted above, the Department has endeavored to make the road skills examination as simple as possible; examiners are told to be patient, repeat instructions if necessary, and do everything possible to help the applicant pass. Their testimony was bolstered by the testimony of Dr. Gonzalez:

> It is not necessary to comprehend and speak English in order to understand public safety officials' instructions because such officials communicate largely with gestures. Officials are generally trained to communicate with gestures whenever necessary for public safety. A public safety official would have to use gestures to get a deaf driver to present his or her license, or to navigate around an accident or construction zone. The same kind of accommodation is commonly made with non-English speakers.

(Pls.' Tr.Ex. 15, Gonzalez Report at 7.)

Finally, as previously noted, Alabama allows non-English speakers from other states and other countries to drive in Alabama as long as they have a valid license. Alabama also issues Alabama licenses to new resident non-English speakers who have valid licenses from other states or countries. Defendants' safety arguments do not address these exceptions or explain how non-resident non-English speakers are somehow less of a safety risk than resident non-English speakers.

It is clear that Alabama provides a multitude of special accommodations for illiterate applicants (audio-taped examinations; examiners orally reading the written examination); deaf applicants (video-taped Sign Language examinations; flash cards depicting driving maneuvers); and non-resident non-English speakers. Nevertheless, no equivalent accommodations are made for resident non-English speaking applicants.

The Defendants' safety argument is not a "substantial legitimate justification" for its English–Only Policy. *Elston,* 997 F.2d at 1407 (citing *Georgia State Conference,* 775 F.2d at 1417). The Defendants have not shown concrete or abstract factors justifying its policy as "legitimate, important, and integral to the defendant's institutional mission," *Id.* at 1413, nor have the Defendants shown that the justification bears a "manifest demonstrable relationship" to the challenged policy. *Id.* at 1412 (citing *Georgia State Conference,* 775 F.2d at 1418). Safety itself, of course, is "legitimate, important, and integral" to the Department's institutional mission. Nevertheless, safety concerns are addressed by examining applicant proficiency in the substantive aspects of the vision, written, and road skills examinations, not in the ability to read the written examination or communicate in English with the examiner. (*See* Defs.' Post Tr.Br. at 6 ("The Department's practice of testing applicants on their knowledge of the rules of the road in the written examination is inherently safety-related.... applicants for driver's licenses are tested to make certain that they are capable of driving safely on the roads of Alabama"); Pls.' Opp'n, Ex. 20, Gonzalez Report at 7 ("It is understood by the Department of Public Safety that driving is a skill that does not rely on reading, but that relies on the comprehension of symbols and the physical execution of driving according to highway safety rules").) Alabama's past and present licensing of illiterate residents, deaf residents, and nonresident non-English speakers proves the point.

c. *The Defendants' arguments regarding the administration and application of foreign language examinations are unpersuasive*

The two arguments proffered by the Defendants in support of their administrative justification for the English–Only Policy relate to the administrative burden placed on

the Department and the integrity of the examination process. The court finds neither of these arguments persuasive.

 As a threshold matter, the court notes that the Department administered written examinations in approximately fourteen foreign languages for over a decade. Colonel Hammond testified at trial that during all of this time period, the Department did not experience any significant or disproportionate problems in giving the examination in a foreign language. As noted earlier, he viewed the program as beneficial and productive, and took steps to expand the program when demand was great enough. The only complaints related to the longer-than-average time period it took to administer foreign language examinations. This argument, however, is equally applicable to the administration of examinations to illiterate English-speakers and deaf applicants. It cannot be reasonably contested that having an examiner read the written examination to an illiterate English-speaking applicant takes as long, if not longer, than providing a non-English speaking applicant with a written examination in a foreign language or an examiner retaining a translation dictionary during the examination.

### i. Examination administration

Defendants argue that "[t]he Department lacks the administrative resources necessary to read foreign-language examinations to applicants like the plaintiffs." (Defs.' Reply at 11; *see also* Defs.' Post Tr.Br. at 5.) Currently, some illiterate English-speaking applicants are read the written examination by Department employees. Prior to the cessation of foreign language examinations, however, these examinations were not read to non-English speakers applicants; written translations were used. Further, although some illiterate applicants are read the examination, some are administered audio-taped recordings. And, the Department has offered no proof that deaf applicants are provided with Department-employed live interpreters proficient in Sign Language; the examination is administered to

them in sign Language via video-tape. Accordingly, consistent with its prior practice, the Department could offer foreign language examinations in translated written form. And, consistent with its current practices, the Department could offer audio-taped or even video-taped foreign language examinations. Like Arizona or California, the Department could provide audio-taped examinations or allow applicants to bring interpreters with them to the examination. The Department would not have to employ interpreters to read the examination to non-English speaking applicants. Defendants' argument that the Department does not have the administrative resources to read foreign language examinations to non-English speaking applicants, even if true, fails to address the obvious, already validated alternatives. Consequently, the argument has little merit.

As for Defendants' arguments regarding the extra time expended on foreign language examinations, the Department spends as much time, if not more on illiterate English speaking applicants, and has to take extra time with deaf and handicapped applicants as well.

Next, Defendants argue that there is no principled way to decide what foreign languages should be accommodated, nor what language dialects should be offered. They argue that by offering a finite number of translated examinations, other languages are necessarily excluded. (Defs.' Mem. at 8–10; Defs.' Reply at 3, 9, 11.) Plaintiffs respond that:

> This alleged concerns [sic] about "the limits of accommodation" is greatly exaggerated. The range of foreign languages spoken in Alabama is quite limited. *See* [Pls.' Opp'n, Ex. 19, Bogie Aff.]. Ninety-five percent of the requests for language assistance received by the Linguistic Databank in Montgomery, Alabama last year were requests from persons who spoke Spanish, Lao, Cambodian, Japanese, Vietnamese, Korean, Thai, or Chinese (Mandarin and Cantonese). [*Id.*, Ex. 23, Ware Aff.].[79] Not surprisingly, the eight languages most fre-

---

79. Dr. Lewis B. Ware is a Professor of Middle Eastern Studies at the Air University, Maxwell Air Force Base, and is the Director of the Linguistic Databank for the International Assistance Project of Alabama. He provided affidavits for both Parties in this action. (*See* Pls.' Opp'n, Ex. 23; Defs.' Mem., Ex. B.) The Databank "is a volunteer service that provides translators and

quently requested by users of the Databank were among the languages into which the Alabama driver's license exam had been translated prior to 1992. *See [Id.,* Ex. 1, Hammond Dep. (sealed copies of Alabama driver's examination in Spanish, Lao, Cambodian, Japanese, Vietnamese, Korean, Thai, and Chinese, as well as Greek, Persian, German, Arabian, French and Polish) ].

Contrary to the Defendants' assertion, there *is* a "principled way of limiting the number of languages in which the test can be given": [sic] provide the written driver's license exam in the ten most common foreign languages spoken in the state. "For language groups outside of the ten most common in Alabama—which are probably very few—applicants could be permitted to bring an interpreter to interpret the written exam. As demand increases for the provision of the exam in a language in which the exam is not already available, the state could have the exam translated and made available in that language." [Pls.' Opp'n, Ex. 20, Gonzalez Report at 5]. The fact that forty-eight states make some type of accommodation for non-English speakers further demonstrates the pretextual nature of this purported rationale. [*Id.,* Ex. 14, Driver's License Examination Survey Results].

(Pls.' Opp'n at 24–25) (emphasis in original).

Defendants replied to Plaintiffs' suggested alternatives by arguing that:

Plaintiffs' attempt to limit the number of languages in issue is utterly unprincipled. Selecting the six or ten most common foreign languages not only begs the question why that number, and not another, was chosen, but also fails to accommodate those who do not speak the chosen language. In this regard, Lewis Ware's Affidavits are illustrative only; there is no reason to believe that only those languages may be in issue. The suggestion that languages not addressed be accommodated by allowing the applicant to bring an interpreter ignores the Department's bad experience with other interpreters. [*See* Defs.' Mem., Ex. D, Hamilton Aff. ¶ 7 (noting that Sign Language interpreters employed by the Department were giving deaf applicants answers to the examination)]. The Department lacks the personnel resources to verify that an applicant's interpreter is simply reading the test and not providing assistance.[80] Finally, no other applicants

---

interpreters to foreign language speakers in emergencies." (Pls.' Opp'n, Ex. 23, Ware Aff.) The Databank offers these translation and interpretation services in thirty-five languages, "often at a moment's notice. . . . Emergency services are provided by volunteers. Linguists may charge an hourly rate for other services." (Defs.' Mem., Ex. B at 1.)

Dr. Ware testified that:

Most of the referrals made by the Linguistic Databank in recent years concerned requests from members of the public or state or federal agencies for translators and/or interpreters in the following languages, in addition to English: Spanish, Lao, Cambodian, Japanese, Vietnamese, Korean, Thai, and Chinese (Mandarin and Cantonese).

(Defs.' Mem., Ex. B, Ware Aff. at 2.)

To further clarify this statement, I offer the following information. Last year, the linguistic Databank received approximately 10–12 requests for assistance. Of these requests, approximately *ninety-five percent were from* persons who speak the eight languages listed above. Approximately half of the requests were from Spanish speakers.

(Pls.' Opp'n, Ex. 23, Ware Aff.)

Dr. Ware also testified at trial that while linguists may charge for their services, the vast majority of translation and interpretation services are provided by volunteers, at no cost to the non-English speaker in need of aid. He also testified that if the Department of Public Safety contacted the Project, the translation services would be free.

**80.** The fact that the Department had "bad experiences" with previous Sign Language interpreters is not persuasive, particularly because the Department's District Office in Mobile chose to contract with the particular group of interpreters with which it had problems. (Defs.' Mem., Ex. D at 3.) The Department has not stated that it had problems with Sign Language interpreters in other District Offices, nor have they pointed to any problems with interpreters during the years the Department administered foreign language examinations. Under the Defendants' reasoning, however, *all* interpreters would give applicants answers to examination questions.

Not only is that rationale specious, but as Dr. Gonzalez, who, as discussed above, is the Director of the National Center for Interpretation Testing, Research and Policy and the Director and Principal Investigator for the Federal Court Interpreter Certification Project noted, the use of translators outside of the Department to translate the written examination or provide translation services should not compromise the integrity of the examination:

are permitted to use assistance not furnished by the Department.

(Defs.' Reply at 11.)

Plaintiffs responded to Defendants' critique by noting that:

The Department claims that it "would be practically impossible for the state to accommodate the wide variety of languages of persons applying for a license." [Pls.' Tr.Ex. 5, Attorney General Opinion]. In effect, the Department argues that it need not provide the license examination in *any* foreign languages because it cannot possible provide it in *all* foreign languages.

The law is not so blind. The fact that there may be a handful of people whose languages are too obscure to accommodate is not a reason to refuse to serve the thousands of persons whose languages are common in the state. *See Lau v. Nichols*, 414 U.S. at 572, 94 S.Ct. 786 (Blackmun, J., concurring) (English-only policy would not violate Title VI in a case "concerned with just a few youngsters, or with just a few youngsters, or with just a single child who speaks only German or Polish or any language other than English.... [N]umbers are at the heart of this case."); *Serna v. Portales Municipal Schools*, 499 F.2d 1147, 1154 (10th Cir.1974) (recognizing that "only when a substantial group [of foreign language speakers] is being deprived [of their rights] will a Title VI violation exist"); *see also Valadez v. Graham*, 474 F.Supp. 149, 159 (M.D.Fla.1979) (refusing to find a Title VI violation when only thirty-two migrant students were affected).

(Pls.' Post–Tr.Br. at 12–13) (emphasis in original). After again noting the limited range of foreign languages spoken in Alabama, and that ninety-five percent of requests for volunteer language assistance were from individuals speaking the eight languages outlined above, Plaintiffs again noted that these eight "were among those into which the Alabama driver's license exam had been translated prior to 1992." (*Id.* at 13.) The Plaintiffs then went on to note that:

Linguists expert Dr. Roseann González testified that the Department could easily provide the written driver's license exam in the ten most common foreign languages spoken in the state. Indeed, prior to 1992, the Department gave the exam in fourteen foreign languages. [Pls.' Tr.Ex. 11]. For other language groups in Alabama, applicants could be permitted to bring an interpreter to the written exam. As demand increases for the provision of the exam in a new language, the state could have the exam translated into that language.[81] [*See* Pls.' Tr.Ex. 15, González Report at 5; González Test.]. The fact that forty-eight states make some type of accommodation for non-English speakers demonstrates the specious nature of the Department's rationale. [Pls.' Tr.Ex. 21].

The Department's claim that there are too many "dialects" to accommodate is exaggerated and reflects a misunderstanding of the issue. All languages have a standard written form that is understood by all speakers of the language, regardless of their native country or region. [*See* González Test.]. In Spanish, for example, people from one country may use the word "carro" and people from a different country may prefer the work [sic] "automovil."

Professional translators have an ethical duty as members of their professional organizations, such as the American Translators Association and others, to keep a document secure according to the guidelines of the client. Translators and interpreters play an integral role at all levels of local, state, and federal government activities. Without assured security, federal judges could never rely on the confidentiality of a translation of documents or tapes in numerous cases in which such translation is required for the administration of justice.

(Pls.' Opp'n, Ex. 22, Gonzalez Report at 4.)

In addition, the court notes that if the Department utilized volunteers to provide written translation services or translation services during the examination, the Department could require volunteers to sign confidentiality and non-disclosure agreements. Violations of such could be punishable under state law. *See, e.g.,* Ala.Code §§ 36–25–8, 36–25–27 (1975) (prohibiting the disclosure of confidential information by public officials and providing for penalties). Further, Dr. Gonzalez notes that Arizona and California, for example, have found the use of interpreters brought by the applicant to be the most cost-efficient and least disruptive way of dealing with the limited and non-English speaking public, and have reported no problems with the use of interpreters. (Pls.' Opp'n, Ex. 22, Gonzalez Report at 5.)

81. As Colonel Hammond testified was done during his tenure at the Department.

But everyone who speaks Spanish understands that both words mean "car." Moreover, to the limited extent that particular words vary from country to country, alternative words can be provided. *Id.*. For example, the Spanish exam previously administered by the Department provided some alternative Spanish words. [*See* Pls.' Tr.Ex. 13, Spanish Examination (providing both "pito" and "bocino" as alternatives for the English word "horn")]. In any event, any problems with dialect variations on the exams did not pose significant obstacles in the past; according to Lt. Byers, he worked around dialect problems by allowing the use of a translation dictionary.[82]

(Pls. Post–Tr.Br. at 13–14.)

Without deciding which practices would meet the requirements of Title VI, while also meeting the administrative concerns of the Department, the court simply notes that the Department currently does nothing, officially, to accommodate non-English speaking resident applicants.[83] . Clearly, Plaintiffs have offered "comparably effective alternative practice[s] which result[ ] in less disproportionality," and, consequently, have met their burden under *Elston*, 997 F.2d at 1407. The court finds as much. As part of its Order, the court will direct the Department, in conjunction with the Plaintiffs, to devise practices that comply with Title VI while at the same comporting with the Department's administrative requirements. The Department, and not this court, is in a better position to examine its administrative constraints and formulate a policy that addresses both concerns.

### ii. Examination integrity

▆ Defendants argue that "[l]imiting the distribution of the tests protects the integrity of the examination. As [Lt.] Hamilton states, the Department does not generally distribute the examination to the community. While the examination is sometimes compromised, the Department should not be required to risk compromising the test more frequently. Distribution of the test increases the potential for compromise." (Defs.' Mem. at 10; *see also* Defs.' Reply at 12.) The court is unclear as to the meaning of the phrase "does not generally distribute." It implies that examinations are sometimes distributed. Obviously, if the English language examination were available to the community via targeted distributions, the "potential for compromise" would be increased. Defendants' language is ambiguous, however, it seems that Defendants are arguing that the utilization of professional and volunteer translators would increase the risk of compromising the examination. Defendants also appear to argue that non-English speakers are more likely to cheat on the examination than English speakers. Three examples offered by the Defendants support these constructions of Defendants' argument.

First, Defendants point to their previous "bad experience" with Sign Language interpreters utilized in the Department's Mobile District Office. The court has disposed of this argument *supra*, note 80. Second, the Defendants cite to the Affidavits of Lieutenant Hamilton and Ronald Johnson, Driver's License Program Coordinator for the Georgia Department of Public Safety. (Defs.' Mem. at 10.) The portion of Lieutenant Hamilton's Affidavit upon which Defendants rely states as follows:

> With some Vietnamese applicants, the Mobile district office has detected cheating on the examination. It appears that the Vietnamese community has all six examinations that we administer translated. We have seen some applicants convert the an-

---

**82.** Although Defendants' concede that the use of translation dictionaries is allowed, (Defs.' Post–Tr.Br. at 15), this fact is contrary to official policy. In practice, translation dictionaries are either not allowed at all, are allowed, but are retained by the examiner, or they may be retained by the applicant. Further, it is doubtful that allowing the use of translation dictionaries, on its own, would resolve the issues raised in this action. Dr. Gonzalez testified that having a translation dictionary may aid those applicants with some English skills, but would not aid those applicants with little or no English skills. As an example, she testified that certain specific driving-related words, such as "hydroplaning," would usually not appear in a translation dictionary.

**83.** Testimony adduced at trial disclosed that contrary to official policy, some driver's licensing centers allowed the use of translation dictionaries.

swers into a dot-dash code and secrete the coded answers in dictionaries and elsewhere.

(Defs.' Mem., Ex. D, Hamilton Aff. at 3–4, ¶ 10.) The portion of Ronald Johnson's Affidavit relied upon by the Defendants states:

> From time to time, we have learned that the Georgia examinations have been compromised. In one instance, we procured a Polish-language translation through the University of Georgia in Athens. Shortly afterwards, we found that Polish applicants in Athens had a copy of the test prior to testing. More recently, we have been advised that illegal Latin American immigrants have a Spanish-language version of the test before they come to our driver's license facilities.

(Defs.' Mem., Ex. E, Johnson Aff. at 2, ¶ 5.)

Turning first to Defendants' reliance on Georgia's experience with their Polish examination, Georgia's isolated experience in its Athens, Georgia, office is irrelevant to Alabama's administration of its driver's license examination. Assuming it is, however, Ronald Johnson testified at trial that the Georgia Department of Public Safety solved their problem by "scrambling" the questions—i.e., by placing them in different orders and utilizing several different examinations. He also testified that the Georgia Department learned from its experience with the Polish examination by instructing translators of its other foreign language examinations, for example Japanese and Bosnian examinations, to take additional precautions. Mr. Johnson reported no problems with either the Japanese or Bosnian examination. Further, as Plaintiffs note, "the Defendants were apparently not concerned about potential cheating when they sent the driver's license exam outside of the Department to be translated into American Sign Language." (Pls.' Opp'n at 28 n. 27). Finally, as noted previously, concerns about the leakage of tests can be alleviated by employing professional translators who are subject to a code of ethics and by requiring them, as well as volunteer translators to sign confidentiality/non-disclosure agreements subject to penalty under state-law. *See supra* note 80. This is but one method of addressing examination integrity concerns.

As for the apparent contention that non-English speakers are more likely to cheat, the Defendants only conceded that English speaking applicants also cheat, (Defs.' Reply at 12), after Plaintiffs accused the Defendants of demonstrating "stereotypical biases against non-English speakers." (Pls.' Opp'n at 28; *see also Id.* at 26 (citing to *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 2486, 132 L.Ed.2d 762 (1995) (prohibiting racial and ethnic classifications based on stereotypes and noting that such classifications are "offensive and demeaning")).)

Further, the testimony of the Department's current and former employees belied the Defendants' contentions. Major Cottingham testified that he knew of no evidence that non-English speakers were *more likely* to cheat on the examination than English speakers. (Pls.' Opp'n, Ex. 2, Cottingham Dep. at 41.) In fact, when asked whether he was aware of any specific incidents of cheating by foreign applicants, he answered:

> No. I was just told that, you know, that there was some cheating going on with—with the applicants. But in fairness to everybody, there's cheating going on, you know, with the English and I guess anything else. People are going to cheat on the driver's license examination.
>
> Q: But you knew of no evidence that cheating was a bigger problem with foreign examinations?
>
> A: Not big—not bigger, no, sir.

(*Id.* at 42.) Colonel Hammond testified that during his tenure at the Department, copies of the English language examination were taken from the examination room and driver's license offices were burgled. (*Id.*, Ex. 1, Hammond Dep. at 21.) Maintaining the security of foreign language examinations was not a bigger problem than maintaining the security of the English examinations. (*Id.*) He testified at trial that examination integrity concerns applied equally to both English and non-English examinations.

Lieutenant Hamilton testified at trial that in addition to the cheating by Vietnamese applicants noted in his deposition, certain Asian applicants would get argumentative with Department officials. He admitted at

trial, however, that English-speaking applicants also argued and cheated, but contended that "Orientals were worse." (Hamilton Test.) When questioned by the court, Lieutenant Hamilton admitted that other than typical administrative problems such as argumentative applicants and the longer time periods associated with applicants requiring special accommodations, such as illiterate, deaf, and other handicapped applicants, foreign language examinations imposed no other substantial burdens. Lieutenant Byers also confirmed at trial that cheating was detected with English speaking applicants as well as non-English speaking applicants.

In their proffer of their test integrity rationale, the Defendants have not met their burden of proving a "substantial legitimate justification" for the English–Only Policy. *Elston,* 997 F.2d at 1407 (citing *Georgia State Conference,* 775 F.2d at 1417). Although undoubtedly examination integrity is "legitimate, important, and integral to the defendant's institutional mission," *Id.* at 1413, the Defendants have failed to show a "manifest demonstrable relationship" to the challenged policy. *Id.* at 1412 (citing *Georgia State Conference,* 775 F.2d at 1418). Examination integrity could be maintained, as exemplified by the testimony of Defendants' witness Ronald Johnson, and the evidence discloses that both English speaking and non-English speaking applicants attempt to cheat on the examination; none more so than another.

Finally, even if it were true that non-English speakers cheated at a higher rate than English speakers, that fact alone would not justify the English–Only Policy. The court assumes that those applicants caught cheating are not given passing grades on the written portion of their examination. Preventing all non-English speaking residents from obtaining driver's licenses because a percentage of non-English speakers cheated—and are dealt with administratively—is not the solution, particularly because the Department still issues licenses to English speaking applicants even though it admits that English speaking applicants cheat.

d. *Congress has never declared English to be the official language of the United States, consequently the Department's English–Only Policy is not a reflection of national policy, and, even if it were, does not justify the Policy*

 Although Defendants contend that "English is the national language of the United States," (Defs.' Mem. at 8; Defs.' Reply at 9–10), Plaintiffs correctly note that "[b]ills proclaiming English as the official language of the United States have repeatedly been introduced in Congress. All have failed." (Pls.' Post–Tr.Br. at 10 (citing Pls.'s Opp'n at 20 n. 20 (citing bills)).) [84]

In support of their argument that English is the national language of the United States, Defendants cite to naturalization prerequisites requiring "an understanding of the English language, including an ability to read, write, and speak words in ordinary usage in the English language...." (Defs.' Mem. at 8 (citing 8 U.S.C. § 1423)), and federal regulations requiring operators of commercial vehicles to demonstrate limited proficiency in the English language. (*Id.; see also* 49 C.F.R. § 391.11(b)(2).)

Turning to the naturalization requirements, it is obvious that becoming a United States citizen differs both qualitatively and quantitatively from obtaining a Class D driver's license in Alabama. Indeed, non-citizens may obtain Class D driver's licenses.

Naturalization involves, in part, the shifting of allegiances from one sovereign to another, and the granting of a multitude of civil rights and liberties not available to foreign nationals. The procedural and substantive requirements for naturalization are legislative decisions of Congress intended to, among other things, ensure loyalty to the new sovereign, *see, e.g.,* 8 U.S.C. § 1424, and to aid naturalized citizens in assimilating into

---

**84.** Although strong arguments can be made in support of establishing English as the official national language, patriotism, loyalty, or, for that matter, the ability to drive an automobile should not turn on whether it is or not. As the Arizona Supreme Court recently recognized: "The American tradition of tolerance recognizes a critical difference between encouraging the use of English and repressing the use of other languages.," *Ruiz,* 957 P.2d at 990 (quoting *Yniguez v. Arizonans for Official English,* 69 F.3d at 923).

American society. The legislative history of 8 U.S.C. § 1423 notes:

> Through the system of citizenship classes sponsored by the Immigration and Naturalization Service and the local school system, the alien is aided in preparing himself for citizenship, and every effort is made to give him fundamental and uniform knowledge of our political and social structure. In order that he may intelligently use this fundamental and uniform knowledge and so that he may be a complete and thoroughly integrated member of our American society, the committee feels that he should have a basic knowledge of the common language of the country and be able to read, write, and speak it with reasonable facility.

1952 U.S.C.C.A.N. 1653, 1736. Becoming a citizen entails a long-term, if not life-time commitment to the United States. Accordingly, ensuring assimilation by providing for English proficiency may well be justified under that rationale. Indeed, in addition to requiring some English skills, § 1423(a) requires "a knowledge and understanding of the fundamentals of history, and of the principles and form of government, of the United States." 8 U.S.C. § 1423(a)(2). These concerns are simply not implicated in the Driver's License Division's testing of road skills and driving proficiency; its institutional mission. (*See* Hamilton Test. (testifying that safety is the main concern behind driver's license examinations).) Knowledge of American or Alabama history, or of the political structure of the United States or Alabama is not a prerequisite to obtaining a driver's license in Alabama. Further, in sections not quoted by the Defendants, 8 U.S.C. § 1423 provides for a multitude of exceptions and prohibits "extraordinary or unreasonable" conditions from being imposed. *See* 8 U.S.C. § 1423.

Defendants also cite to the requirement that those seeking to obtain a commercial driver's license be able to "read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records." (*Id.* (citing 49 C.F.R. § 391.11(b)(2).)) Defendants argue that "[i]f the United States can require commercial licensees to be conversant in English, how does the State of Alabama violate anyone's rights when it administers its written examinations for standard licenses only in English." (*Id.*)

First, commercial driver's licenses differ from Alabama's Class D driver's licenses in that federal commercial driver's license requirements regulate the operation of "vehicle[s] used on public highways in interstate commerce to transport passengers or property" when: (1) the vehicle has a gross weight rating of 4,537 or more kilograms (10,001 or more pounds); or (2) the vehicle is designed to transport more than fifteen passengers, including the driver; or (3) the vehicle is used in the transportation of hazardous materials. 49 C.F.R. § 390.5.

In contrast, Alabama's Class D licenses apply to noncommercial vehicles, excluding motorcycles. (*See* Pls.' Tr.Ex. 32, Alabama Driver's Manual at 3, 5.) In fact, Alabama itself distinguishes between Class D licenses and commercial driver's licenses. *See* Ala. Code §§ 32–6–49.8(d) and 32–6–49.10(b); Pls.' Tr.Ex. 32, Alabama Driver's Manual at 7. Holders of Class D licenses ordinarily cannot operate vehicles over the "commercial" weight limit, vehicles designed to transport more than fifteen passengers, including the driver, or vehicles used in the transportation of hazardous materials, as defined by the relevant statutes. In its Uniform Commercial Driver License Act, Alabama has promulgated its own laws regulating commercial motor vehicles that mirror the federal regulations. *See* Ala.Code § 32–6–49.1 et seq.; *see also id.* at §§ 32–6–49.3(5), 32–6–49.8, 32–6–49.10. Other than the interest in safe driving skills and proper vehicular maintenance, the safety concerns inherent with the operation of "commercial" vehicles "on public highways in interstate commerce to transport passengers or property" are simply not present when it comes to the operation of personal vehicles under a Class D license.

Operators of commercial vehicles are required to interact with regulatory officials on a much more frequent basis than those with Class D licenses, (i.e., highway weigh-stations), and are required to maintain and submit various reports and records on a routine

basis that are simply not required of holders of Class D licenses. *See, e.g.,* 49 C.F.R. §§ 390.15, 390.31, 390.35, 391.27, 391.51, 395.8, 397.19. Given these numerous reporting requirements, regulations requiring an understanding of English "to respond to official inquiries, and to make entries on reports and records," may well be justified. And, given the higher safety risk ostensibly posed by commercial vehicles that carry everything from schoolchildren to explosive chemicals, requiring a sufficient understanding of English to converse with the general public and to understand highway traffic signs and signals may well be justified on safety grounds.[85] Nevertheless, the court notes that even given the much stronger rationales supporting the English requirement in 49 C.F.R. § 391.11(b)(2), the regulation has been challenged as violative of Title VI and is under review by the United States Department of Transportation. (Pls.' Opp'n, Ex. 22.) The court notes, however, that even if the federal government requires limited English comprehension for certain licenses, that does not absolve the State of Alabama from its legal and contractual obligation to abide by the dictates of Title VI and its regulations. *See supra,* Section C(3)(a).

Further, as Plaintiffs' note:

> Even if English were the "national language of the United States," providing translated driver's license exams does not conflict with that policy. To the contrary, the provision of the exam in foreign languages actually helps to *promote* English proficiency. *See* Exhibit 20 at pp. 1–3 (expert report of Dr. Gonzalez) (limiting access to a driver's license limits employment, the setting in which immigrants typically learn English, and limits interactions with English speakers in the community at large); Exhibit 1 at 18–19 (Hammond deposition) ("I felt that for [non-English speakers] to be assimilated into the mainstream of life in this state that a driver's license would be appropriate for their livelihood."); *see also Gutierrez v. Municipal*

*Ct.,* 838 F.2d 1031, 1042 (9th Cir.1988), *vacated as moot,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989) (rejecting as a valid state interest the defendants' claim that "the United States is an English-speaking country" and holding that "[t]hat self-evident fact provides little support for the restrictive [English-only] rule").

If the state's refusal to provide the exam in English were actually necessary to reflect a "national language" policy, the State would be compelled to cease all other communication in languages other than English. But the State publishes or distributes documents, notices, and brochures in a variety of foreign languages. *See* Exhibit 21 (notices and pamphlets distributed by Alabama Department of Public Health and the Alabama Development Office). According to Robert Sutton of the Alabama Development Office, the state prints or distributes brochures in a number of different languages in order to attract foreign investment.[86] Project managers who bring foreign investors to Alabama are free to hire translators to facilitate the visit. To make the visitors feel at home, Governor Fob James has recorded a video welcoming visitors with a voice-over in various languages. Given the numerous ways in which Alabama conducts its business in foreign languages, the English-only driver's license policy can hardly be deemed necessary to "reflect the national language."

(Pls.' Opp'n at 21–22.)

Thus, to the extent that Defendants' argument is based on the supposition that its English–Only Rule promotes assimilation into society, as Plaintiffs note, Dr. Gonzalez testified that it would actually have a contrary effect:

> The English Only rule promulgated by the Department of Public Safety ... is a rule that serves no linguistically useful purpose and is counterproductive. Withholding a

---

**85.** Alabama utilizes international traffic signals that enable comprehension with little or no understanding of the English language. Given the nature of the federal commercial licensing regulations, however—the regulations address commercial vehicles involved in interstate travel—traffic signals may differ from state to state, requiring such a regulation to ensure understanding of potentially different signs.

**86.** Mr. Sutton's deposition was taken on November 21, 1997, and has not yet been transcribed. [Footnote 22 in original].

driver's license severely limits the ability of individuals to compete for, acquire, and maintain employment, as well as to carry out daily duties, such as driving themselves and others to school (to learn English and other important skills), driving to seek medical care for themselves and their children, driving to interact with social service agencies, and driving to attend religious services. These limitations not only interfere with survival, but they radically restrict normal interactions with English speakers in the community at large.

. . .

The English Only rule will not carry out the mandate of Amendment 509 "to preserve and enhance the role of English" in Alabama. First, a rule like Alabama's will severely retard the development of English by individuals who are limited or non-English speakers by denying access to employment. Employment is the primary way in which immigrants to this country acquire or learn English as a second language. From a sociolinguistic perspective, employment is viewed as the most significant factor that contributes to language shift (learning a new language at the expense of another). This is true both at the individual and group level.

. . .

Second, prohibiting limited and non-English speakers from obtaining a driver's license will likely create language ghettos populated by limited and non-English speakers who have not acquired English because of their exclusion from employment. These households are characterized by the U.S. Census Bureau as "linguistically isolated"—those households where no member age 14 or older can speak English "very well." This isolation is usually a direct result of lack of daily interaction in the larger English-speaking community. These "linguistically isolated households" are factors in the perpetuation and maintenance of the foreign language and also have other long-term social and economic consequences. For example, the creation of language ghettos with a number of adults who cannot get to work and are not acquiring English will, in turn, increase the number of children whose acquisition of English will be retarded. This increases

the number of limited-English proficient and non-English proficient children and adults who may require more linguistic assistance in educational and social service settings.

(Pls.' Opp'n, Ex. 20, Gonzalez Report at 2.)

The Defendants' national policy argument is not a "substantial legitimate justification" for its English–Only policy. *Elston*, 997 F.2d at 1407 (citing *Georgia State Conference*, 775 F.2d at 1417). The Defendants have not shown that Congress has declared English to be the official national language, and even if it were, have not shown how that fact would justify its policy as "legitimate, important, and integral to the defendant's institutional mission," *Id.* at 1413, nor how it bears a "manifest demonstrable relationship" to the challenged policy. *Id.* at 1412 (citing *Georgia State Conference*, 775 F.2d at 1418).

e. *The Defendants' fiscal arguments fail*

Finally, Defendants argue that:

The State's resources are limited, and the requirement to administer examinations in foreign languages would be costly. . . . If the State is required to administer examinations in foreign languages, it will have to procure written translations of the examination in each language. In addition it will have to procure the capability of reading each foreign examination to an applicant unable to read and write in that language. . . . Plaintiffs would have the financially strained State of Alabama and Department of Public Safety procure tests and language capability and expend its personnel resources at the expense of performing other important functions. The Department, not plaintiffs or this Court, should decide how its budgetary and personnel resources are to be used.

(Defs.' Mem. at 9; *see also* Defs.' Reply at 9, 11; Defs.' Post–Tr.Br. at 5.) In support of their arguments, Defendants offered the Affidavit of Roscoe Howell, Commander of the Data Information Services Unit of the Department. (Defs.' Reply at 11.) He testified that the Department:

received proposals from persons offering to provide translation services for deaf applicants. The offer was not one to provide

free services, but rather offered the services for $50.00 per hour. The Department rejected the proposal because of its cost and concerns about test integrity, and instead developed a video test procedure using State resources.

(Defs.' Mem., Ex. F., Howell Aff. at 2.)

■ Defendants fail to address, however, the deposition testimony of Colonel Hammond, who stated that during his tenure as Chief of the Driver's License Division and Assistant Director of the Department, the Department incurred no costs in obtaining translations of the English language examination. Lieutenant Byers also testified that prior to 1992, the Department utilized a foreign language translation service that maintained a databank in Huntsville, Alabama where foreign language examinations were procured at no cost to the State. The evidence shows that the Department obtained translation services from volunteers such as individuals at the University of Alabama in Huntsville. (Pls.' Opp'n, Ex. 1, Hammond Dep. at 24.) Ronald Johnson testified that Georgia incurs no costs in obtaining translated version of its English language examination because the Georgia Department of Public Safety utilizes University of Georgia translators. As it has done in the past, the Department could seek translation services from individuals within the State's system of higher education, at no cost to the Department.

Plaintiffs point out that:

Even if the state employed professional translators, it would cost approximately $10,000 to translate the exam into ten different languages with six versions of each language. [Pls.' Opp'n, Ex. 20, Gonzalez Report at 3. Dr. Gonzalez also noted that "If the [Department] did not require camera-ready copies, the cost to translate the exam into six versions of one foreign language would be approximately $300.... If possible, Alabama could 'share' translated exams with other neighboring states so that quality tests could be produced at less cost. In the area of court interpreting, such a consortium of states currently shares expenses and expertise." *Id.*] Given that the total Department of Public Safety budget for fiscal year 1997–1998 is over nine million dollars, this figure is

negligible. [*See* Pls.' Opp'n, Ex. 24 (DPS budget) ].

Even assuming that the administration of the exam in foreign languages would entail some cost to the State, its interest in conserving its financial resources does not automatically trump all other concerns. *See Frontiero*, 411 U.S. at 690, 93 S.Ct. 1764 ("administrative convenience is not a shibboleth, the mere recitation of which dictates constitutionality" under heightened scrutiny); *Graham v. Richardson*, 403 U.S. at 375, 91 S.Ct. 1848 (State's "concern for fiscal integrity" not a compelling justification for state welfare laws discriminating against aliens). Nor would it justify the Defendants' refusal to allow examinees to bring, at their own expense, interpretation aids or certified translators.

(Pls.' Opp'n at 25–26.)

Plaintiffs' argument that the Department's fiscal concerns would not justify the prohibition of the use of interpretation aids or certified translators supplied by applicants, is well taken. Further, it is clear from the evidence that fiscal concerns were not a factor in the Department's decision to cease the administration of foreign language examinations. And, regardless of the dispute that arose at trial regarding the Department's exact budget for fiscal year 1997–1998, the Defendants stipulated at trial that its budget was over $50 million dollars. *If* the Department decides that it wants to contract with professional translators rather than taking advantage of volunteers, as the Department did prior to 1992, the costs would be trifling. *Cf. United States v. Board of Trustees for the Univ. of Alabama*, 908 F.2d 740, 751 (11th Cir.1990) ("In light of UAB's annual transportation budget of $1.2 million, an expenditure of $15,000, plus occasional amounts ... is not likely to cause an undue burden on UAB").

Based on the foregoing, the court finds that Defendants' fiscal arguments do not establish a "substantial legitimate justification" for the English–Only Policy. *Elston*, 997 F.2d at 1407 (citing *Georgia State Conference*, 775 F.2d at 1417). Although fiscal matters are, in certain circumstances, "legitimate, important, and integral to the defen-

dant's institutional mission," *Id.* at 1413, the Defendants have not shown that the fiscal implications of the English–Only Policy create such a circumstance. Further, it is clear that fiscal concerns played no part in the Department's cessation of foreign language examinations, and the Defendants have not shown a "manifest demonstrable relationship" to the challenged policy. *Id.* at 1412 (citing *Georgia State Conference,* 775 F.2d at 1418). Finally, even if Defendants have met their burden, the Plaintiffs have shown "comparably effective alternative practice[s] which would result in less disproportionality." *Id.* at 1407.

Dr. Gonzalez's conclusion in her report is an apt summary and analysis of the Department's English–Only Policy:

> Language policies should be rational, reasonable and fair to the population they impact, and consistent with the goals of the state or agency they serve. [They must, of course, also meet relevant legal requirements]. The [Department's] English Only rule satisfies none of these criteria. This rule promotes neither the intention of Amendment 509 to enhance the role of English in the state, nor does it protect the integrity of any examination or promote the welfare or safety of any community. It has the opposite effect. It retards the learning of English among this population, which also significantly jeopardizes the assimilation of limited and non-English speaking persons into the community, which is harmful in the long run to the state of Alabama and to the excluded population. The rule has an irreparable detrimental effect on persons of limited or no English proficiency. For all of these reasons, the policy should be more thoughtfully reformulated to provide reasonable accommodations to limited and non-English speakers.

(Pls.' Opp'n, Ex. 20, Gonzalez Report at 7–8.)

Based on the foregoing, the court finds that Defendants have failed to establish a "substantial legitimate justification" for its English–Only Policy. *Elston,* 997 F.2d at 1407. Or, if they have, the Plaintiffs should nevertheless prevail because they have shown "comparably effective alternative practice[s] which would result in less disproportionality." *Id.*

## IV. CONCLUSION, JUDGMENT, AND DECLARATION

Although at trial the court granted Defendants' motion for judgment as a matter of law on Plaintiffs' intentional discrimination claims with the full agreement of the Plaintiffs, it could be inferred that because the State of Alabama knew, by their own admission, that their English–Only Policy may be in violation of Title VI and/or the Equal Protection Clause, that the State intends to treat resident non-English speakers differently than all other applicants for driver's licenses.

First, the evidence in this action clearly establishes that the State goes out of its way to aid illiterate English speaking applicants, deaf applicants, and handicapped applicants. Non–English speaking out-of-state drivers may drive in Alabama, and may obtain an Alabama driver's license without having to take the Department's examinations.

Second, the evidence establishes that the Department administered foreign examinations for over a decade, and encountered no significant problems in so doing. The former Chief of the Driver's License Division and former Assistant Director of the entire Department, Colonel Hammond, testified that there were no problems with the foreign language examinations, the program was expanded when demand was great enough, and translated examinations were obtained at no cost to the Department. He testified that he saw no reason for not providing foreign language examinations, and thought that it was a good program.

Third, the English–Only Policy was enacted after the enactment of Amendment 509, but before the Department sought an Attorney General's Opinion regarding the legality of the Policy. Not only was the Opinion issued eight months after the Policy went into effect, but the Attorney General's Opinion was written by an Assistant Attorney General who was concurrently serving as General Counsel to the Department and who was the individual who drafted the Department's request for an Attorney General's Opinion. The same person wrote the Department's request and the Opinion.

Finally, the Defendants' proffered justifications for the English–Only Policy fail in the light of reason. For example, the Defendants rely on the Attorney General's Opinion that states that safety concerns, including the ability to read and understand highway signs and the ability to understand the directions of law enforcement officers, evidently trump any possible problems with Title VI or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In addition to ignoring the Supremacy Clause to the United States Constitution, the Opinion fails to address why these concerns aren't relevant for illiterate English speaking applicants who cannot read and understand highway signs, or the ability, or lack thereof, of deaf applicants to understand the directions of law enforcement officers. Illiterate drivers cannot read, regardless of what language they speak, and deaf drivers cannot hear, regardless of the language they speak or understand.

At the least, the State could be chastised for failing to do a more thorough analysis of its policy. In retrospect, however, this may have made no difference, as the English–Only Policy was already in effect at the time the Attorney General's office issued its Opinion, and the evidence suggests that although Attorney General Opinions in Alabama are advisory only, the Opinion regarding the Department's English–Only Policy was requested and issued because it served to protect the Director from liability. *See Broadfoot v. State*, 28 Ala.App. 260, 182 So. 411, 412 (1938) ("[W]ritten opinions of the Attorney General are not controlling. They are merely advisory and, under the statute [Alabama Code § 36–15–19 (1975) ], such opinions operate only to protect the officer to whom it is directed from liability because of any official act performed by such officer as directed or advised in such opinion."); *see also Hunt v. Tucker*, 875 F.Supp. 1487, (N.D.Ala.1995); *Hunt v. Anderson*, 794 F.Supp. 1557, 1563 (M.D.Ala.1992); *Hill Grocery Co. v. State*, 26 Ala.App. 302, 159 So. 269 (1935); Defs.' Reply at 2 n. 1.

Official English Laws have recently become common, although few have spawned state policies that have been challenged in the courts. Language laws have been struck down as violative of the Equal Protection guarantees of the Fourteenth Amendment or as violative of the First Amendment. *See, e.g., Lau v. Nichols*, 414 U.S. 563, 568–69, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Ruiz v. Hull*, 1998 WL 203081 (Ariz. April 28, 1998). Here, the court finds that the Alabama Department of Public Safety's English–Only Policy violates Title VI; it unjustifiably impacts non-English speaking residents of Alabama on the basis of national origin.

Seventy-five years ago, in *Meyer v. Nebraska,* the Supreme Court addressed the constitutionality of a state statute that made it illegal to teach a language other than English in public or private schools. Justice McReynolds observations are as applicable today as they were then:

It is said the purpose of the legislation was to promote civic development by inhibiting training and education of the immature in foreign tongues and ideals before they could learn English and acquire American ideals, and 'that the English language should be and become the mother tongue of all children reared in this state.' It is also affirmed that the foreign born population is very large, that certain communities commonly use foreign words, follow foreign leaders, move in a foreign atmosphere, and that the children are thereby hindered from becoming citizens of the most useful type and the public safety is imperiled.

*That the state may do much, go very far, indeed, in order to improve the quality of its citizens, physically, mentally and morally, is clear; but the individual has certain fundamental rights which must be respected. The protection of the Constitution extends to all, to those who speak other languages as well as to those born with English on the tongue. Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution— a desirable end cannot be promoted by prohibited means.*

For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide:

'That the wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent.... The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but the offspring of the inferior, or of the better when they chance to be deformed, will be put away in some mysterious, unknown place, as they should be.'

In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius their ideas touching the relation between individual and state were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any Legislature could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution.

The desire of the Legislature to foster a homogeneous people with American ideals prepared readily to understand current discussions of civic matters is easy to appreciate. Unfortunate experiences during the late war and aversion toward every character of truculent adversaries were certainly enough to quicken that aspiration. But the means adopted, we think, exceed the limitations upon the power of the state and conflict with rights assured to plaintiff in error.

*Meyer v. Nebraska,* 262 U.S. 390, 401–02, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (emphasis added).

■ The court finds, and it is CONSIDERED, ADJUDGED and DECLARED that the Department's English–Only Policy violates Title VI of the Civil Rights Act of 1964. Accordingly, Plaintiffs' are entitled to their requested relief.

## V. ORDER

Based on the foregoing, the court finds that Plaintiffs have met the criteria for the awarding of permanent injunctive relief: (1) violation of the applicable statute or regulatory authority by the Defendants; (2) continuing irreparable injury to the Plaintiffs in the absence of an injunction; and (3) lack of an adequate remedy at law. *See Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983); *Sierra Club v. U.S. Army Corps of Engineers,* 935 F.Supp. 1556, 1571–72 (S.D.Ala.1996). The scope of injunctive relief should be tailored to address the specific violations of law by the Defendants. *See, e.g., Madsen v. Women's Health Ctr.,* 512 U.S. 753, 762, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); *cf. McKusick v. City of Melbourne, Fla.,* 96 F.3d 478, 484 n. 5 (11th Cir.1996).

Rather than mandate specific relief at this time, it is CONSIDERED and ORDERED as follows:

(1) Defendants' Motion for Judgment as a Matter of Law on Plaintiffs' Title VI claims be and the same is hereby DENIED.

(2) Plaintiffs' Motion For Leave To Amend Complaint be and the same is hereby GRANTED.

(3) The Alabama Department of Public Safety, its officers, agents, servants, employees, attorneys, and all those in active concert or participation with them, be and the same are hereby PERMANENTLY RESTRAINED AND ENJOINED from enforcing or aiding, abetting, commanding, counseling or procuring the enforcement of the Department's English–Only Policy.

(4) The Director of the Department of Public Safety, in his official capacity, all those in active concert or participation with him; his agents, servants, employees, attorneys, and all those in active concert or participation with them, be and the same are hereby PERMANENTLY RESTRAINED AND ENJOINED from enforcing or aiding, abetting, commanding, counseling or procuring the enforcement of the Department's English–Only Policy.

(5) On or before July 20, 1998, the Defendants shall, in conjunction with the Plaintiffs, fashion proposed policies and practices for the accommodation of Alabama's non-English speaking residents who seek Alabama driver's licenses. Such proposed policies and practices shall be consistent with this Memorandum Opinion, and shall be amended, as necessary, to accommodate additional non-English speaking persons who are not now contemplated.

(6) The Parties shall submit their joint proposals to the court for its review and approval, as appropriate, on or before July 20, 1998.

(7) Should the Parties fail to agree on specific issues, those issues should be cataloged by each Party in a separate pleading, apart from the joint proposals. These separate pleadings shall be filed no later July 24, 1998. The exact issues upon which the Parties could not reach agreement should be specifically identified, and each Party shall delineate its proposal(s), the justification(s) for its proposal(s), and any supporting authority. Grounds considered and rejected by the court in this Memorandum Opinion will not be considered by the court and should not be argued. Nor will the court entertain further arguments on the substantive merits of this action, such as additional proffered justifications for the English–Only Policy or additional evidence known to the Parties but not submitted to the court.

Should a Party intend to file a separate pleading outlining areas of disagreement, that Party shall file a pleading concurrent with the joint proposals filed July 20, 1998, notifying the court of that Party's intention to file a pleading within five days therefrom.

(8) On or before June 26, 1998, the Parties shall provide the court with a status report outlining the Parties' progress in formulating proposed policies and practices consistent with this Memorandum Opinion.

(9) Should the Parties fail to reach agreement as to proposed policies and practices consistent with this Memorandum Opinion, or should the Parties fail to formulate adequate proposals, the court will then mandate specific relief, and will employ court-appointed experts to aid the court in fashioning appropriate relief, with costs taxed as appropriate.

(10) The court retains jurisdiction over this action, and all of its aspects, pending further Order of the court.